

**DEPARTMENT OF THE NAVY**
COMMANDER NAVAL AIR FORCES
BOX 357051
SAN DIEGO CALIFORNIA 92135-7051

5354
Ser N00/097
13 May 19

FINAL ENDORSEMENT on CAPT (b) (6)         , USN, ltr of 16 Aug 18

From:   Commander, Naval Air Forces
To:     File

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
        COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)         USMC AND
        LIEUTENANT COURTLAND A SAVAGE USN

1.  On 10 January 2018, at the request of Commander Naval Air Force Atlantic (CNAL), the Commander, Naval Air Forces (CNAF) Chief of Staff, convened this investigation to determine the facts and circumstances of a series of unresolved Inspector General, Article 1150, and Congressional complaints submitted by Captain (b) (6)         and Lieutenant Courtland Savage throughout the prior year. Capt (b) (6) was removed from the strike fighter training pipeline after a Field Flight Performance Board (FFPB) that concluded on 31 March 2016 and first complained about racial discrimination impacting that process via a formal EO complaint dated 6 December 2017. LT Savage was removed from the pipeline via a Field Naval Aviator Evaluation Board (FNAEB) concluding on 18 April 2017 and first challenged that FNAEB process on the basis of racial discrimination via a Congressional complaint dated 23 July 2017. From the results of this investigation, I make the following determinations:

    a.  The two investigating officers compiled and analyzed over 500 pages of documentation and interviewed 19 witnesses, many of whom had moved on to other commands and geographic locations. The overall conclusion was that Capt (b) (6)  and LT Savage, at different times and for different reasons, failed to complete their fighter training successfully. Based upon the evidence in this investigation and my 37 years of experience in Naval Aviation, the graded events of these two pilots evidence sustained substandard performance and it is highly unlikely they could have completed the fighter syllabus successfully. Consequently, I concur with the conclusions of the FFPB and the FNAEB held for these officers.

    b.  Despite my agreement with the findings of the FFPB and the FNAEB, I do find there was inappropriate conduct by Instructor Pilots who did not treat Replacement Pilots Capt (b) (6)  and LT Savage with appropriate dignity and respect through the assignment and use of discriminatory call signs and inappropriate social media discussions evidencing a general lack of inclusion and professionalism.

    c.  This investigation, covering events which reached back years before the complaints were raised, took over 180 days to complete, and then longer than that to reach final endorsement. Despite the best intentions of all concerned, and the extensive deliberations required to assess the findings and formulate corrective actions this timeline is unacceptable. While the sensitive and

**SAVAGE PE 6, Page 1 of 135**

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)                USMC AND
LIEUTENANT COURTLAND A SAVAGE USN

personal nature of these complaints required a careful, thoughtful, holistic approach, from the
time that LT Savage first raised the issue of racial discrimination with his CO in April of 2017,
through the various unresolved IG, 1150, and Congressional complaints that followed, to the
time that the complaints were elevated for CNAF to investigate, we simply should have moved
faster in gathering the facts and reaching a conclusion.  As a result, I have directed process
improvements to ensure better efficiency in the future.

2.  Subject to the following modifications, the findings of fact and opinions are approved:

a.   Summary: Delete executive summary.  The executive summary is duplicative of the
findings of fact and opinions in the body of the investigation.

b.  Preliminary statement, paragraph (8): Add additional sentence to read, "Capt (b) (6)  was
not required or requested to speak to the investigating officer in person."

c.  FF 21: Delete FF 21.  Information in FF 21 is duplicative with FFs 22 and 23.

d.  FF 34: Add additional sentence to read: "The 'Pure Bloods' group chat is a privately
administered group chat that has no official sanction from VFA 106 leadership or the Navy."

e.  FF 35: Amend to read: "IPs, if a USNA graduate, were often automatically added to Pure
Bloods upon check-in at VFA 106."

f.  FF 37: Amend to read: "Terms used in the group chat included words and phrases that are
used in some contexts as racial slurs or epithets."

g.  FF 38: Delete FF 38.  The facts in FF 38 are duplicative of FF 37.

h.  FF 39: Amend to read: "Capt (b) (6) stated he felt the eggplant emoji was directed
towards him as an offensive racial slur with the popping champagne bottle emoji depicting his
canopy jettison incident from 25 Feb 15."

i.  FF 58: Amend to read: LT Savage was offended by JOPA group chats discussing negative
stereotypes of African-Americans."

j.  FF 66: Delete FF 66.  FF 66 states a personal opinion that is unnecessary to substantiate
the conclusions of the investigation.

k.  FF 76:  Amend to read, "The IO found that no further investigation was required."

l.  FF 83: Delete FF 83. FF 83 states a personal opinion that is unnecessary to substantiate
the conclusions of the investigation.

m.  FF 106: Amend to read: "The CO has the authority to disapprove any call sign anytime.
LtCol (b) (6)  further stated that he never involved the CO in call sign review during his tenure
as the XO."

**SAVAGE PE 6, Page 2 of 135**

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)        USMC AND
LIEUTENANT COURTLAND A SAVAGE USN

n. FF 108: Amend to read: "LT Savage observed other RPs' grades in the SHARP database and used that information to compare his performance."

o. FF 113: Amend to read: "LCDR(b) (6) stated that he did not believe there had been any retaliation against him for his actions to rectify the syllabus and evaluation deficiencies."

p. Opinions 1(g) and 1(h):  List under findings of fact as FF 118 and FF 119 respectively.

q. Opinion 1(i): Amend to read: "Members of the 'Pure Bloods' group, to include Major (b) (6)   and LT (b) (6) who were FFPB members made unprofessional and inappropriate statements and used unprofessional and inappropriate emojis in the group chat."

r. Opinion 2(b): Amend to read: "Regardless of actual intent, a reasonable person could conclude the eggplant emoji used in the 'Pure Bloods" group chat was racially offensive and discriminatory."

s. Opinion 2(c): Delete Opinion 2 (c).  The findings of fact do not substantiate a "feeling" of protection for this behavior.

t. Opinion 3: Amend to read: "While Capt(b) (6)   and LT Savage's claim that their FFPB and FNAEB results were predicated upon racial discrimination, these claims are unsubstantiated. However, the evidence supports a conclusion that certain VFA-106 Instructor Pilots (IPs) did not treat Replacement Pilots (RPs) Capt(b) (6) and LT Savage with appropriate dignity and respect through the assignment and use of discriminatory call signs and inappropriate social media discussions and use outside of the FFPB and FNAEB process."  [FF (1) – (117)]

u. Opinion 5: Delete Opinion 5. This opinion is not relevant to the determinations in this investigation.

v. Opinion 7: Delete second sentence.  The second sentence of Opinion 7 is not relevant to the determinations in this investigation.

3. Corrective actions in this investigation must address both the underlying complaints of Capt (b) (6)  and LT Savage as well as the broader measures required to ensure the integrity and high standards expected throughout Naval Aviation.  Accordingly, subject to the following modifications and additional direction, the recommendations of the investigating officer are approved:

a. Recommendation 1: Recommendation 1 is disapproved. Capt (b) (6) is a U.S. Marine Corps aviator and the recommended action is outside my authority.  I direct a copy of this investigation be provided to Deputy Commandant for Aviation, U.S. Marine Corps for action as he deems appropriate.

b. Recommendation 2: Recommendation 2 is disapproved. LT Savage is no longer on active duty with the U.S. Navy.  Additionally, due to LT Savage's sustained substandard performance

20

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
       LIEUTENANT COURTLAND A SAVAGE USN

during the strike fighter syllabus, convening a new board is inadvisable and highly unlikely to
result it in a different recommendation.

    c.  Recommendation 3: I concur with the recommendation of the investigating officer.  As
stated above, Deputy Commandant for Aviation, U.S. Marine Corps will receive a copy of this
investigation for action as he deems appropriate.

    d.  Recommendation 4: I concur with the recommendation of the investigating officer, and I
direct Commander, Naval Air Force, Atlantic (CNAL), to conduct the counseling on LCDR
(b) (6)   and report completion to me no later than 30 days from the receipt of this endorsement.
Because LT (b) (6) is now assigned to Commander, Carrier Strike Group FOUR, I am forwarding
this investigation to U.S. Fleet Forces Command with my recommendation that he consider the
recommendation for administrative counseling.

    e.  Recommendation 5: I concur with the recommendation of the investigating officer and
further direct the training include guidance on the appropriate use of social media.  The
Commanding Officer shall report completion of this training to me, via CNAL, within 30 days
from receipt of this endorsement.

    f.  Recommendation 6: I concur with the recommendation of the investigating officer and
further direct Chief of Naval Air Training ensure that all training command and Fleet
Replacement Squadrons formalize direction for call sign assignment and review.  The directions
shall include direct oversight by the command's executive officer.  Chief of Naval Air Training
shall report completion no later than 90 days from receipt of this endorsement.

4.  In addition to the recommendations above, I also direct the following corrective action:

    a.  I direct CNAL to take administrative action with regard to LtCol (b) (6)          and
CDR (b) (6)          and report completion to me no later than 30 days from the receipt of
this endorsement.

    b.  Because CAPT (b) (6)     is now assigned to Commander, Carrier Strike Group
EIGHT, I am forwarding this investigation to USFFC and request that they consider conducting
administrative counseling.

5.  Finally, Naval Air Forces will identify and source a diversity and inclusion expert with
training experience in unconscious bias and stereotype threat to deliver training at VFA-106.  As
an enduring requirement, similar training will be incorporated into the prospective commanding
officer and prospective executive officer courses and the Commander Training Symposia.  I
intend to invite LT Savage and Capt (b) (6) to assist in the development of the training
curriculum.  While it is not the responsibility of these officers to create the solution for the
unprofessional and offensive behavior they experienced, it is my hope these officers understand
the sincerity of our commitment in addressing unprofessional behavior and will want to join us
in this corrective action.

21

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
        COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
        LIEUTENANT COURTLAND A SAVAGE USN

6. This investigation is closed; the corrective actions I have directed to ensure the continued high standards and success of Naval Aviation is only beginning.  My point of contact for this matter is CDR Brandon Keith, Deputy Force Judge Advocate, USN, who may be reached at (b) (6)           or brandon.keith@navy.mil.

# (b) (6)

D. H. MILLER III

Copy to:
CUSFFC
DCA HQMC
JAD HQMC
COMNAVAIRLANT
CNATRA
VFA-122
VFA-106
VMFAT-101
LT Savage
Capt (b) (6)

**SAVAGE PE 6, Page 5 of 135**

16 August 18

From:  CAPT (b) (6)          USN
To:    Commander, Naval Air Force, U.S. Pacific Fleet

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)
       USMC AND LT COURTLAND A SAVAGE USN

Ref:   (a) JAGINST 5800.7F (JAGMAN Chapter II)
       (b) OPNAVINST 5354.1G (Navy Equal Opportunity Program)
       (c) Captain Ashley's Complaint of Wrongs under Article 1150 with encls 1-5 of
           01 Mar 17
       (d) Captain (b) (6)  Incorrect Information Included in FFPB Report and
           Mismanagement of FFPB Process with encls 1-29 [Ref (c), encl (3)]
       (e) Captain (b) (6)    Memorandum for the Record to USFFC Inspector General for
           Discrimination and Unequal Treatment with encls 1-4 of 21 Nov 17
       (f) LT Savage's letter to Senator Mark Warner with encls 1-20 of 23 Jul 17
       (g) Office of General Counsel (OGC) Race and Color Discrimination Quick Start Guide
           (QSG)
       (h) COMNAVAIRFORINST 5420.1F (Field Naval Aviator Evaluation Board
           Procedures (FNAEB))
       (i) VFA-106 DEOMI Organizational Climate Survey (17 May 17)
       (j) MCO 1000.6 ACTSMAN

Encl: (1) Appointing order ICO CAPT (b) (6) dtd 09 Apr 18
      (2) Extension order ICO CAPT (b) (6) dtd 19 Apr 18
      (3) Extension order ICO CAPT           dtd 12 Jun 18
      (4) Extension order ICO CAPT (b) (6)   dtd 28 Jun 18
      (5) Appointing order ICO CAPT )(b) (6) dtd 10 Jan 18
      (6) Extension order ICO CAPT (b) (6)   dtd 06 Feb 18
      (7) Extension order ICO CAPT (b) (6)   dtd 19 Mar 18
      (8) Interview of Lt Col (b) (6)         of 16 Apr 18
      (9) Interview of Capt (b) (6)   of 17 Apr 18
      (10) Statement of LT (b) (6) of 19 Apr 18
      (11) Interview of LT .         with Article 31b of 23 Apr 18
      (12) Statement of Maj (b) (6)     with Enclosures 1-3 of 23 Apr 18
      (13) Statement of LCDR (b) (6)   of 02 May 18
      (14) Interview of Maj (b) (6)    with Article 31b of 10 May 18
      (15) Interview of Capt (b) (6)   of 14 May 18
      (16) Interview of Capt (b) (6) of 24 May 18
      (17) Interview of CDR (b) (6)   of 07 Jun 18
      (18) Interview of CAPT (b) (6)  of 20 Jun 18
      (19) Statement of CAPT (b) (6)   of 02 May 18
      (20) Capt (b) (6)    NATOPS Evaluation Report of 19 Feb 16
      (21) Urban Dictionary eggplant emoji screenshot

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)         USMC AND
LT COURTLAND A SAVAGE USN

(22) Statement of LT Savage of 18 Jan 18
(23) Statement of CDR (b) (6) of 23 Jan 18
(24) Statement of Lt Col (b) (6) of 29 Jan 18
(25) Statement of LCDR (b) (6) of 12 Feb 18
(26) Statement of LCDR (b) (6) of 13 Feb 18
(27) Statement of LCDR (b) (6) of 14 Feb 18
(28) Statement of LCDR (b) (6)     of 15 Feb 18
(29) Statement of CDR (b) (6)     of 27 Feb 18
(30) Interview of LCDR (b) (6) of 10 May 18
(31) Interview of LT (b) (6) of 11 May 18
(32) Interview of CDR (b) (6)     of 04 Jun 18
(33) Interview of LT (b) (6)   of 07 Jun 18
(34) Preliminary Inquiry Investigation ICO LT Savage's informal EO Complaint of
26 Apr 17
(35) Email statement of CDR (b) (6) of 04 Jul 18
(36) Email statement of LT (b) (6)   of 09 Jul 18
(37) Statement of LT (b) (6)     of 23 Feb 18
(38) Statement of Lt Col (b) (6)   regarding callsign procedures at VFA-106 of 11 Jul 18
(39) VFA-106 FNAEB FOIA data 2012-2017
(40) NAVPERS 5354/2 (CAPT (b) (6)
(41) NAVPERS 5354/2 (Maj (b) (6) )
(42) NAVPERS 5354/2 (LCDR (b) (6)   )
(43) NAVPERS 5354/2 (LT (b) (6))
(44) NAVPERS 5354/2 (LT         )
(45) NAVPERS 5354/2 (CDR (b) (6)
(46) NAVPERS 5354/2 (LCDR (b) (6)     )

Executive Summary



2

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
        COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
        LT COURTLAND A SAVAGE USN



3

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)         USMC AND
LT COURTLAND A SAVAGE USN



## Preliminary Statement

1. In accordance with references (a) and (b), this reports the command investigation convened pursuant to enclosure (1) to inquire into the facts and circumstances concerning possible orders violations of Department of the Navy (DON) policies on equal opportunity by CAPT (b) (6) former Commanding Officer (CO) of VFA-106, CDR (b) (6)       current CO of VFA-106, Major (b) (6)   of Marine Aviation Training Support Detachment Oceana, and the following current and former IPs at VFA-106: LCDR (b) (6)      , LCDR (b) (6)    LT (b) (6), and LT (b) (6) during a time period from winter 2015 (Capt (b) (6)    start at VFA-106) to spring 2017 (conclusion of LT Savage's FNAEB process).

2. A great deal of time has elapsed since Capt (b) (6)   Field Flight Performance Board (FFPB) dated 31 Mar 16.  Also complicating the matter are the various avenues that he looked for relief through: 1) a Request for Mast from CAPT (b) (6)  2) an IG request to the Marine Corps that was denied, 3) an IG request to CNAL IG that directed him to submit an Article 138 "Complaint against Commanding Officer" which subsequently changed to an Article 1150 "Complaint of

4

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
        COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)            USMC AND
        LT COURTLAND A SAVAGE USN

Wrongs", and ultimately 4) equal opportunity racial discrimination complaint on 06 Dec 17.
Regarding LT Savage's timeline, he reported to VFA-106 14 Jan 16, submitted his letter to
Senator Warner on 23 Jul 17 and submitted his equal opportunity racial discrimination complaint
on 06 Apr 18. He did not submit an Article 138 or Inspector General report.

3.  Two separate EO complaints are contained, discussed and highlighted in this report as they
both involve members of VFA-106. In accordance with ref (b), EO complaints are normally
investigated separately, yet upon further consideration, Commander, Naval Air Force, U.S.
Pacific Fleet (CNAP) Staff Judge Advocate (SJA) combined both complaints into one JAGMAN
report.

4.  CAPT (b) (6)        was first appointed as Investigating Officer by CNAP in Jan 18. He
focused on LT Savage's complaint, gathering statements and conducting interviews. CAPT
(b) (6) had an approved retirement date, and combined with the approved extensions, was unable
to complete the investigation before his last day in the Navy. I utilized all his completed
interviews and statements in this JAGMAN.

5.  All reasonably available evidence was collected, and all pertinent complainants, alleged
offenders and witnesses were either interviewed or gave statements with the exception of CDR
(b) (6)     who elected to obtain counsel.

6.  CNAP Chief of Staff granted five total extensions in the conduct of this investigation due to
the scope, witness availability and primary duty requirements. There are over 500 pages of
documents between both complaints.

7.  CAPT (b) (6) received legal advisement from Commander, Navy Region Mid-Atlantic
(CNRMA) SJA, CNRMA OGC, CNAL IG and CNAP SJA.

8.  Capt (b) (6) , currently living in San Diego, CA, traveled to Norfolk, VA using his own funds
in order to speak to CAPT (b) (6) in-person and bring all relevant documents.

<u>Findings of Fact</u>

1.  Capt (b) (6) named five alleged offenders regarding his formal EO complaint: 1) CAPT (b) (6)
(b) (6)     USN; 2) Maj (b) (6)      , USMC; 3) LCDR (b) (6)      , USN; 4) LT (b) (6)
USN; and 5) LT (b) (6)      , USN. [Ref (d)]

2.  LT Savage named two alleged offenders regarding his formal EO complaint: 1) CDR (b) (6)
(b) (6)     USN; and 2) LCDR (b) (6)         , USN. [Red (d)]

3.  Capt (b) (6) eported to VFA-106 as a Category 1 RP for initial F/A-18C/D training on 09
Jan 15. He was in class 15-2. [Ref (e), Encl (3)]

4.  Capt (b) (6)     FFPB was conducted on 31 Mar 16. [Ref (d), Encl (8)]

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)           USMC AND
LT COURTLAND A SAVAGE USN

5. The Senior Member of the FFPB was Maj (b) (6)     [Ref (d), Encl (10)].

6. A member of the FFPB was LT (b) (6) [Ref (d), Encl (10)].

7. MCO 1000.6 states "An FFPB is an informal administrative board…" and "legal rules of
evidence do not apply". FFPBs "may consider and include in the record any matter of reasonable
authenticity relevant to the case." [Ref (j)]

8. Capt (b) (6)   stated that Maj (b) (6)  did not allow him to be present when the FFPB
interviewed witnesses. [Encl (41)]

9. Maj (b) (6)   stated that Capt (b) (6) did not request to cross-examine witnesses at the time
the board was in session. [Encl (12)]

10. Capt (b) (6)   stated that he was treated differently than white RPs, specifically LT (b) (6) and
LT (b) (6)  that had similar difficulties in the syllabus, because he is African-American. [Ref (e),
Encl (2)]

11. Capt (b) (6)   Below Average % in all Phases was 15.9%. LT (b) (6)  was 12.6%. LT
(b) (6)   was 14.1%. [Ref (e), Encl (2)]

12. CDR (b) (6) stated LT (b) (6) had a real world E.P. headwork issue, not a NATOPS violation
like Capt (b) (6)   mishandling of a Plaining Link Failure. LT (b) (6) had an EP sim the next
day with zero issues. Compared to (b) (6)  it was different. [Encl (23)]

13. CDR (b) (6) stated LT (b) (6) didn't execute tactics well, but had fewer safety concerns than
Capt (b) (6)   [Encl (23)]

13. CDR (b) (6) stated out of LT (b) (6)  LT (b) (6) and LT (b) (6)  none failed an EP warm-
up simulator prior to Fighter Phase. Capt (b) (6)  did the worst with headwork with his NATOPS
check. [Encl (23)]

14. Eleven grade cards from Capt (b) (6)   transition syllabus had standards that were adjusted
from the time of completion of the flights to the time that the board used the grades for FFPB
data. [Ref (d), Encl (6), (7)]

15. The FFPB used a trend analysis excel spreadsheet that utilized the incorrect grades cards and
depicted the cells as yellow vice white. [Ref (d), Encl (4)]

16. VFA-106 adjusts grading standards based upon the recommendation on the Phase Head to
the Commanding Officer via the Training Officer. [Encl (17)]

17. VFA-106 adjusted grading standards in 2014, 2015 and 2016. [Encl (17)]

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)        USMC AND
       LT COURTLAND A SAVAGE USN

18. Capt (b) (6) rankings in SHARP were: a) Transition Phase (70/100); b) Strike Phase
(28/100); c) Overall (55/100).  [Ref (e), Encl (3)]

19. In CAPT (b) (6)  FFPB endorsement letter, it states Capt (b) (6)  rankings as: a)
Transition Phase (70/100); b) initial attempt at Strike Phase (84/100); c) Basic Fighter
Maneuvering (BFM) Phase (83/100); d) Fighter Weapons and Tactics (FWT) Phase (100/100);
Overall (99/100).  [Ref (d), Encl (11)]

20. CAPT (b) (6) tasked the Training Department to conduct an in-depth review, an apples-to-
apples comparison, between Capt (b) (6) and other RPs in order to better capture Capt (b) (6)
ranking.  [Encl (18)]

(b) (5) (b) (6)

22. CAPT (b) (6)  stated rankings are extremely fluid and change frequently as event grade
sheets are continually entered into the system.  [Encl (19)]

23. CAPT (b) (6) stated that an RP can graduate and move on even if ranked 100/100.
Conversely, a top ranking RP will not graduate if they cannot safely and successfully complete a
particular training objective such as night carrier qualification.  [Encl (19)]

24. CDR (b) (6) squadron Training Officer, conducted a "trend analysis" on Capt (b) (6) due to
his poor performance on SFAM-116 and his NATOPS check ride.  [Ref (d), Encl (9)]

25. Capt (b) (6) did not receive a Signal of Difficulty (SOD) for SFAM-116.  [Ref (d), Encl (8)]

26. Capt (b) (6) did pass his NATOPS check, although the IP, LT (b) (6)  stated it was below
average.  [Ref (d), Encl (8), (20)]

27. CAPT (b) (6) never signed Capt (b) (6)  NATOPS check.  [Encl (20)]

28. CDR (b) (6)  gave Capt (b) (6) a SOD for trend analysis on 19 Feb 16.  It was Capt (b) (6)
5th SOD.  [Ref (d), Encl (9)]

29. CDR (b) (6) had previously conducted a trend analysis on other RPs identified as struggling.
[Encl (17)]

30. CDR (b) (6) had never given an RP a SOD for trend analysis prior to Capt (b) (6) [Encl
(17)]

31. The endorsement routing for a Marine Pilot under instruction at a Navy FRS (e.g., VFA-
106) and respondent assigned for initial training: (a) CO, FRS; (b) CO, MATSG; (c) Type Wing
Commander; (d) TYCOM; and (e) Commandant of the Marine Corps. [Ref (h), Encl (12), pg 12]

7

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6) USMC AND
LT COURTLAND A SAVAGE USN

32. The FFPB endorsement routing was: (a) CO, VFA-106; (b) CO, MATSG-33; (c) CO, Marine Corps Intelligence Schools; (d) Commanding General, Marine Corps Training Command; and (e) Deputy Commandant for Aviation. [Ref (d), Encl (8)]

33. ASM-52 at the Pentagon determined the FFPB routing and described it as unique. [Encl (8)]

34. Pure Bloods group chat consisted of VFA-106 IPs that were U.S. Naval Academy graduates. [Encl (11)]

35. (b) (5)
(b) (5) [Encl (30)]

36. LT (b) (6) an African-American IP and USNA graduate, was not automatically added to Pure Bloods and is not member, as of his interview. [Encl (33)]

37. (b) (5)
(b) (5)                                          [Ref (e), Encl (1)]

# (b) (5)

39. (b) (5) (b) (6)
(b) (5)
[Ref (e)]

40. The Class 15-2 t-shirt depicts an F/A-18 jettisoning its canopy and states "Once you pop, the fun don't stop". [Ref (e), Encl (1)]

41. LT Savage's name appeared in the Pure Bloods group chat during the eggplant emoji discussion. [Ref (e), Encl (1)]

42. According to the website www.urbandictionary.com, the eggplant emoji is used as a substitute for penis. [Encl (21)]

43. Maj (b) (6) was a member of Pure Bloods. [Encl(12)]

44. Maj (b) (6) in reference to Capt (b) (6) stated "That's the price to pay in this community. You do stupid shit, you get made fun of. Or you killself/others. His attrition was his small price to pay. Frankly, we did his ass (and the community's) a favor. But his bullshit makes me professionally embarrassed." [Ref (e), Encl (1)]

45. LCDR (b) (6) was a member of Pure Bloods. [Encl (13)]

46. LT (b) (6) was a member of Pure Bloods. [Encl (11)]

8

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN(b) (6) _____ USMC AND
LT COURTLAND A SAVAGE USN

47.  LCDR (b) (6)  used the eggplant emoji to depict a penis and combined it with a popping
champagne bottle emoji to describe masturbation (i.e., "you beat me"). [Encl (13)]

48.  LT (b) (6) used the eggplant emoji to depict a penis, combined it with a popping champagne
bottle emoji to describe masturbation (i.e.' "you beat me"). [Encl (10)]

49.  In the Pure Bloods chat, LT (b) (6) did use a black hand emoji to confirm that LT Savage was
African-American and in-fact the other RP involved in the EO complaint.  [Encl (10)]

50.  LT Savage reported to VFA-106 as a Category 1 Replacement Pilot (RP) for initial F/A-
18E/F training on 14 Jan 16.  He was in class 16-3. [Ref (f), Encl (4)]

51.  LT Savage's Field Naval Aviator Evaluation Board (FNAEB) was conducted on 18 Apr 17.
[Ref (f), Encl (4)]

52.  LT Savage's FNAEB was routed in accordance with Ref (h).  [Ref (f), Encl (4)]

53.  The senior member of the FNAEB was CDR (b) (6) , USN.  [Ref (f), Encl (4)]

54.  LT Savage stated that CDR (b) (6) told him at the conclusion of the FNAEB, that he (LT
Savage) was "more than capable of successfully transitioning to another platform".  [Ref (f)]

55.  CDR (b) (6)  stated he does not have any recollection of anyone on the board telling LT
Savage he was capable of successfully transitioning to another platform.  [Encl (35)]

56.  LT Savage stated when he started at VFA-106, he heard jokes that might be considered
insensitive or even racist.  [Encl (22)]

57.  LT Savage stated that he, along with other minority pilots, was treated differently than non-
minority pilots with the result being that we were targeted for attrition from the program.  [Ref
(f), Encl (4)]

58.  (b) (5)
(b) (5)                                            [Ref (f), Encl (1)]

59.  LT (b) (6) stated on the JOPA group chat that IPs used negative stereo-types to describe
single demographics and had a general negative attitude towards minorities.  [Encl (31)]

60.  LT Savage stated he never felt comfortable bringing up his concerns to most people because
he worried that it would have a negative impact on his career.  [Ref (f), Encl (4)]

61.  CDR (b) (6) , an African-American Instructor Weapons System Operator (IWSO) and the
squadron Operations Officer, stated the allegations of racial bias raised in LT Savage's complaint
are without merit.  [Encl (29)]

9

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
LT COURTLAND A SAVAGE USN

62. CDR (b) (6)    stated that LT Savage was not attrited because of racial bias, but because he
was a danger to himself and others when in the air. [Encl (29)]

63. CDR (b) (6)    , an African-American and former VFA-106 IP, stated there is no culture
of attrition or blatant weeding out, "you're in the FRS now". [Encl (32)]

64. CDR (b) (6)    was attached to VFA-106 three times during his 20+ year career and
never experience racial discrimination at the squadron. [Encl (32)]

65. LCDR (b) (6)    an African-American IP, stated that he has not found VFA-106 to be a
hostile working environment for African-Americans, and he has not experienced racial bias in
this command (VFA-106). [Encl (27)]

(b) (6) (b) (5)

67. LT Savage stated that he was targeted for attrition by LCDR (b) (6)    (squadron Training
Officer) during his FSTK-117 because he gave him his 8th and final SOD for a task not included
on the flight card, strafing. [Ref (f)]

68. CDR (b) (6)  was the FAC(A) on LT Savage's FSTK-117 and stated although strafing is
not normally part of the FSTK 117, he was the instructor that directed LT Savage to execute
those runs for two reasons: LT Savage failed to execute the required syllabus actions; and he
hoped that, since LT Savage had successfully strafed numerous times in previous events, he
would at least be able to complete those tasks. [Encl (29)]

69. Regarding the requirement for strafing on the FSTK-117 flight, LCDR (b) (6)  believed this
was taken into account by his instructors as they believed that based on the extra training LT
Savage had that he should have been able to complete the event albeit with a slightly increased
level of difficulty. [Encl (27)]

70. LT Savage informed LCDR (b) (6) that he felt he was being targeted for attrition. [Ref (f)]

71. LCDR (b) (6) informed CDR (b) (6)  of LT Savage's claim of being targeted for
attrition due to racial discrimination. [Encl (27)]

72. CDR (b) (6)    directed that a Preliminary Investigation (PI) be conducted to determine
whether LT Savage's concerns were valid. [Encl (27)]

73. LT (b) (6)    , a VFA-106 IP, conducted the PI into LT Savage's allegations of racial
discrimination. [Encl (34)]

10

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
LT COURTLAND A SAVAGE USN

74. LT (b) (6) _ received legal advisement from the VFA-106 Legal Officer prior to
conducting the PI. [Encl (36)]

75. LT (b) (6) _ read LT Savage his Article 31b rights prior to interviewing him for the PI
as directed by the Legal Officer. [Encl (36)]

76. (b) (5)
(b) (5)                                                              [Encl
(34)]

77. LT Savage stated in the past year and a half, three pilots, including himself, were attrited
from training due to "performance", and all three were minorities (two African-Americans and
one Hispanic). [Ref (f)]

78. CNAL has not tracked racial metrics regarding FNAEBs since 2001. [Encl (30)]

79. CNAL does track gender metrics regarding FNAEBs. [Encl (30)]

80. LCDR Cook is the CNAL FNAEB Program Manager. [Encl (30)]

81. LCDR (b) (6) stated that LT Savage received significantly more training opportunities than
other VFA-106 FNAEBs. [Encl (30)]

82. LT Savage received a total of 8 SODs up through the Strike syllabus. The average RP SODs
through end of Strike Phase is 0.83. [Ref (f), Encl (4)]

(b) (5)

84. LT Savage stated that LT (b) (6) vas assigned as his mentor following his PRB. [Ref
(f)]

85. LT Savage stated that he met with LT (b) (6) on at most six occasions and never
appeared to be more than a formality and "check in the box". [Ref (f)]

86. LT Savage stated that he and his mentor had only minimal meetings for four months. [Ref
(f)]

87. LT (b) (6) stated that he was assigned as LT Savage's mentor because he was having
difficulty in the Strike Phase, and LT (b) (6) is a qualified Joint Terminal Attack Controller
(JTAC) and Forward Air Controller, Airborne (FAC(A)), and has deep experience in the skills
necessary to succeed in the strike mission. [Encl (37)]

11

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
       LT COURTLAND A SAVAGE USN

88.  LT (b) (6)      stated he met with LT Savage on at least 10 separate occasions between
November 2016 and February 2017. [Encl (37)]

89.  LT (b) (6)      stated they devised a remediation plan that included both a commitment to
spend more time studying, as well as the execution of a number of simulators to address certain
shortfalls.  [Encl (37)]

90.  LT (b) (6)      stated he offered LT Savage his personal support to help in any aspect of his
training; however, LT Savage neither approached him for his assistance nor shared with him any
concerns about his ability to successfully complete the Strike Phase on his second attempt.  [Encl
(37)]

91.  LT Savage stated that his callsign for a large portion of his training was "Radio", after a
mentally challenged African-American man in a movie of the same name. [Ref (f)]

92.  Capt (b) (6)  stated that his callsign is "Kazaam" which is supposed mimic "ka-boom" for
the sound when he jettisoned the canopy off the jet.  Kazaam is also a character from the movie
"Kazaam" portrayed by the African-American basketball player Shaquille O'Neal.  [Encl (16)]

93.  LCDR (b) (6) stated that he received the callsign "Radio" during his first Fleet squadron,
VFA-115.  [Encl (27)]

94.  LCDR (b) (6)  stated he was advised by a mentor to change his callsign from "Radio" to
"MC" to avoid negative perceptions.  He had the nickname of "MC" since childhood in reference
to the singer MC Hammer.  [Encl (27)]

95.  CDR (b) (6)      callsign is "Snoop" and stated he received it in his first JO tour (2003)
due his poor rapping abilities.  [Encl (32)]

96.  LT (b) (6)      stated his callsign is "Ruby Rhod" because of his physical likeliness to the
movie character in "The Fifth Element" played by Chris Tucker, an African-American actor.
[Encl (33)]

97.  LT (b) (6)      received the callsign Ruby Rhod at his first Fleet squadron, VFA-115.  [Encl
(33)]

98.  CDR (b) (6)      stated that LT Savage's callsign while attached to VFA-106 was "Mr.
Bucket" which had no racial connotation.  [Encl (29)]

99.  CDR (b) (6)      stated that he does not know of any minority aviators that received any
callsign at VFA-106 that had any racial component.  [Encl (29)]

100.  CDR (b) (6)      was the IWSO for LT Savage's for SSTK-116 (dtd 10/20/2016).  In the
overall comments section, CDR (b) (6)      refers to LT Savage as "Radio" three times.  This
simulator was prior to the Strike Det.  [Ref (f), Encl (15)]

12

**SAVAGE PE 6, Page 17 of 135**

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
LT COURTLAND A SAVAGE USN

101. LCDR (b) (6)      stated that LT Savage's Callsign Review Board occurred while on
detachment at Mountain Home AFB and his callsign was "Mr. Bucket". [Encl (28)]

102. LT Savage stated that white pilots receive callsigns based on their personalities or actions,
as opposed to their race.  [Ref (f)]

103. LtCol (b) (6) VFA-106 XO, stated the squadron's procedures for awarding callsigns for
CAT 1 RPs. [Encl (38)]

104. The callsign review board at VFA-106 is informal and not codified in an instruction. [Encl
(38)]

105. VFA-106 leadership provided informal guidance for callsigns, such as 1) Callsigns need to
be appropriate in nature but, are not confined to those that do not understand our culture and
history; 2) They will not be derogatory in nature.  Fun and humorous is good but they are not to
be offensive to the aircrew or any other.  [Encl (38)]

106. (b) (5)
(b) (5)
(b) (5)                              [Encl (38)]

107. On 26 Apr 18, LCDR (b) (6) Assistant Training Officer, participated in a meeting with
CDR (b) (6)      and LT Savage to discuss his perception of his performance compared to his
peers.  [Ref (f)]

108. (b) (5)
(b) (5)                                          [Ref (f)]

109. After the meeting, LCDR (b) (6) sent an email to all IPs that SHARP flight and gradesheet
logging was going to change in order to streamline the process.  [Ref (f), Encl (19)]

110. LT Savage claims that the Training Department's restriction of RP SHARP access to other
RPs' grades was a direct action to prevent the discovery of bias and inconsistencies in the
grading system.  [Ref (f)]

111. LCDR (b) (6) stated that the process of modifying the way that students submitted
gradesheets had been underway for weeks.  The change was seen as a way to both streamline
submission and limit students' sharing of personal information with others.  [Encl (25)]

112. LT Savage stated that LCDR (b) (6) an IP, was targeted for retaliation when he provided
information to Capt (b) (6) regarding his complaint.  LT Savage stated this had a chilling effect
on his ability to come forward and report discrimination.  [Ref (f)]

13

**SAVAGE PE 6, Page 18 of 135**

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)    USMC AND
LT COURTLAND A SAVAGE USN

113. (b) (5)(b) (6)            (b) (6)



(b) (5)                [Encl (26)]

114. The Overall Unit Summary of 17 May 17 DEOMI Organizational Climate Survey
(DEOCS) indicated that VFA-106 was at, or near Navy norms for all discriminatory behaviors,
including both Racist Behaviors and Racial Discrimination. [Ref (i), pg 55-57]

Equal Opportunity Standards

115. The Navy is comprised of men and women who work together to accomplish the mission.
Each member of the Navy is entitled to be treated with dignity and respect, and to work in an
environment free of harassment and unlawful discrimination. Additionally, each member is
expected to abide by the Navy core values of honor, courage and commitment. Harassment and
unlawful discrimination must not be ignored or condoned. [Ref (b), Chapter 1/2.Policy/para (c)]

116. Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or
name calling, physical assaults, intimidation, ridicule or mockery, insults or put-downs, offensive
objects or pictures, and interference with work performance regardless of the means of
communication (oral, written, e-mail, texts messages, social media, etc.). [Ref (b), Chapter
1/2.Policy/para (g)/sub para (1)]

117. Responsibilities: (a) Treat others with dignity and respect; and (b) Prevent destructive
behaviors and promote an environment of professionalism, dignity, respect, and trust for all.
[Ref (b), Chapter 2/10.Service Members/para (a)]

Opinions

1. There is an appearance of tainting Capt (b) (6)  FFPB process due to multiple
inconsistencies (e.g., data, endorsement routing, RP rankings), combined with racially offensive
symbols/comments from white IPs, and unprofessional and disparaging remarks from the senior
board member. The following supports:

    a. While in accordance with MCO 1000.6, yet in order to be completely transparent in
the FFPB process, Maj (b) (6) should have ordered Capt (b) (6) to be present when the
Board interviewed witnesses and allowed Capt (b) (6) to cross-examine the witnesses, if
desired. [FF (7), (8), (9)]

    b. Capt (b) (6) FFPB used incorrect grade card data that indicated he was below
average in Admin Comm and Headwork/CRM. [FF (14), (15), (16), (17)]

14

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6) ........... USMC AND
LT COURTLAND A SAVAGE USN

c.  The FFPB utilized VFA-106's ranking system as a basis for his removal, yet SHARP
does not account for event re-flys, therefore rankings are calculated by staff IPs which
allows for too much subjectivity and possible bias.  [FF (17), (18), (19), (20), (21), (22)]

d.  The subjective ranks included in the FFPB put Capt (b) (6) at a disadvantage.  [FF
(14), (15), (16), (17), (18), (19), (20), (21), (22)]

e.  ASM-52's decision to route the FFPB for endorsement through two non-aviation
commands put Cap (b) (6)  at a disadvantage.  [FF (31), (32), (33)]

f.  CDR (b) (6) should not have issued a SOD for trend analysis since there was no
precedent for that instance.  Instead, if Capt (b) (6)  did not pass his NATOPS
checkflight, remediation should have been completed IAW OPNAVINST 3710.  [FF
(23), (24), (25), (26), (27), (28), (29)]

FF 118 LCDR (b) (6)  and LT (b) (6) use of the eggplant emoji was found to be racial
discriminatory and offensive by Capt (b) (6) .  [FF (34), (35), (36), (37), (38), (39), (45),
(46), (115), (116), (117)]

FF 119 LCDR (b) (6)  and LT (b) (6) use of the eggplant emoji was intended to convey
"penis".  [FF(45), (46), (47), (48)]

i. (b) (5)                                          (b) (6)              (b) (6)
(b) (5)
(b) (5)        [FF (5), (6), (34), (37)]

j.  Per the OGC QSG and similar to a Caucasian person hanging a Confederate flag in a
work place with an African-American person, the eggplant emojis displayed the Pure
Bloods group chat created a perception of racial discrimination.  [FF (37), (38)]

k.  Maj (b) (6)  made unprofessional and demeaning comments regarding Capt (b) (6)
performance at VFA-106, and his ultimate removal from the squadron.  [FF (43), (44),
(115), (116), (117)]

2.  There is an appearance of tainting LT Savage's FNAEB process, although less significant
than Capt (b) (6)  through subjective RP rankings and racially offensive symbols/comments
from white IPs in the Pure Bloods/JOPA group chat.  The following supports:

a.  The subjective ranks included in the FNAEB put LT Savage at a disadvantage.  [FF
(16), (17)]

b.  (b) (5)
(b) (5)
(b) (5)                                                      [FF (37), (38)]

15

Subj:   COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
LT COURTLAND A SAVAGE USN

(b) (5)

3. (b) (5)          (b) (6)
(b) (5)
(b) (5)                                                      [FF (61), (62), (63), (64),
(65), (66)]

4.  The preponderance of the evidence clearly indicates that LT Savage was a struggling aviator
who received extra attention from the command in order to help him overcome performance
deficiencies.  [FF (68), (72), (73), (76), (81), (87), (88), (89), (90)]

(b) (5)

6.  Although many IPs stated that LT Savage's claim that his callsign was "Radio" vice "Mr.
Bucket" was false, CDR (b) (6)    referred to LT Savage as "Radio" on a grade card,
substantiating that it was LT Savage's callsign at one time, even if "unofficial".  [FF (98), (100),
(102)]

7.  VFA-106's action to prevent RPs from accessing other RPs' SHARP gradesheets, is in
accordance with Navy policy for the protection of PII, should never have been allowed in the
beginning and is not an attempt to cover up racial bias.  (b) (5)
(b) (5)
(b) (5)          [FF (107), (108), (109), (110), (111)]

8.  LCDR (b) (6) was not targeted by command leadership for assisting either Capt (b) (6) or LT
Savage in their EO complaint.  [FF (112), (113)]

Recommendations

1.  I recommend that ASM-52 direct VMFAT-101 to convene a FFPB regarding Capt (b) (6)
VFA-106 FRS training syllabus. This will allow for a more transparent and fair process because
of the following factors:

a.  Squadron should utilize a new excel spreadsheet to correctly depict cells as white, vice
yellow, removing the perception of below average performance;

b.  Squadron should utilize grade cards with correct blue standard blocks in order to
remove the perception of below average performance;

c.  Squadron should utilize only SHARP derived rankings;

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106 MADE BY CAPTAIN (b) (6)          USMC AND
       LT COURTLAND A SAVAGE USN

    d.  Squadron will utilize established Marine Corps endorsement routing; and

    e.  Be free from any perception of racial bias from staff IPs

2.  I recommend that CNAL, via CNAP, direct VFA-122 to convene a FNAEB regarding LT
Savage's VFA-106 FRS training syllabus. This will allow for a more transparent and fair process
because of the following factors:

    a.  Squadron should utilize only SHARP derived rankings

    b.  Be free from any perception of racial bias from staff IPs.

3.  I recommend that Maj (b) (6)  receive a Non-Punitive Letter of Caution for his disparaging
remarks regarding Capt (b) (6)

4.  I recommend that LCDR (b) (6)   and LT (b) (6) receive formal counseling regarding the
inappropriate use of text messages/emojis in a professional environment.

5.  I recommend that all VFA-106 Officers receive Equal Opportunity training from its Echelon
II command.

6.  I recommend that VFA-106 establish formal guidance (i.e., squadron instruction) regarding
the awarding of callsigns to CAT 1 RPs. This formal guidance should include: 1) a designated
head of the board that should be at a minimum an O-4; and 2) required minority/female board
membership if a minority/female CAT 1 RP is receiving a callsign.



CAPT, USN



**DEPARTMENT OF THE NAVY**
COMMANDER NAVAL AIR FORCE
UNITED STATES PACIFIC FLEET
BOX 357051
SAN DIEGO CALIFORNIA 92135-7051

5340
Ser N01/221
9 Apr 18

From: Commander, Naval Air Force, U.S. Pacific Fleet
To: CAPT (b) (6) USN

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
COMPLAINT AT VFA-106

Ref: (a) JAGMAN Chapter II
(b) OPNAVINST 5340.1F CH-1

1. This appoints you, per reference (a), to inquire into the facts and circumstances surrounding the basis of the equal opportunity complaint by LT Courtland A. Savage, USN and Capt. (b) (6) (b) (6) , USMC.

2. Investigate the basis of the complaint, determine the validity of the allegations made in the complaint, and recommend any appropriate administrative or disciplinary action. Report your findings of facts, opinions, and recommendations in letter form by April 30, 2018, unless an extension of time is granted. If you have not previously done so, read Chapter II of reference (a) as well as reference (b) in its entirety before beginning your inquiry.

3. You may seek legal advice from my Deputy Force Judge Advocate, CDR (b) (6) JAGC, USN, during the course of the investigation. She may be reached at (619) 545-5045 or by e-mail at (b) (6)

(b) (6)

J. J. CZEREWKO
Chief of Staff



**DEPARTMENT OF THE NAVY
COMMANDER NAVAL AIR FORCE
U.S. PACIFIC FLEET
BOX 357051
SAN DIEGO CALIFORNIA 92135-7051**

5340
Ser N01/ 221
19 Apr 18

From: Commander, Naval Air Force, U.S. Pacific Fleet
To:    CAPT (b) (6)     USN

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106

Ref:   (a) JAGMAN Chapter II
       (b) OPNAVINST 5340.1F CH-1

1.  Per references (a) and (b), as the appointed investigating officer, you have requested an extension to your initial due date to report your findings.  Your request is made due to the totality of both complaints and the two-year time lapse between alleged misconduct and complaint, which impacts easy availability of witnesses due to PCS/reassignment.

2.  Your request for an extension until 30 May 2018 is hereby granted.

**(b) (6)**

J. J. CZEREWKO
Chief of Staff



**DEPARTMENT OF THE NAVY**
COMMANDER NAVAL AIR FORCE
UNITED STATES PACIFIC FLEET
BOX 357051
SAN DIEGO CALIFORNIA 92135-7051

5340
Ser N01/ 348
12 JUN 18

From:  Commander, Naval Air Force, U.S. Pacific Fleet
To:      CAPT (b) (6)      USN

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
         COMPLAINT AT VFA-106

Ref:    (a) JAGMAN Chapter II
         (b) OPNAVINST 5340.1F CH-1

1.  Per references (a) and (b), as the appointed investigating officer, you have requested an
extension to your initial date to report your findings.

2.  Your request of an extension until 29 June 2018 is hereby granted.

3.  You may seek legal advice from LCDR (b) (6)      , JAGC, USN, during the course of the
investigation.  He may be reached at (619) 545-2796 or by e-mail at (b) (6)

(b) (6)

J.U. RZEREWKO
Chief of Staff



**DEPARTMENT OF THE NAVY**
**COMMANDER NAVAL AIR FORCE**
**U.S. PACIFIC FLEET**
**BOX 357051**
**SAN DIEGO CALIFORNIA 92135-7051**

5340
Ser N01/ 389
2 8 JUN 2018

From: Commander, Naval Air Force, U.S. Pacific Fleet
To:     CAPT (b) (6)      USN

Subj: COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106

Ref:   (a) JAGMAN Chapter II
       (b) OPNAVINST 5340.1F CH-1

1.  Per references (a) and (b), as the appointed investigating officer, you have requested an
extension to your initial due date to report your findings.

2.  Your request for an extension is hereby granted, but only until 13 July 2018.  Report your
findings of facts, opinions, and recommendations in letter form by 13 July 2018.

3   You may seek legal advice from LT (b) (6)      , JAGC, USN, during the course of the
investigation.  He may be reached at (619) 545-4785, or by email at
(b) (6)

(b) (6)

J.J. CZEREWKO
Chief of Staff



**DEPARTMENT OF THE NAVY**
COMMANDER, NAVAL AIR FORCE, U.S. PACIFIC FLEET
BOX 357051
SAN DIEGO CALIFORNIA 92135-7051

5340
Ser N01/ 025
10 Jan 18

From: Commander, Naval Air Force, U.S. Pacific Fleet
To:    CAPT (b) (6)            , USN

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106

Ref:   (a) JAGMAN Chapter II
       (b) OPNAVINST 5340.1F CH-1

1.  This appoints you, per reference (a), to inquire into the facts and circumstances surrounding
the basis of the equal opportunity complaint submitted to Honorable Mark Warner, United States
Senate by LT Courtland A. Savage.

2.  Investigate the basis of the complaint, determine the validity of the allegations made in the
complaint, and recommend any appropriate administrative or disciplinary action. Report your
findings of facts, opinions, and recommendations in letter form by 2 February 2018, unless an
extension of time is granted. If you have not previously done so, read Chapter II of reference (a)
as well as reference (b) in its entirety before beginning your inquiry.

3.  You may seek legal advice from my Deputy Force Judge Advocate, CDR (b) (6)
JAGC, USN, during the course of the investigation. She may be reached at (b) (6)            or by
e-mail at (b) (6)

**(b) (6)**

J. CZEREWKO
Chief of Staff



**DEPARTMENT OF THE NAVY**
COMMANDER, NAVAL AIR FORCE, U.S. PACIFIC FLEET
BOX 357051
SAN DIEGO CALIFORNIA 92135-7051

5340
Ser N01/ 081
6 Feb 18

From:  Commander, Naval Air Force, U.S. Pacific Fleet
To:      CAPT (b) (6)                USN

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
         COMPLAINT AT VFA-106

Ref:    (a) JAGMAN Chapter II
         (b) OPNAVINST 5340.1F CH-1

1.  Per references (a) and (b), as the appointed investigating officer, you have requested an extension to your initial due date to report your findings.

2.  Your request for an extension until 2 March 2018 is hereby granted.

(b) (6)

J. J. CZEREWKO
Chief of Staff



**DEPARTMENT OF THE NAVY**
**COMMANDER NAVAL AIR FORCE**
**U.S. PACIFIC FLEET**
**BOX 357051**
**SAN DIEGO CALIFORNIA 92135-7051**

5340
Ser N01/ 179
19 Mar 18

From:  Commander, Naval Air Force, U.S. Pacific Fleet
To:    CAPT (b) (6)          USN

Subj:  COMMAND INVESTIGATION INTO FORMAL EQUAL OPPORTUNITY
       COMPLAINT AT VFA-106

Ref:   (a) JAGMAN Chapter II
       (b) OPNAVINST 5340.1F CH-1

1.  Per references (a) and (b), as the appointed investigating officer, you have requested an extension to your initial due date to report your findings.

2.  Your request for an extension until 23 March 2018 is hereby granted.

(b) (6)

C. A. CLAPPERTON
Chief of Staff
Acting

16 Apr 18

Telephone interview with Lt Col (b) (6)      (ASM-52)

1. Was the endorsement process correct for Capt. (b) (6) s FFPB?

   Yes.  That was determined by this office, but it was a unique
   situation.  MATSG-33 did not have a clear ISIC as it was
   transitioning from a "command" to a "detachment".  This
   office decided that the routing should go from MATSG-33 to
   Marine Corps Intelligence Schools to Marine Corps Training
   Command.

17 Apr 18

Initial telephone interview of Capt (b) (6)

Originally from Chicago, IL
Enlisted in the Marine Corps in 2003; infantry, fought in Iraq
Attended Embry-Riddle Aeronautical University
Commercial airline pilot with American Eagle out of Iona, IL
Currently assigned at VMGR-352
Not married, long term girl friend

1. What is your ends?
For the wrong to be corrected; original MOS reinstated; want to
be a Hornet pilot again; FFPB removed from the record.
I was treated differently than my white counter-parts

19 APR 18

Subj:   STATEMENT BY LT (b)(6)          , INSTRUCTOR, VFA-106

1.  Following my initial Fleet tour on the west coast, I
reported to VFA-106 in June 2015 and have been an Instructor
Pilot (IP) there since.  I have served as a Schedules Officer,
the Carrier Qualification (CQ)Courseware Officer, Assistant CQ
Phase Head and finally as the CQ Phase Head.

2.  I was not present in the command when Capt (b)(6)    began the
F/A-18 FRS syllabus.  When I joined the command, he had already
completed the transition phase and had already gone through his
first attempt at the strike syllabus.  I was not a qualified
instructor at that time and have never personally flown with
Capt (b)(6)   in his entire time with VFA-106.  My only personal
interactions with him were on a professional basis through
greeting him in passing in the squadron spaces or in conducting
official business while he was the Squadron Duty Officer (SDO).

3.  In my duties as a schedules officer, I was responsible for
the writing of the simulator and flight schedules along with
approximately 10 other instructors.  It was during the execution
of these duties that I learned of his struggles throughout the
syllabus from other instructors.  He was identified as a student
struggling and was issued a refresher syllabus by CDR (b)(6)  ,
VFA-106 Training Officer, after his first unsuccessful attempt
at the strike syllabus. I can't remember if there was specific
guidance given but in general practice at the time, he would
have been scheduled to fly with senior instructors who were
designated Standardization Instructor Pilots for the strike
phase in order to ensure performance standards were met and
training was conducted in accordance with the FRS syllabus. Capt
(b)(6)    again failed the strike syllabus on his second attempt
and was recommended to a FFPB which resulted in his removal from
the F/A-18 FRS syllabus.  I was not a member of his FFPB and
because I had never flown with him nor was a qualified
instructor in that phase at the time I have no knowledge of
those proceedings.

4.  Capt (b)(6)     specific EO allegation against me comes in
referencing a WhatsApp Group Chat called "Pure Bloods" in
November 2017.  "Pure Bloods" is a reference to commissioning
source and specifically was a group of current and former
instructors who were all US Naval Academy (USNA) graduates where
we generally discuss football games and USNA activities.  This
specific conversation regarding Capt (b)(6)    and LTJG Savage

began with someone sending out a picture of an F/A-18 canopy laying on the ground in a storage area and someone asking if the mishap instructor pilot lost something, in reference to Capt (b)(6)    accidental jettisoning of a canopy.  The conversation continued with 13 current and former instructors about his continued press for investigation into his removal from the F/A-18 FRS syllabus based on a perceived racist bias against him. The conversation was a private conversation among peers about his and LTJG Savage's EO complaint and their performance in the syllabus.  The conversation was a frank discussion that was not intended for dissemination but shows that there was no racial bias in their removal from the syllabus and was done so because of concern for their safety and the safety of others.

5.  Capt (b)(6)    alleges that I and others used an eggplant emoji as code for a racial slur in reference to him and that it was evidence of systemic racial bias against him at VFA-106.  The eggplant emoji is commonly known as the penis emoji based on its phallic shape.  In fact, the eggplant emoji is specifically referenced in the major motion picture movie trailer BLOCKERS, released this month, where the eggplant emoji is referred to as the "dick emoji" and not any other racist meaning.  A recent military.com article even states that the eggplant emoji is typically known as a phallic reference but Capt (b)(6)    alleges that it was used as a racist term for him.  In the whatsapp conversation, I and one other person used the eggplant emoji in conjunction with an opening champagne bottle toward one another and not in reference to Capt (b)(6)    in anyway.  Specifically, I made a statement on the chat that the other person "beat me" to a similar comment about the investigation.  The other person posted the eggplant and champagne bottle popping as a crude hand job joke that he had ejaculated because I "beat him".  Several comments later the other former instructor similarly says that I "beat him" to a comment and I subsequently posted the eggplant and champagne bottle emojis making a similar hand job / ejaculation joke to him.  The eggplant emoji was never used as code for a racial slur against Capt (b)(6)    and I had never heard of the eggplant being a racial slur against African Americans previously.

6.  Capt (b)(6)    also makes an allegation against me that I used a black finger emoji in reference to LTJG Savage and that this act is inherently racist and further evidence of the bias against both of them.  The black finger emoji when read in the context of the conversation shows that I made a statement that Capt (b)(6)    was trying to bring LTJG Savage in on the EO complaint against VFA-106.  Another person asks "white dude?"

and I laugh and state "That's the irony" in reference to the poor optics of the situation that another African American had been removed from training for performance.  A third instructor asks "Savage?", and I used the black finger emoji to both confirm the name of the student and the fact that he is indeed African American.  I then make a statement one comment later that their removal from training was coincidental and that they were both going to kill themselves implying that there was no racist motivation to their removal from training but it was out of concern for their safety and the safety of others.  This entire conversation continues on further to be a frank discussion on performance issues in the aircraft for both students and not based on race.

7.  I have been at VFA-106 for almost 3 years and believe that all of the IPs work hard to maintain fair standards for all of the students.  Although I am not a minority pilot, I have not witnessed bias against any RP, regardless of race, religion or gender.  I actually think that it would be nearly impossible for the systemic racial bias that Capt (b)(6)   and LTJG Savage allege, or any racial bias, to exist at VFA-106 because it would be found out too quickly and not allowed to continue.

_____

(b)(6)                                        DATE
LT, USN

23 Apr 18

### LT (b) (6) interview

a.read and waived Article 31 rights
unclassified
rules of evidence
(b) (6)
Separating in Sep 2018
Starting with Delta Airlines in 30 days


1. What is your background and when did you report to VFA-106?
Reported to -106 in June 15.  Previously at VFA-94 (CVW-17/USS
VINSON).  Currently an FRS Instructor Pilot (IP) at -106.

2. What was your first impression of Capt (b) (6)?
No real first impression. Aware of issues in Strike Syllabus
therefore scheduled with Stan IPs

3. Did any other students repeat the Strike Syllabus?
Yes, a student WSO.

4. Did the "Pure Bloods" group chat exist when you arrived at -106?
Yes, it was built at -106.

5. Is everyone in "Pure Bloods" a USNA grad?
Yes, to the best of my knowledge.

6. Is that known to everyone?
Yes, they (the non-USNA IPs) make fun of us.  There is a "JOPA"
group as well, but more of a coordination thing.  One of many
uses: discuss RPs and red box scheduler.

7. Can non-USNA IPs join "Pure Bloods"?
They don't want to.

8. When are the PB messages from? Nov 17?
No, Sep 17.

9. Why would someone comment on an event that took place in 2015
on Capt (b) (6) s first flight?  Two years later?
I don't know.

10. How did Capt (b) (6) get hold of the messages?

From LT (b) (6)          a -106 IP and Legal Officer in the
squadron.  Is he a part of PB? Yes, but he's since been removed
from the group.

11. Are there any minorities (African-American, Hispanic, Asian,
female, homosexuals, etc)in PB?
Several women, maybe an African-American.


12. Have you used the eggplant emoji previously and in what
context?
Yes, as a penis.  I never would have used it as a racial
comment.

13. What color, if any, do you use for self-depiction in text
messages?
I don't always use white, but have before.  Know an African-
American that uses black.

14. What other African-American Officers have you seen go
through -106 during your time in the squadron?

Three prior African-American Officer, 2 pilots and 1 WSO in the
last three years.  LT (b)(6)    who went to a VFA squadron in
Japan.  If he got Japan, then he had to be in the top half of
his FRS class and great boat grades.  He was after Ashley and
before Savage.  Also LT (b)(6)   one of the top WSO, who went to
VFA-211 in CVW-1.

15. Per para 7 in your statement, why would systemic racism be
"nearly impossible" to exist at -106?
It's a huge flight schedule with too many people.  Someone would
know and see it, put something in CO's suggestion box, DEOCS.

## ARTICLE 31 RIGHTS

Name: **(b) (6)**    Rank/Rate: LT / O - 3    Activity:

Unit: VFA -106

Telephone number:

I have been advised that I may be suspected of the offense(s) of:
— Article 92: failure to obey order or and that:
regulation of DOD Directive 1020.02E

(b)(6) [ ]    I have the right to remain silent.    Diversity Management and Equal Opportunity

[ ]    Any statements I do make may be used as evidence against me in trial by court-martial.

[ ]    I have the right to consult with lawyer counsel prior to any questioning. This lawyer counsel may be a civilian lawyer retained by me at my own expense, a military lawyer appointed to act as my counsel without cost to me, or both.

[ ]    I have the right to have such retained civilian lawyer and/or appointed military lawyer present during this interview.

[ ]    I have the right to terminate this interview at any time.

### **WAIVER OF RIGHTS**

(b)(6) [ ]    I further certify and acknowledge that I have read the above statement of my rights and fully understand them, and that:

(b)(6) [ ]    I expressly desire to waive my right to remain silent.

[ ]    I expressly desire to make a statement.

[ ]    I expressly do not desire to consult with either a civilian lawyer retained by me or a military lawyer appointed as my counsel without cost to me prior to questioning.

[ ]    I expressly do not desire to have such a lawyer present with me during this interview.

[ ]    This acknowledgment and waiver of rights is made freely and voluntarily by me, and without any promises or threats having been made to me or pressure or coercion of any kind having been used against me.

**(b) (6)**  04/23/2018    **(b) (6)**   23 APR 2018
(Witness signature/date)    (Member signature/date)
**(b) (6)**    LT USN

Understanding my rights under U.C.M.J. Article 31, I wish to make the following statement:

_____

Naval Justice School    03/16
Publication    X-1

**SAVAGE PE 6, Page 37 of 135**



**DEPARTMENT OF THE NAVY**
HEADQUARTERS UNITED STATES MARINE CORPS
3000 MARINE CORPS PENTAGON
WASHINGTON, DC 20350-3000

IN REPLY REFER TO:
5420
ASM-52
15 Aug 16

MEMORANDUM FOR THE RECORD

From:   Senior Member, Flight Status Selection Board (FSSB)
To:     Deputy Commandant for Aviation

Subj:   FLIGHT STATUS SELECTION BOARD ICO FIRST LIEUTENANT (b)(6)
        (b)(6)  (b)(6)            USMC

Ref:    (a) MCO 1000.6, Assignment, Classification, and Travel
            Systems Manual (ACTS Manual)

Encl:   (1) Senior Member, FFPB ltr 5420 FFPB, dtd 31 Mar 16

1. The Flight Status Selection Board (FSSB) met at 1000 on 15 August
2016 to review the enclosure in accordance with the reference. First
Lieutenant (b)(6)   having been properly apprised of the time and place
of the FSSB, elected to appear before the Board and provided a closing
statement.

2. Background

    a. On 31 March 2016, a Field Flight Performance Board (FFPB) was
convened by the Commanding Officer, VFA-106 in order to evaluate First
Lieutenant (b)(6)  s status as a Naval Aviator.  The FFPB was initiated
due to First Lieutenant (b)(6)  s overall poor performance throughout
the F/A-18 CAT I Fleet Replacement Squadron syllabus.

    b. FFPB: Recommended **Transition.**

    c. CO, VFA-106: Recommended **Revocation of Flight Status.**

    d. CO, MATSG-33: Recommended **Revocation of Flight Status.**

    e. Commander, MCIS: Recommended **Revocation of Flight Status.**

    f. CG, TRNGCMD: Recommended **Revocation of Flight Status.**

3. FSSB Findings and Opinions

    a. The FSSB conducted a thorough analysis of both the facts and
personal testimony of First Lieutenant (b)(6)   The Board found that
the procedures of the Field Flight Performance Board were in
accordance with all relevant orders and directives.

    b. The FSSB believes that First Lieutenant (b)(6) is suitable
for continued service as a Naval Aviator.

Enclosure (1)

Subj:   FLIGHT STATUS SELECTION BOARD ICO FIRST LIEUTENANT (b) (6)
(b) (6) (b) (6)          USMC

4.   FSSB Recommendation. Upon careful consideration of the references
and endorsements, the Board recommends Transition to a multi-crew
fixed-wing platform, if possible C-9/C-40.



(b) (6)
Col          USMC
Senior Member

(b) (6)
Col          USMC
Member

(b) (6)
LtCol        USMC
Member

(b) (6)
LCDR MC (FS) USN
Member

(b) (6)
LtCol        USMC
Recorder

Copy to:
CMC (MMOA-2/3 & MMRP-20)
CG, TRNGCMD
CO, MCIS
OIC, MATSD-33
CO, VFA-106
1stLt (b) (6)

2

Enclosure (1)



EVIDENCE PROVIDED BY SUBJECT OF COMPLAINT

FFPB Submitted: 31 Mar 2016

→ Monday, September 11 was in 2017.
This private conversation took place
18 months after FFPB submitted.
(In 2016, September 11 was a Sunday)

Enclosure (2)

This is the jet canopy that (b) (6) (b) (6) inadvertently jettisoned on his first flight in the F-18. There was a non-standard plan to have him in the back seat, for which there are no simulators, and he had no experience with. This incident was not o•cially held against him.

This is in regards to Capt (b) (6) FOIA request, which was denied.

The eggplant is a racial slur and the popping champagne bottle is in reference to the jettisoned canopy



*EVIDENCE COMPLAINANT PROVIDED*

*⟹ No date for context of when this private conversation took place*

*Evidence (?)*

ııll Verizon LTE    08:48    ✈ ✱ 99% ▭
dictionary.com

## Who uses 🍆 ?

The *eggplant* emoji is also called the *aubergine* emoji in the UK and Japan. While it can literally refer to the food item (say, if someone was talking about an eggplant parmesan recipe), it's most often used online to represent the penis. This is in large part to the fact that the emoji representations of other oblong foods associated with penises, like the banana or cucumber, look less phallic.

The *eggplant emoji* is frequently combined with other emoji. When paired with the *mouth* emoji, it can suggest oral sex. When compared with the *peach* emoji, which people liken to a butt or female genitalia, it can mean anal or vaginal sex. Coupled with the *sweat droplets*

---

ııll Verizon LTE    08:49    ✱ 98% ▭
dictionary.com

liken to a butt or female genitalia, it can mean anal or vaginal sex. Coupled with the *sweat droplets* emoji, it can represent ejaculation. Because of its suggestiveness, the *eggplant* emoji is often used in sexting.

The *eggplant emoji* has become so associated with the penis that people even use the word *eggplant* as a stand in, or euphemism for, the word *penis*.

## For example



---

ııll Verizon LTE    08:51    ✈ ✱ 97% ▭
🔒 google.com    ↻

urbandictionary.com  ⌐Ð  ⋮

**3**

# Eggplant Emoji

**Dick**.

**Eggplant** emojis are commonly used to represent **male** genetalia.

*I **sent** her some **wild eggplant emoji** pics*

by **breanna gregory** July 05, 2016



<   

---

ııll Verizon LTE    08:52    ✱ 96% ▭
🔒 google.com    ↻

## MOTHERBOARD

We finally have solid evidence that the ubiquitous crying-while-laughing face is the most used emoji in the world, and that everyone is using the eggplant as a dick, according to a new analysis from third-party mobile keyboard company SwiftKey.

SwiftKey aggregated more than 1 billion emojis sent by millions of users of its keyboard cloud system (an opt-in service that analyzes what users type to responsively predict their most-used words) between October 2014 and January 2015. It divided the

<   

*Enclosure(3)*

.ıll Verizon  LTE          08:53          ∗ 95% ▬

🔒 google.com          ↻

**MOTHERBOARD**

| America leads the world in use of these emoji | | | | |
|---|---|---|---|---|
|  | | | | |

Source: SwiftKey 

Canadians, meanwhile, used "raunchy" category emojis, such as the jerking-off fist and the smiley poop, more often than average. But there is one

‹          ⬆️     📖     ⧉

.ıll Verizon  LTE          08:53          ∗ 95% ▬

🔒 google.com          ↻

**MOTHERBOARD**

SwiftKey also chose to categorize the eggplant emoji under "raunchy" rather than food, a nod to the common understanding that it's often used as a phallic symbol. Its popularity compared to other food emojis—the eggplant is used 0.05 percent of the time in the US compared to 0.02 percent for the corn or 0.01 percent for the tomato—indicates it most likely isn't being used to represent the vegetable. Nobody eats eggplant that much.

It's not exactly ground-breaking

‹          ⬆️     📖     ⧉

Enclosure (3)

(b) (6)
23 Apr 2018

From: Major (b) (6)    USMC, Assistant Operations Officer, Strike-Fighter Squadron ONE ZERO SIX
To:   CAPTAIN (b) (6)   USN, N3, CNRMA

Subj:  STATEMENT REGARDING EQUAL OPPORTUNITY COMPLAINT

Encl:  (1) Flight Status Selection Board (FSSB) Memorandum of Senior Member, dtd 15 Aug 16
       (2) Screenshot of What's App Chat Conversation with Date of Conversation as 11 Sep 17
       (3) Screenshots of Meaning of the Eggplant Emoticon from Multiple Internet Sources

On 24 Feb 16, the CO of VFA-106 appointed me via a Convening Order as the senior member of a Field Flight Performance Board (FFPB) for First Lieutenant (1stLt or Lt) Jason A. (b) (6)  At the time, I was the XO of Marine Aviation Training Support Group-33 (MATSG-33), the "PSD" for Marines aboard NAS Oceana. I was also an Instructor Pilot at VFA-106.  An FFPB is the process for which Marine Aviators undergo for flight performance issues that persist when unit level means of correcting flight deficiencies have been exhausted (Human Factors Board (HFB), Performance Review Board (PRB), counseling, remedial syllabi, etc). The governing document for a Marine FFPBs is MCO 1000.6, the USMC ACTS Manual.

At the time of the Convening Order, I was aware 1stLt (b) (6) was having issues with performance, although I, and other board members, did not yet know the full extent. As the XO of MATSG-33, it was my job to have situational awareness to where each Marine student was in the syllabus, and how they were generally performing.  1stLt (b) (6) reputation at this time was that he was a hard worker, determined to succeed, and a polite and professional officer.  When I was appointed, to started looking into his HFB, PRB, grade sheets, and his performance in Flight School.  I officially gave notification of the FFPB to Lt Ashley on 24 Feb 16, FFPB Encl (2) which he signed. (The FFPB is not enclosed in this document due to PII and its size, but can be provided upon request.)  This Notification states what his rights are and that he understands them. I cannot recall if he had any questions at the time of notification.

At 1400 on 29 Feb 16, the FFPB was convened by me and three other board members:  LCDR (b) (6) (b) (6)           , Flight Surgeon; LT (b) (6)         , VFA-106 Instructor Pilot; and LT (b) (6)        , VFA-106 Instructor Pilot.  **It is noted in the FFPB's Preliminary Statement that Lt Ashley did not object to the composition of the board.**  The board met with Lt (b) (6) and several other witnesses who were available.  The board conducted an in-depth analysis of Lt (b) (6) record that covered his performance at VFA-106 and in flight school, and are included in the FFPB report and its enclosures. Lt (b) (6) requested statements from several instructors from VFA-106 and flight school on his behalf, and they were also included in the FFPB package. IAW the FFPB checklist, Lt (b) (6)   was allowed to access and review all materials considered by the FFPB prior to the report's initial submission to the Convening Officer, CAPT (b) (6)  , VFA-106 CO. He submitted a written statement that is included as Enclosure (17) to the FFPB.

One of the concerns that Lt (b) (6) expressed to me at the time just before submittal, and in his written statement (Pg 10 of 45, FFPB Encl (17)), was what MCO 1000.6 says about no witness or "interested party" being a member of the board.  I explained to him that no member of the board was your instructor for one of your failed events (called "SODs" or Signal of Difficulty or "pink sheet"), and I, as the senior member, has never flown with him.  LT (b) (6) flew two flights with Lt (b) (6) (2x FAM flights); in both flights there were no issues or concerns noted by the IP.  LT (b) (6) flew a Fighter-Weapons flight that was a "nice" flight; he also flew a Fighter-Weapons sim that was considered "average." In fact, one of

the gradesheets Lt (b) (6) submitted in his written statement to highlight comments that show "I am improving and I correct my mistakes" (Pg 8 of 45, FFPB Encl (17)) is a grade sheet from LT (b) (6) a supposed "interested party" board member (Pg 15 of 45). He seems to be playing both sides of the coin. The point is that over the course of a student's syllabus, a student will end up flying with almost all of the instructors in the squadron. This is especially true in Lt (b) (6)  case as he has flown many additional flights and sims beyond what the syllabus allots. To put experienced instructors on the board who have had no contact with the respondent is not practical. VFA-106 instructors are not, by default, interested parties, but are used since they have a breadth of experience instructing many FRS students and intimately understand the characteristics and trends of struggling FRS students. Ultimately for this FFPB, the decisions of the board were made based on the evidence included in the FFPB, and nothing outside of the evidence included in the FFPB.

Another complaint that Lt (b) (6) had about the FFPB that was documented in his initial statement (FFPB Encl (17)) was that he didn't have the opportunity to sit in on the board when the panel interviewed other witnesses (Pg 10 of 45, FFPB Encl (17)), nor did he have the ability to cross-examine the witness. The FFPB process does not dictate either of these as a right, nor did he even request to do so at the time the board was in session. **MCO 1000.6 states, "An FFPB is an informal administrative board..." and "legal rules of evidence and testimony do not apply," and FFPBs "may consider and include in the record any matter of reasonable authenticity relevant to the case." He was advised of, and acknowledged, all of his rights pertaining to the FFPB in his Notification, FFPB Encl (2). Furthermore, the board ensured his rights were not infringed and allowed him to exercise those rights.**

After Lt (b) (6) submitted his written statement, it took another couple of weeks to type up the FFPB Report. The determination of the FFPB was for him to transition to another manned Marine aviation platform other than TACAIR. The FFPB was submitted to the Convening Officer, CO VFA-106, after which the respondent is now given his official copy of the entire FFPB Report, including enclosures. On 5 May 16, he signed an acknowledgment (FFPB Encl (26)) that he was provided the completed FFPB and he noted his desire to make a statement. On 12 May 16, Lt (b) (6) provided his Response to the Completed FFPB (FFPB Encl (27)).

One of the complaints that Lt (b) (6) had in is Response was about the routing of the FFPB. According to COMNAVAIRFORINST 5420.1F on page 2, Marine Aviators assigned to Navy Commands shall be processed using the procedures outlined in reference (a), which is MCO 1000.6 ACTS Manual. In the 5420.1F, it also says that the FFPB report shall be routed via FRS CO, MATSG CO, Type Wing Commander, TYCOM, then CMC. This is a disagreement in the routing chain between 5420.1F and MCO 1000.6. However, even the 5420.1F, on page 18 states, "Where conflicts exist between this instruction and reference (a) [MCO 1000.6], the procedures outlined in reference (a) **shall** be used." Bottom line, a Marine FFPB will use a Marine Corps Order. I called the Marine Corps' FFPB SME, LtCol (b) (6)  ASM-52 about this conflict, and he directed the FFPB be routed VFA-106 CO, MATSG CO, MCIS CO, USMC Trng Cmd CG, CMC. As a result of this conflict, I believe ASM-52 and the Navy's FNAEB SME collectively updated the 5420.1F to correct this conflict. I tried to explain this to Lt (b) (6) several times, but he didn't want to accept the fact that MCO 1000.6 abides and that the way the FFPB was routed was correct.

Now that the FFPB was submitted, my job was to be apprised of what level of command the FFPB was at and to get copies of each endorsement along the way. On 28 Jun 16, Lt (b) (6) submitted a NAVMC 11296, Request Mast (RM) to see CAPT (b) (6)  VFA-106 CO. The RM went through me since at this point I am the Detachment Commander of MATSD Oceana (formally MATSG-33). The RM was heard by

2

CAPT (b) (6)   on 8 Jul 16. Lt (b) (6) submitted a written statement where he again complained of the FFPB being improperly routed. Other complaints were: He was not allowed to make a rebuttal and that additional information was added to the FFPB report. He requested that my FFPB report be recalled and another report be conducted on the basis of the board members being interested parties. CAPT (b) (6) thoroughly responded in writing to Lt (b) (6)  RM statement in which he alluded to the board's actions being IAW MCO 1000.6 and refuted the claims of Lt (b) (6)  (CAPT (b) (6)     response can be provided upon request.)

The RM submitted by Lt (b) (6) corresponds to the time when Officers in the squadron started to have a negative impression of him. He was dissatisfied and refused to accept the results of the FFPB. As a result, he tried to discredit the credibility of the board process. The accusations of procedural errors, that he didn't have chances to respond, that he couldn't question witnesses or sit in during witness interviews, that the board has "interested parties," that the board used methods or evidence that was not authorized, to name a few, became a ceaseless attack. He requested Mast again, but this time with the Marine Corps Intelligence Schools (MCIS) CO, Col (b) (6)   (I cannot recall the date). His attempts at redress were tedious and time consuming.

The four endorsements the FFPB required before getting to the FSSB, addressed to the level of detail and effort that went into the FFPB. "The FFPB did an admirable job thoroughly reviewing 1stLt (b) (6) overall performance and providing well thought out opinions and recommendations." "The FFPB report thoroughly details the strengths and weaknesses of 1stLt (b) (6).." On 15 Aug 16, the FSSB published the memorandum of their decision to transition Lt (b) (6) to KC-130Js, agreeing with the FFPB's recommendation. In the FSSB's Findings and Opinions, **"the Board found that the procedures of the Field Flight Performance Board were in accordance with all relevant orders and directives"** (Encl (1)). The FFPB package was accepted by each level of command in the routing chain, and was not rejected or sent back for any bias or a lack of impartiality.

While waiting for his orders to train in KC-130Js, Lt (b) (6) worked at MATSD Oceana and reported to me. Not much was expected of him during the day; I had him working on a PI and I believe a LOD Determination. He had a lot of latitude to PT, come in mid-morning and leave early afternoon. Around the end of Aug 16, he received his PCS orders to report to MATSG-22 on NAS Corpus Christi. He set up his check out to be the first week in Sep 16, although I can't recall the exact date. On the day he left, he came into MATSD Oceana, picked up his orders with the Marines up front, then took off. He never checked out with me, told me he's leaving, or submitted to me his MROW for his fitrep. I was surprised at his lack of decorum to see me, or even call to let me know he was leaving. I called him on his phone a few minutes later and he said he was already two hours on the road. I counseled him for lack of professionalism, yet still wished him luck in his new career path.

A few days later, I called the MATSG-22 XO, LtCol (b) (6)   to let him know that Lt (b) (6) was on his way to Corpus Christi, and he seemed to already be expecting him. I gave him a summary of his time at VFA-106, to include his dissatisfaction with the results of the process starting with the FFPB. I also asked him if he would be willing to brief Lt (b) (6) on proper check out procedures and courtesy.

From about Sep 16 until I turned over MATSD Commander in Aug 17, I worked daily with LtCol (b) (6) VFA-106 XO, on Marine issues. Newly promoted Capt (b) (6) had initiated an IG complaint against VFA-106, still seeking redress of his attrition from the F/A-18 pipeline. I was not given the details. During this time, LtCol (b) (6)   would occasionally ask me for information about the FFPB and FSSB so that he could answer RFIs related to the IG. I do not know for sure if the IG went up the USMC or USN chain,

3

(b) (6)

23 Apr 2018

but either way it involved VFA-106. From what I understand, other instructors at VFA-106 were interviewed concerning the IG and the instructor cadre knew something "not good" was brewing.

By this point, negative sentiment had started to develop amongst the instructors about Capt (b) (6) Instructors were upset that Capt (b) (6) was manipulating the system after he was attrited, and was casting undeserved aspersions upon the command which naturally offended the instructor base. Though rumor at the time, it was believed that the IG/CONGRINT was based on racial discrimination, which further frustrated the instructor corps.

Shortly after joining VFA-106 in 2015, I was invited into a private chat room called "Pure Bloods" on What's App. This is an unofficial app we use on cell phones to better enhance our communication amongst the instructors. There are different chat rooms we use for different purposes: some for use at work amongst different departments, and some that are recreational. **Pure Bloods is a chat room for instructors that are USNA graduates.** We pass info about Navy Football games and tickets, talk about homecoming, coordinate wearing our class rings on Fridays, quote old Academy sayings, make jokes, and give each other a hard time.

On Monday, 11 Sep 17, **eighteen months after I submitted the FFPB** (Encl (2)), a conversation began about Capt (b) (6) that started with a joke about when the canopy was blown off of an F/A-18. Capt Ashley, at this time, was assigned to his fleet KC-130 squadron at MCAS Miramar, CA. After months of hearing these unfounded claims brewing against VFA-106, the collective frustration of the situation manifested itself in the conversation.

It appears Capt (b) (6) has issue with my comment on the chat, in reference to a class t-shirt that made light of the canopy incident. He thinks it showed I had bias a year-and-a-half prior at the time of the board. **My comment made on a private chat well after the FFPB was completed, was after Capt (b) (6) repeated attempts to manipulate the system and criticize a fair process. However, prior to, and during the FFPB, the sentiment behind my comment did not exist since it was his actions post-adjudication that inspired that sentiment.**

Capt (b) (6) accused me of "not stopping or reporting a racist conversation" on the chat. **I did not see a racist conversation take place, therefore, there was nothing to stop or report.** As to the use of the eggplant emoticon by another member on the chat, I have included Encl (3) to reflect my understanding of it.

In my opinion, Capt (b) (6) didn't like the end result of the FFPB/FSSB process—even though he got a better outcome than others historically have—and he is trying every method he can to overturn the results, culminating in making these unfounded accusations.



4

(b) (6)

Statement in regards to Capt. (b) (6) USMC

On a chat, someone posted a photo of a canopy lying on the ground. This reminded me of Capt. (b) (6) and caused me to ask if anyone had heard he was suing VFA-106 on the grounds of racial discrimination. At the same time another member of the chat posted the same fact, however my comment was posted first. That member then posted that I had beat him to the punch. At which point I posted an eggplant emoji and a champagne bottle exploding to indicate that I was winning, in so much that I was the first to post that detail. At the same time that I responded to the first commenter, a third person asked who we were talking about, and that comment posted just before my emoji response. Due to all of these texts posting nearly at the same time (all have the same time stamp), the question as to who we were talking about posted in between the back and forth between myself and the first commenter. At no point did I use an eggplant to describe Capt. (b) (6) In fact, I did not even know, nor have I ever heard of the eggplant having a derogatory racial connotation. I was simply responding to another person saying that I was quicker to the draw.

The chat's name is "Pure Bloods." This chat refers to Naval Academy Graduates. It has zero racial connotations and only exists to bolster of our academy pride. It is a tongue in cheek reference to the fact that we feel that our college is better than everyone else's institution of higher learning.

10 May 18

- Did you use FFPB Administrative Checklist (tool) dtd
  18Nov10?
    o Para 6. Why did you not allow respondent (Capt (b)(6) )
      to read and receive of a copy FFPB, and allow comments
      prior to sending to Convening authority (CAPT (b)(6) )?

- What is considered an "interested party"?

- Did you ever unofficially counsel him that jets just wasn't
  for him?

- Do you believe you did everything correctly, IAW
  instructions?


***Upon meeting with Major (b)(6)   to conduct the personal
interview, he elected not to waive his Article 31 rights,
therefore I was unable to conduct the interview.***

10 May 18

- Did you use FFPB Administrative Checklist (tool) dtd
  18Nov10?
    o Para 6. Why did you not allow respondent (Capt (b) (6)
      to read and receive of a copy FFPB, and allow comments
      prior to sending to Convening authority (CAPT (b) (6))?

- What is considered an "interested party"?

- Did you ever unofficially counsel him that jets just wasn't
  for him?

- Do you believe you did everything correctly, IAW
  instructions?


***Upon meeting with Major (b) (6)    to conduct the personal
interview, he elected not to waive his Article 31 rights,
therefore I was unable to conduct the interview.***

Rights Advisement Forms

## ARTICLE 31 RIGHTS

Name: (b) (6)  Rank/Rate: _Major/O -4_  Activity:

Unit: _VFA-106_

Telephone number:

I have been advised that I may be suspected of the offense(s) of:
— _Article 92: failure to obey order or_ and that: _regulation of DoD Directive 1020.02E_
                                                    _Diversity Management and Equal_
[✓] I have the right to remain silent.                          _Opportunity_
[✓] Any statements I do make may be used as evidence against me in trial by court-
martial.
[✓] I have the right to consult with lawyer counsel prior to any questioning. This lawyer
counsel may be a civilian lawyer retained by me at my own expense, a military
lawyer appointed to act as my counsel without cost to me, or both.
[✓] I have the right to have such retained civilian lawyer and/or appointed military
lawyer present during this interview.
[✓] I have the right to terminate this interview at any time.

## WAIVER OF RIGHTS

[ ] I further certify and acknowledge that I have read the above statement of my rights
and fully understand them, and that:
[ ] I expressly desire to waive my right to remain silent.
[ ] I expressly desire to make a statement.
[ ] I expressly do not desire to consult with either a civilian lawyer retained by
me or a military lawyer appointed as my counsel without cost to me prior to
questioning.
[ ] I expressly do not desire to have such a lawyer present with me during this
interview.
[ ] This acknowledgment and waiver of rights is made freely and voluntarily by
me, and without any promises or threats having been made to me or pressure
or coercion of any kind having been used against me.

(b) (6) _5/10/18_   (b) (6)  _10 MAY 18_
(Witness signature/date)         (Member signature/date)

Understanding my rights under U.C.M.J. Article 31, I wish to make the following statement:

Naval Justice School          03/16
Publication          X-1

14 May 18

Telephone interview with Capt (b) (6)

1. Can you tell me other African-American RPs that may have been subjected to racial bias, besides LT Savage?  Other minorities, such as Hispanics or females?

Yes, LTJG (b) (6)    and two female RPs during my time there.

2. Were there any African-American/minority/female staff IPs during your time at VFA-106?

No minorities, but I did fly with two female pilots.

3. Where had you seen/heard the word "eggplant" used prior?

In my community it means nigger.  It's also listed on the website as a synonym for nigger.

4. Do you know any other meanings for the eggplant emoji specifically?

No.

5. You've never heard it used to represent a penis?

No.

6. What does "Pure Bloods" mean to you?

To me that has racial connotations because no other minorities were in the chat.

7. Let's discuss the aptitude test from the HFB.  Who briefed you on it?

LT (b) (6) my assigned mentor.  He said it was an evaluation and not training.  I thought it would consist of training flights to help me improve on what deficiencies I had, instead it was to see if I should continue in the syllabus.

24 May 18

Personal interview of Capt (b) (6)

Capt (b) (6) flew to Norfolk at his own expense to meet in-person
with me to discuss his case in-depth.  He brought with him all
supporting documents to give to me.  The discussion lasted more
than 2.5 hours.  The following are comments and/or questions.
"He" refers to Capt Ashley.

- Originally in class 15-1

- He didn't start off so well in the squadron with the canopy
jettison, but thought it was behind him.

- He'd seen the word nigger used in one of the group chats early
one at his time in the squadron.  He was very surprised that
officers would be saying it.

- LT (b)(6)        was his class advisor.  Didn't have much
interaction with him.

- He was never invited to any social functions, figured because
he was older than most RPs.

- He did everything he was supposed to do; never made waves with
IPs no issues at all, other than the color issue.

- Received a SOD on BFM-103 directed by Lt Col (b)(6)      IP was
LT(b)(6) and (b)(6)    an observer.  Was NORDO during the flight
(cannon plug issue) that complicated the flight.

- Conducted re-fly with CDR (b)(6)  (Training Officer) in back
seat of his aircraft (F/A-18B).  Lead on re-fly was LT(b)(6)  (on
FFPB).

- Solo flight the next day, LT (b)(6)  was single seat aircraft.
CDR (b)(6)   directed the SDO to change LT (b)(6)   aircraft to
F/A-18F so he could observe flight from back seat.  Passed BFM-
103 flight with LT (b)(6)

- "Felt the pressure that they are out to get me.  I can see the
set up."

- Other RPs did worse than me and continued in syllabus.

- EP review simulator (FFAM-116) with Mr. (b) (6)    (civilian instructor)

- NATOPS check sim, aircraft went 90 degrees off centerline and he ejected.

- He received a SOD for "trend analysis" (enclosure 9) conducted by CDR (b) (6)    although he passed his NATOPS review and NATOPS check ride (SFAM-116 by LT (b) (6)   ).

- LT (b) (6)    was a rollback into 15-5.  Failed FQCL-101 and was given NATOPS check the same day.

- LT (b) (6)    was retained in syllabus after receiving six SODs to include his NATOPS check and failed an additional flight at the carrier.

- Why did FFPB create a new excel spreadsheet (vertical red/yellow/green)?

- Non-aviator in MATSG chain of command/endorsing chain; just rubber stamped the recommendation.

- His callsign is (b) (6)    which is supposed mimic "ka-boom" for the sound when he jettisoned the canopy off the jet. (b) (6)    is also a character from the movie (b) (6)    portrayed by the African-American basketball player Shaquille O'Neal.

07 Jun 18

Personal interview of CDR (b) (6)

- currently CO of VFA-213 at NAS Oceana
- Was Training Officer (T.O.) at VFA-106 from May 2014-Dec 2016.

1. Do you believe that Capt (b) (6)   FFPB was a legitimate removal from training?

Yes, it was completed 100% above board, supremely confident.

2. Is there racism at VFA-106?

No.  There's no indication that someone was judges by race only. There were indications that some male instructors were easier on two female WSOs.  We addressed it.

3. Can you explain what "trend analysis" is and how it is used?

Trend analysis was used by the T.O. for any student that was identified as struggling. We wanted to ensure that anyone going to the Fleet, was ready for the Fleet.

4. Tell me your impression of Capt (b) (6)   performance.

He thinks he was stopped because of tactical development, but he wasn't. He's missing the point. It was for safety of flight issues. I flew with him multiple times. His lack of situational awareness would endanger himself and others.

5. Didn't he pass his NATOPS check with LT (b) (6)  ?

Although the paperwork is signed by the IP and RP, the CO did not sign it.  After the IP debriefed me on the flight, I recommended to the CO that he not sign it. It was the straw that broke the camel's back.

6. Have you ever given a SOD for trend analysis?

No, but completed the analysis for other RPs.

7. Did you think to give Capt (b) (6) a Marine mentor?

In 2015, we did not have the option. Major (b) (6)   was a guest IP, had the XO, a PXO, and Major (b) (6)       the Operations

Officer.  Didn't have a USMC J.O. There was a Capt, but he was
PCSing. LT(b)(6) was an up-and-comer.

8. The PRB recommended an "aptitude" syllabus.  Was that normal?

Not normal, but not the first or the last. It was a mix of
flights, there was a high threat CAS tactical simulator.  He had
an improving trend, but it was not enough.

9. If an RP receives a SOD, is your policy to re-fly the next
day?

It depends on the reason for the SOD. If the IP believes the RP
just needs to fix one issue, then yes. On detachment, you
usually would because your time is limited and you want to get
two Xs per day per student.

10. So the fact that Capt(b)(6)  received a SOD for a flight in
the morning, then flew a night flight, then reflew the SOD
flight the next morning wasn't unusual?

No.

11. Were you aware that the blue blocks (the "standard") on the
grade cards were moved between the time Capt (b)(6) completed
the flight, and when the grade cards were printed out to be used
for the FFPB? (Showed CDR (b)(6)   the cards and the subsequent
spreadsheet showing the cells colored yellow (i.e., below
standard) instead of white (i.e., met standard)).

No.

12. Why are those blue blocks moved?

We change the standards for certain flights if needed.   I
believe it happened three times, 2014, 2015 and 2016. The Phase
Head would make a recommendation to the T.O., who would brief
the C.O., then change it in SHARP.

13. Can you compare two other RPs, LTs (b)(6)   and (b)(6)   who
also struggled in the syllabus and were in the squadron at the
same time?

First, Capt  (b)(6) should not have had access to other RPs
flight records.  The squadron has since changed SHARP so other
RPS cannot see everyone's flight cards.

(b) (6)   had a real world E.P. headwork issue, not a NATOPS violation like Capt (b) (6)   mishandling of a Plaining Link Failure. (b) (6)   had an EP sim the next day with zero issues. Compared to (b) (6)   it was different.

(b) (6)   didn't execute tactics well, but fewer safety concerns than (b) (6)

Out of (b) (6)   (b) (6)   and (b) (6)   none failed an EP warm-up simulator prior to Fighter Phase. (b) (6)   did the worst with headwork with his NATOPS check.

14. Capt (b) (6) s use of the Master Arm switch comes into play a few times. Is there a contradiction between the simulator and aircraft when manipulating the switch?

In the simulator, the Master Arm switch is used when required. In the aircraft, you only use the switch if something is really going to drop off the airplane.

15. Do you have sim mode in the aircraft? Would you not use it in the aircraft then in sim mode?

Yes, we have a sim mode, but we still don't move the switch during simulated release of ordnance.

20 Jun 18

Telephone interview of CAPT (b) (6)

- Former CO of VFA-106 during Capt (b) (6)   time in squadron
- Currently Chief of Staff for CSG-8 deployed on board USS TRUMAN
- Verbally confirmed that CAPT (b) (6)   is waiving his Article 31 rights

1. Where did the 99/100 ranking come from that you included in the FFPB endorsement?

I had the Training Department conduct an in-depth review, an apples-to-apples comparison, between Capt (b) (6) and other RPs. It was difficult because of all the extra flights he received. As the CO, I never really hung my hat on those rankings. They are very fluid; they move daily.

2. Are you aware of the different standards, the blue boxes, that moved on the grade cards? Which subsequently appeared as yellow cells on the trend analysis spreadsheet?

I was aware until Capt (b) (6) brought it to our attention a year later.

VFA-106 is the Standardization Model Manager across the VFA community. We conduct a conference every year, review the syllabus and makes changes as appropriate.

3. Capt (b) (6)   received a SOD on Strike Det, then reflew the flight the next day. Is that standard practice?

It depends on the reason for the SOD, but yes it may happen.

4. What do you think about "interested parties" on his FFPB? Did you consider the members "interested parties"?

Yes, I thought about it, but didn't question it. We spoke with all the parties, it was a Marine decision and I deferred to the parent service.

5. Have you ever heard the word eggplant being synonymous with the n-word?

No.

6. Have you ever used the eggplant emoji to describe an African-American?

No.

7. Where there white students with just as poor performance that passed the syllabus? How do you ensure that everyone is looked at equally?

We looked at struggling aviators holistically as possible. We look for trends, evaluate extra flights and resources, and do an extensive deep dive.

8. Did you address the endorsement chain issues with ASM-52?

Yes, we brought it up with them per Capt (b) (6)     Request for Mast. Lt Col (b) (6)     sent an email with the Marine Corps decision. I will forward you the email trail.

9. What were your thoughts on the FFPB's composition?

We needed a Marine on the board, so we picked Maj (b) (6) _   . Two IPs from -106. It would be difficult bringing a pilot from Beaufort or Miramar.

10. What about bringing pilots in from Fleet squadrons?

No, we don't do that. It's too much of a burden on the squadrons.

2 May 18

From:  CAPT (b) (6)      USN
To:    CAPT (b) (6)      , USN

Subj:  NAVPERS 5354/2 STATEMENT ICO (b) (6)

1. I have reviewed Capt (b) (6) s NAVPERS 5354/2 Equal Opportunity Report and recommend it be rejected as untimely and as having been previously addressed. Alternately, I request it be determined unsubstantiated on its merits.

2. Capt (then 1stLt) (b) (6) was a F/A-18C Fleet Replacement Squadron (FRS) student during my time as the VFA-106 Commanding Officer. His training was halted on 19 February 2016 due to substandard aeronautical performance. During his time at VFA-106, Capt (b) (6) appeared before a Human Factors Board (HFB), Performance Review Board (PRB), and Field Flight Performance Board (FFPB), as well as a USMC Flight Status Selection Board (FSSB) as part of the FFPB process. Capt (b) (6) checked out of VFA-106 on 1 June 2016. My last interaction with him was on 8 July 2016, when I provided a response to his mast request, confirming decisions on his FFPB case. LtGen (b) (6)      , USMC Deputy Commandant for Aviation (DCA) adminstered final adjudication of the FFPB report on 19 August 2016, directing Capt (b) (6) to transition to the USMC KC-130 training pipeline.

3. Over approximately 18 months, Capt (b) (6) contested multiple aspects of his FFPB. His grievances are captured in the following:

    12 May 2016—Response to Board Opinion
    28 June 2016—NAVMC 11296 Request Mast Application
    15 November 2016—Inspector General Complaint
    1 March 2017—Complaint of Wrongs under Article 1150
    10 May 2017—Article 1150 Rebuttal
    10 May 2017—Article 1150 Supplementary Rebuttal
    6 December 2017—EO Complaint

4. In four documents submitted between 12 May 2016 and 1 March 2017, Capt (b) (6) made no allegation of racial discrimination. The first accusation does not occur until his 10 May 2017 Article 1150 rebuttal. This was 306 days after my last interaction with him on 8 July 2016. Capt (b) (6) then waited an additional 210 days to submit this NAVPERS 5354/2 Equal Opportunity Report. Per OPNAVINST 5354.1G, a formal report shall be made within 60 calendar days of the offending incident, or the most recent incident in the case of a series of incidents. As with his late submission of the 2017 Article 1150 complaint, the excessive 516 day tardiness of this current EO complaint cannot be justified by any unusual circumstance. Additionally, none of Capt (b) (6) s grievances are new. In this EO report, he repeats previous allegations that: (1) I treated him different than other students; (2) I included false and inaccurate ranking information in my FFPB endorsement; and (3) he was subject to FFPB board membership comprised of interested members. I responded to these concerns in my 8 July 2016 Request Mast response and 7 April 2017 statement on Article 1150 complaint. Having failed to gain wanted resolution during the FFPB and Article 1150 processes, Capt (b) (6) has simply resubmitted old arguments using different means. I contend this complaint should be rejected because it is excessively late and has been previously reviewed.

5. An in-depth understanding of Capt (b) (6)s performance deficiencies leading to his removal from the F/A-18C training pipeline can be obtained by reviewing his HFB, PRB, and FFPB reports. My assessment of Capt (b) (6) s performance as the VFA-106 Commanding Officer is captured in my 7 June 2016 FFPB endorsement. I stand by the opinions and recommendations contained in that endorsement.

6. Capt (b) (6)s ongoing narrative is he was an average performing replacement pilot (RP) who was unfairly removed from training. To support this, Capt (b) (6) cites a 55/100 ranking which he alleges I subsequently undercut with a "false" and "made up" ranking system in an attempt to wrongfully remove him from the F/A-18C flight syllabus. It is worth noting that Capt (b) (6)s tactical struggles were not unique to his time at VFA-106. After doing exceedingly well during primary flight training, his performance fell off considerably during advanced jet training at VT-7 where he placed in the bottom 4th percentile of his peer group.

7. The F/A-18C Category I pilot syllabus consists of 153 evaluated events (66 simulators and 87 flights) and is broken up into four major phases—Transition, Strike, Fighter, and Carrier Qualification. Similar to the Navy Standardized Score (NSS) model applied in CNATRA flight training, VFA-106 uses a moving ranking system to determine how graduating replacement aircrew (RAC) compare to the previous 100 syllabus completers. Attrites who fail to complete the syllabus are not factored into the previous 100 ranking pool. Substandard performance, safety-of-flight, or directive (SOP, NATOPS, etc.) violations can result in an event failure known as a Signal of Difficulty (SOD). The vast majority of RAC complete events on their first attempts in line with training curriculum intent. A VFA-106 snapshot from 1 January 2015 to 31 December 2016 revealed a total of 135 Category I RP syllabus completers (35 F/A-18C and 100 F/A-18 E/F). The average number of SODs was .82 per RP through the Transition and Strike phases (76 events) and 1.8 per RP throughout the entire 153 event syllabus. Capt (b) (6) received three SODs during Strike phase alone, necessitating a pause in his training. During the 2015 and 2016 timeframe, only three RPs, including Capt (b) (6), repeated Strike phase due to performance issues ($\approx$2.2%). Training complexity increases as replacement aircrew progress through the syllabus and significant early struggles rarely translate to later success. As evidence, none of the three RPs required to repeat Strike phase successfully completed the F/A-18 FRS syllabus.

8. While Capt (b) (6) is correct in stating he was ranked 28 / 100 in Strike phase and 55 / 100 overall, these numbers come with an important caveat. The system which compiles the ranking data assumes events are completed, as intended, on the first attempt. It does not have the agility to reconcile multiple grade sheets attributed to the same event particularly when an entire phase is repeated. The above rankings did not paint a fully accurate picture as Capt (b) (6) repeated 15 separate Strike events, some up to three times, with only his most recent grades being factored into the relative ranking. This is analogous to comparing an academic student who took the same test three times achieving scores of 50%, 70%, and 90% against another student who achieved 85% on their first and only test attempt. Making an apple-to-apples comparison above is difficult since it is reasonable to infer the second student's scores would have also improved if given two more test taking opportunities. I clearly made this point in my endorsement of Capt (b) (6) s FFPB stating, "His initial attempt at the Strike syllabus yielded a ranking of 84 of the previous 100 RPs . . . ." This did not take away the 28 / 100 ranking he attained on a follow-on phase attempt but instead put it in proper context noting, "He demonstrated improvement in the Strike phase through heightened monitoring and additional training opportunities, but only after subsequent attempts at the phase." Capt (b) (6) also completed 56% of the Fighter phase events before his training was

eventually terminated.  As system rankings are typically not generated until after a RAC completes all events in a particular training phase, I asked my training department to perform a comparative analysis of the events only Capt (b) (6) completed to get a quantitative measurement of his advanced tactics performance since he was over half way through Fighter phase.  Again, this data caveat is clearly communicated in his FFPB endorsement.

9.  As I explain above, the process assumes everyone can successfully complete the syllabus and the ranking reflects this by capturing only the most recent scores of passing students.  Additionally, rankings are extremely fluid and change frequently as event grade sheets are continually entered into the system.  For these reasons, Capt (b) (6) s focus on the ranking is a red herring.  If a RAC demonstrates the requisite ability to safely execute the FRS syllabus and complete the required training objective in each phase, they will graduate and move on to an operational fleet squadron regardless of their relative position, even if ranked 100 / 100.  The opposite is also true, a top ranking RAC will not graduate if they cannot safely and successfully complete a particular training objective such as night carrier qualification.  A ranking is simply one of several data points which inform a broader assessment of a RAC's performance, potential, and motivation.  As I wrote in my Article 1150 statement: "In situations where replacement aviators struggle, their performance is evaluated carefully on a case-by-case basis to determine the best course of action."

10.  Capt (b) (6) claims "different treatment" disadvantaged him.  In reality, Capt (b) (6) was given more opportunities to succeed than others, to include repeating 14 flight and 21 simulator events.  He went through the full range of administrative boards (HFB, PRB, and FFPB) during his time at VFA-106.  The 17 June 2015 HFB occurred after (b) (6)  training was halted due to three SODs in Strike phase.  A 22 July 2015 PRB took place a short time later after (b) (6)  completed remedial strike refresher training.  I concurred with the VFA-106 Training Officer's 27 July 2015 PRB recommendations which established: "These are the final measures intended to allow 1stLt (b) (6) the opportunity to successfully complete the FRS syllabus.  If there are follow on failures, even with 1stLt (b) (6)  exceptional attitude and motivation, those will not make up for his shortcomings as an F/A-18 pilot and will not warrant additional training resources."  Capt (b) (6) later received a fourth SOD on 25 January 2016 during a Basic Fighter Maneuvering (BFM) event.  Nonetheless, I permitted Capt (b) (6) to continue training until a subsequent fifth safety-related SOD on 19 February 2016 convinced me a FFPB was necessary.  I did this, because I assessed his professionalism and exceptional work ethic coupled with the extended length of time since his last SOD warranted him another attempt.  However, allowing Capt (b) (6) to continue training after he failed the conditions of his PRB was not an opportunity I extended other RAC under similar probationary circumstances.

11.  Capt (b) (6) complains some of his FFPB board members were biased because they were associated with a group chat named "Pure Bloods".  I was unfamiliar with this name until I reviewed the EO complaint but have recently learned this was a group comprised of junior officer instructors.  The group name is a tongue-in-cheek reference to their Naval Academy lineage and I have no reason to believe it possesses racial undertones.  Capt (b) (6)  board members were in fact selected based solely on criteria established in Marine Corps Order 1000.6.  Additionally, Capt (b) (6) was notified of his FFPB right to challenge board membership on 29 February 2016, but he did not object.

12. Each FRS is continually measured on its ability to produce replacement aircrew and every fully trained pilot and WSO is critical to meeting operational squadron manpower needs. It is irrational to remove a RAC from training unless it is absolutely necessary to do so. In an unlimited resource environment, it might have been possible for Capt (b) (6) to have completed the FRS syllabus by repeating many additional syllabus events. However, in addition to the $11,773 FY16 cost per F/A-18C flight hour, every time Capt (b) (6) re-flew an event it also tied up valuable aircraft, range space, maintainer, and instructor resources to the detriment of other FRS production needs. While efficiency concerns played a small role in the decision to halt Capt (b) (6) F/A-18C training, the overarching factor was that he was heading down a path towards an aircrew-induced mishap. As I wrote in my Article 1150 response: "Referring a struggling aviator to a Field Naval Aviator Evaluation Board (FNAEB) or FFPB is a solemn decision and one not taken lightly." In my professional judgment, initiation of a FFPB was necessary in Capt (b) (6) case, because he posed an excessive safety risk to himself, the Command, and the USMC tactical aviation community. Race played absolutely no role in the decision.

13. Capt (b) (6) has been afforded more than a fair opportunity to raise his concerns over the last two years. He appears intent on recycling old complaints using different grievance procedures continuing a trend of draining valuable time and resources away from others. It is time this matter be finally settled. I respectfully recommend you determine this complaint to be unsubstantiated.

(b) (6)

# NATOPS EVALUATION REPORT

OPNAV 3710/7 (4-90) S/N 0107-LF-009-8000                    REPORT SYMBOL OPNAV 3710-21

| NAME (LAST, FIRST, MIDDLE INITIAL) (b) (6) | RANK 1ST LT | SSN ON FILE |
|---|---|---|
| SQUADRON / UNIT VFA-106 | AIRCRAFT MODEL FA-18 A-D | CREW POSITION PILOT |
| TOTAL PILOT / FLIGHT HOURS 312.3 | TOTAL HOURS IN MODEL/SERIES 86.9 | DATE OF LAST EVALUATION 13 APR 15 |

## NATOPS EVALUATION

| REQUIREMENT | DATE COMPLETED | GRADE | | |
|---|---|---|---|---|
| | | Q | CQ | U |
| OPEN BOOK EXAMINATION | 18 FEB 16 | Q | | |
| CLOSED BOOK EXAMINATION | 18 FEB 16 | Q | | |
| IMMEDIATE ACTION EXAMINATION | 18 FEB 16 | Q | | |
| ORAL EXAMINATION | 19 FEB 16 | Q | | |
| EVALUATION FLIGHT | 19 FEB 16 | Q | | |

| FLIGHT DURATION 1.0 | AIRCRAFT BUNO TOFT 23 | OVERALL FINAL GRADE QUALIFIED |
|---|---|---|

REMARKS OF EVALUATOR / INSTRUCTOR

FLIGHT CONDUCTED PER OPNAVINST 3710.7U AND COVERED START EMERGENCIES, TAKEOFF ABORTS, LOSS OF THRUST ON TAKEOFF, OUT-OF-CONTROL FLIGHT, INFLIGHT EMERGENCIES, SINGLE ENGINE PROCEDURES / CONSIDERATIONS, AND LOSS OF DIRECTIONAL CONTROL.

1ST LT ASHLEY IS RECOMMENDED TO BECOME FULLY NATOPS QUALIFIED IN THE F/A-18 A-D AIRCRAFT.

CONDUCTED CRM FLIGHT EVALUATION PER CNAFINST 1542.7A.

A REVIEW OF ACM TRAINING RULES WAS CONDUCTED IN CONJUNCTION WITH THIS EVALUATION.

**EXPIRES: 28 FEB 17**

☐ CHECK IF CONTINUED ON REVERSE SIDE

| GRADE, NAME OF EVALUATOR/ INSTRUCTOR LT (b) (6) | SIGNATURE (b) (6) | DATE 19 FEB 16 |
|---|---|---|
| GRADE, NAME OF EVALUEE 1ST LT (b) (6) | SIGNATURE (b) (6) | DATE 19 FEB 16 |

REMARKS OF UNIT COMMANDER

1ST LT (b) (6)   IS FULLY NATOPS QUALIFIED IN THE FA-18 A-D AIRCRAFT.

| RANK, NAME OF UNIT COMMANDER CDR (b) (6)   CO | SIGNATURE | DATE |
|---|---|---|

WST, OFT, COT, or cockpit check in accordance with OPNAVINST 3510.9 US GOVERNMENT PRINTING OFFICE: 1993-504-079/00119



18 JAN 18

Subj:  STATEMENT BY LT COURTLAND SAVAGE

1.  Like other African-American aviators, I learned early in my
training that I needed be "twice as good in order to be
average."  I believed this to be true and started to see
confirmation of it while I was flying T-45s at the training
command.  I basically accepted the way I was treated as normal
and did well enough in my training to be selected to fly F/A-
18s.

2.  When I started at VFA-106, I heard jokes that might be
considered insensitive or even racist.  I was sometimes
concerned about the ease and openness in which the racist jokes
were made, but I didn't want to be "the guy" who creates an
issue about something because I did not want to bring extra
attention on myself.  I shared my concerns with LCDR (b)(6)      , one
of the few other African-American pilots in the command, and he
counseled me to be careful about saying something unless I had
clear proof.

3.  Everything seemed to go pretty well during my initial
training at VFA-106, but that changed when I entered the Strike
Phase.  Although I made mistakes in some of my flights, I know
that I received grades that were lower than other students who
made similar errors, or worse.  I started to feel as if I were
being spotlighted, not because of my performance, but because
instructors were giving me lower grades because I was an African
American.

4.  I continued to share my concerns about discrimination with
LCDR (b)(6)    and was especially concerned after receiving a SOD
from the Training Officer, LCDR (b)(6)      , following my FSTK
117 flight.  In this case, I felt as if LCDR (b)(6)      had set
me up for failure by adding elements to the flight that were not
part of the syllabus and then giving me poor grades for my not
executing these extra elements to his satisfaction. After LCDR
(b)(6)    shared my concerns with the Commanding Officer, an
investigation was conducted into the matter.

5.  During the course of the investigation, the investigating
officer read me my Article 32 rights prior to talking to me.
This made me feel that, at a minimum, I was already suspected of
committing an offense.  Although I responded to some of his
questions with comments that "nobody here is treating me
unfairly" and that I am not being treated differently just

because I am an African American, this was not true.  I said
these things because I was concerned about subsequent reprisals
if I answered differently. Overall, my concerns about being
evaluated differently because of my race just increased.  Just
as in previous commands, I never felt comfortable bringing up my
concerns to most people because I was worried that it would have
a negative impact on my career.

6.  There were other examples of my performance being evaluated
more harshly than non-minority students.  For example, I do not
disagree that my performance during the hypoxic and the seat-
arming events I discussed in my initial letter was flawless;
however, my evaluations following these events were far worse
than others that had similar issue.  I was labeled an "unsafe
pilot," which was not true.  This was part of the overall trend
where I, as a minority, received lower grades for similar
performance by non-minority students.

7.  My letter to Senator Warner contains more examples that
confirm my concerns and the enclosures provide even greater
detail.  I have not changed my opinion that I, along with other
minority pilots, was treated differently than non-minority
pilots with the result being that we were targeted for attrition
from the program.

7.  I am still in the Navy Reserves as I wait to start with the
North Carolina Air National Guard.  They have provisionally
accepted me because they know that I am a proficient and
professional aviator, despite the results of the Navy FNAEB.

8.  I think it is critical that the issue of racial bias be
addressed at every level in the Navy, specifically in VFA-106 so
that others will not be victimized in the same way I was.

9.  Because my FNAEB was conducted unfairly using biased and
incorrect data, I would like the Navy to reconsider its findings
and remove it from my record.  I do not feel as if I should have
to report to potential future employers that I was removed from
a flight training program when that removal was done improperly.

_____    _____
Courtland Savage                   DATE
LT, USN

23 JAN 18

Subj:   STATEMENT FROM CDR (b) (6)        EXECUTIVE OFFICER,
        VFA-213

1.   I served as the Training Officer (TO) at VFA-106 from May
2014 until December 2016 and, in that capacity, had overall
responsibility for the training of replacement pilots and NFOs
for the Fleet. In my role as the TO, I emphasized that,
"standards are standards" and must apply to everyone equally.  I
expected that the pilots and NFOs who completed their training
at VFA-106 would be able to perform assigned missions safely and
responsibly.  Additionally, at no time during time at VFA-106
did I ever personally, or have any second hand observations, of
racially inappropriate behavior, comments, treatment among
student pilots or other leadership.  I

2.   My main interaction with LTJG Savage was when he first
checked in to VFA-106 in January 2016.  LTJG Savage was on the
low end of NSS scores for student pilots reporting to VFA-106:
in other words, his demonstrated performance in his previous
training commands was well below those of his peers.  Despite
his NSS scores, and based on the needs of the Fleet, I decided
to move him from the F/A-18C to the F/A-18E/F training syllabus.
He was very excited about this change.

3.   LTJG Savage was a motivated student during the initial
(Familiarization) stage of his training. While I never evaluated
him personally, I received reports from instructors that he
showed up to his events prepared and eager to learn.
Unfortunately, not long after his arrival, his training was
interrupted for medical reasons (med down).  Still, while he was
med down, he stayed engaged with me and my office, updating us
with his medical status as he prepared to return to flight
status.

4.   When LTJG Savage returned to flight status, his initial
performance was below average but not considered unsafe;
however, as I turned over the TO job LCDR (b) (6)       LTJG
Savage's performance provided increasing reasons for concern,
including two Signals of Deficiency (SODs) for poor
performance..

Subj:   STATEMENT FROM CDR (b) (6)          EXECUTIVE OFFICER, VFA-213

5.  Overall, I did not have very much direct interaction with LTJG Savage during our time together at VFA-106.  The data shows that he arrived for training as a below average aviator and that his performance was increasingly considered unsafe.  Although I think it is unfortunate when a replacement pilot or NFO is unable to complete their training, it would be far worse for that aviator to reach the Fleet and be unable to complete a mission or worse endanger themselves or others.

(b) (6)                          _____

                                                    DATE
CDR, USN

29 JAN 18

Subj:  STATEMENT BY LT COL (b) (6)          EXECUTIVE OFFICER,
       VFA-106

1.  I was both the Executive Officer (XO), and senior Marine, at
VFA-106 during the time that LT Savage and 1Lt (b)(6)   were
replacement pilots.

2.  In addition to being a fully-qualified instructor pilot, as
the XO, I am responsible to the Commanding Officer for ensuring
the good order and discipline of the command.  In this capacity,
I sometimes provide oversight of things like callsigns in order
to ensure that they do not overstep current Navy guidance and
are not likely to be considered offensive.

3.  I also take an active role as a mentor, counseling junior
officers on topics that range from aviation skills to life in
the Fleet.  I feel that my experience can be very helpful to
more junior officers and enlisted that are facing a number of
difficult challenges, both personal and professional.

4.  As leadership, the Skipper, Command Master Chief and I are
required to ensure that standards are standards, whether they
are related to aircrew training or basic military discipline.
We are diligent in addressing any perceptions that any service
member, regardless of rank, race or gender is being
discriminated against.  I think that the Command Climate survey
taken while LT Savage was a student at VFA-106 demonstrates that
our Command does a good job of maintaining fairness in
everything we do.

5.  I am aware of the struggles that LT Savage had during his
training at VFA-106; however, I think that his claims of racial
bias increased only as the likelihood of his successfully
finishing the training decreased.  His documented performance in
the aircraft and in simulators declined as the complexity of the
syllabus increased.  For example, he had multiple Signals of
Deficiency (SODs), which although not disqualifying, indicate
that sub-standard performance when measured against established
standards.

6.  I think that some of his LT Savage's comments are valid:
the percentage of minority student pilots at VFA-106 is not
really reflective of the percentage of minorities in US society.
That said, VFA-106 is not responsible for the recruitment of

minority personnel and we train all aircrew who are assigned according to the same standards.

7.   Some of LT Savage's assertions, such as callsigns being awarded solely on the basis of race or that there is tolerance for racial discrimination in VFA-106, are unfortunate misperceptions.  Although LT Savage apparently felt differently, I think the Command did everything we could to address his concerns while he was a student, even conducting an investigation into an instance in which LT Savage claimed he had been graded unfairly during a flight event.

8.   It is true that not everyone who starts the training syllabus at VFA-106 completes it.  Our responsibility is to ensure that those aviators who complete the training and head to the Fleet are, in fact, qualified to do so.  LT Savage was provided extra opportunities to successfully complete the training syllabus, but he was unable to do so.  Despite his claims to the contrary, I am convinced that the process he went through was without bias.

_____

(b)(6)                                                    DATE
LtCol, USMC

12 FEB 18

Subj:   STATEMENT BY LCDR (b) (6)                    FLAG AIDE TO THE
        CHIEF OF NAVAL OPERATIONS

1.   I was the assistant Training Officer for a period while LTJG
Savage was going through VFA-106 and wanted to offer my thoughts
about some of the issues he raises in his complaint.

2.   Concerning the t-shirt design he mentions, I have never seen
any t-shirts in any form with designs that could be considered
racially offensive.  Although the designs are developed by each
class as they go through training, the class' ideas are reviewed
by their class advisor, an instructor in VFA-106, to ensure they
do not violate any guidelines or the Navy's Core Values.

3. LT Savage makes observations about the demographic makeup of
the Command, as well as about comments made to him that seemed
to imply he would be treated differently because he was a
minority.  As the only female IP at the time, I can understand
how it feels to be different, but I think his observations are
misplaced and out of context.  First of all, VFA-106 Replacement
Pilots (RPs) and Instructor Pilots (IPs) are not selected based
on any criteria other than competency in the aircraft:  there is
no component of race or gender that decides who will be in the
command.  Secondly, I heard many similar comments from female
service members at VFA-106 about how unusual it was to see a
female instructor.  I accepted those comments as being factual,
or even complimentary, in nature.  The fact that LT Savage
implied that such comments were intended to indicate that he
would need luck to complete the training is, I believe, a
misperception.  Basically, I think that if someone is trying to
find bias, they are going to find a way to do so, whether it is
factual or not.

4.   LT Savage's claims that only white aviators continue to fly
after serious mishaps and/or FNAEBs is untrue. I know of at
least four black pilots who have had serious incidents and yet
continue to fly.  It is also not accurate for him to claim that
he was removed from training because of his SODs or grades.  The
decision to discontinue his training was based on Safety of
Flight concerns:  it was assessed that continuing his training
would potentially endanger himself and, perhaps, others.

5.   CAPT (b)(6)   informed me that he intends to talk to the IPs
involved in some of the events that LT Savage mentions as being
the reason behind his attrition.  I was not directly involved in

any of the events he mentions so I will simply state that the way in which LT Savage assessed his own abilities throughout his time at VFA-106 was generally far better than his actual performance indicated.

5.   LT Savage's accusation that the grading system at VFA-106 is "subjective and guided by a philosophy of attrition" is simply wrong.   The mission of VFA-106 is to train RPs that are ready to execute missions in the Fleet.   Every IP is trained to execute that mission, fairly and objectively, using standards that apply to every student.

6.   LT Savage mentions my presence in the Commanding Officer's office during a discussion about his performance relative to other students in a way that seems to indicate he felt it was evidence of the Command trying to attrite him.   In fact, I asked to be a part of that meeting because, as the Assistant Training Officer, I had been involved in similar discussions with other students and I thought it was important to be able to share that perspective with both the CO and LT Savage.

7.   LT Savage also presents the change in the way gradesheets were submitted as being evidence of racial bias in the Command. This is a misleading assessment.   The process of modifying the way that students submit gradesheets had been underway for weeks.   The change was seen as a way to both streamline submission, because of some previous issues, limit students' sharing of personal information with others.

8.   Overall, I found LT Savage's complaint to be an unfair and unjust accusation of racial bias playing any role in his attrition.   As a minority in Naval Aviation, I can certainly relate to the challenges that face all of us; however, I am convinced that LT Savage was treated fairly, and with the same respect accorded all RPs, throughout his entire time at VFA-106.

(b) (6)
LCDR, USN

_____
DATE

14 FEB 18

Subj:  STATEMENT BY LCDR (b) (6)          NAVAL SPECIAL WARFARE
       GROUP-TEN (NSWG-10) ASSISTANT OPERATIONS OFFICER

1.  I held positions as the Category "Other" Coordinator and
Assistant Training Officer at VFA-106 during the approximate
time period that LT Savage was conducting his training.  I do
not recall if I ever flew with him and I cannot recall any
specific conversations that I may have had with him.

2.  My name may appear in this, and other complaints, because I
was very vocal with my concerns about the content and execution
of training syllabi at VFA-106; however, I was not aware that LT
Savage had mentioned me in his complaint until CAPT(b) (6)
shared it with me.  His use of my experiences and work conducted
at VFA-106 to bolster his claims of racial bias against him or
other minority students is misleading.

3.  While I continue to have serious concerns about the way in
which students are trained and evaluated at VFA-106, I believe
that all students are equally subjected to the deficiencies of
the system.  I am unaware of any evidence that directly links
syllabus deficiencies to claims of unfair and racially-motivated
attrition of minority students.

4.  Failure to comply with VFA-106, CNAF, and OPNAV instructions
over a period of years has yielded systemic issues in the
training syllabi and grading system which, despite the best
localized efforts of instructor cadre, result in inconsistent
evaluations and flawed data-analysis that deliver analytically
ambiguous conclusions.

Moreover, the required process by which the syllabus is updated
to reflect changes in resourcing and tactics is slow, poorly
understood, and has not been executed properly in years. As F/A-
18 Fleet Replacement Squadrons (FRSs) have continued modifying
syllabus execution and resourcing to keep pace with TOPGUN and
Fleet-expressed desires, failure to include the Integrated
Process Team (IPT) for syllabus modification means the content
of each syllabus has not been verified to infuse Human
Performance (HP), Science of Learning (SOL), Instructional
Systems Design (ISD), and curriculum analysis expertise into the
syllabus as required by COMNAVAIRFOR INSTRUCTION 1500.12.

That said, all students, regardless of race, undergo the same
syllabus, despite its shortcomings.

5.  Until reading LT Savage's claim that I was the subject of retaliation for providing information to Capt (b) (6) , which I understand was used in a separate complaint, I had not considered any of my experiences to be retaliatory in nature. While I was very passionate about the need to improve Naval Aviator training I feel that both CAPT (b) (6) then VFA-106 Commanding Officer, and CDR (b) (6) then VFA-106 Training Officer, had provided me ample forum and opportunities to deliver the improvements that I sought, including placing me in the Assistant Training Officer role to pursue their implementation.

CDR (b) (6) , the current VFA-106 Commanding Officer, did call me into his office to inquire about material consistent with my efforts that had appeared in Capt (b) (6) complaint. It was a difficult conversation and it was apparent that he was initially not pleased; however, we worked through the issues to what I believe was our mutual satisfaction.  I did not perceive that the discourse was anything but professional.

6.  Others may have taken CDR (b) (6) request that I voluntarily terminate my flight status and the fact that I did not receive an End-of-Tour Award, as is the norm for instructors, as retaliatory.  The former was resolved as a communication misunderstanding within one day. I have no evidence that these events were retaliation for any of my activity to rectify the syllabus and evaluation deficiencies nor did I consider these events to be retaliatory in nature when they occurred. I am unaware of how LT Savage was made aware of these retaliation "facts."

7.  VFA-106 leadership was aware of my concerns about the entire spectrum of training and they generally tried to assign me to positions where I could have the best opportunity to implement change.  My outspoken views certainly created friction, but it is a mischaracterization of my work's standalone findings, or my personal experiences, to suggest they imply the existence of racial bias within the command.  In my view, the F/A-18 aircrew training pipeline remains deeply flawed and requires renewed scrutiny to ensure it delivers appropriately proficient aircrew to the Fleet.  Such an effort requires political will and a conscious choice to prioritize aviator quality and proficiency over meeting short-term proxies such as aviator production quotas, flight-hour goals, and FITREP timing.  Currently, those preconditions to not exist and the system is designed to incentivize the latter.  Regrettably, the proxies we measure

have become the "thing" we chase. We are experiencing Naval Aviation's "Day 2".

(b) (6)

LCDR, USN

13 FEB 18

Subj:  STATEMENT BY LCDR (b) (6)                SAFETY OFFICER, VFA-106

1.  I never flew with LT Savage, but I am familiar with the concerns he raised about racial bias at VFA-106 because of the conversations we had while he was a Replacement Pilot (RP) and I was an Instructor Pilot (IP) at the Command.

2.  As an African American Navy pilot, I recognize that I am one of the few African Americans that has been exposed to and encouraged to pursue a career in Strike Fighter Aviation.  My father told me that he had always wanted to fly, however he was discouraged from pursuing a career in aviation because he was African American. I am blessed to have had the opportunity to fly Navy jets; during my time serving as a Naval Aviator I have not personally experienced overt racism however I have experienced and observed racial bias during my time in the Navy.

3.  Specifically, in my first Fleet squadron, I felt as if I was held to a different standard than my Caucasian counterparts.  I believe that the call sign of (b) (6)   that I received during a Callsign Review Board was heavily influenced by the fact that I was African American; again not overt racism but rather an indication that I was being observed through a different lens than my squadron mates.  As I reflect on my time at VFA-115 I now realize that I did not receive the same level of professional development and guidance as other junior officers in the command.  This forced me to seek out mentorship and guidance external to the Command.  The sage guidance and leadership I received from these mentors allowed me to achieve a critical paradigm shift that changed the trajectory of my career. Upon my departure from VFA-115, I was advised by one of my mentors to change my callsign back to (b) (6) which I have been a called since childhood, to avoid any negative perceptions associated with being known as (b) (6)  a movie character who was well known for being a mentally challenged African American. Unfortunately, my experience in this squadron convinced me that, as a minority, I needed to be better than average just to be considered average and shatter any negative perceptions others may have due to my skin color.

4.  I have sought mentorship throughout my career.  The advice given to me by other African-American aviators, both current and former, has been invaluable.  Like Mr. (b) (6)       and CAPT (b) (6)            I have tried to be a role model for others.  It is in this context that I came to know LT Savage.

SAVAGE PE 6, Page 77 of 135

5. I approached LT Savage when it was apparent that he was struggling during the Strike phase of training while detached to NAF El Centro in winter 2017. At that time, LT Savage did not express any perceptions that he was being targeted as an African American, but rather had a very humble attitude about his performance. At that time, he held himself accountable for the areas in which he was struggling. LT Savage continued to seek my guidance in the following months and brought to my attention several events in which he felt that he was graded unfairly. He communicated that the grade sheets of his classmates indicated that he was being graded on a different scale.

6. I shared his concerns with the VFA-106 Training Officer, LCDR (b)(6)  and Operations Officer, CDR (b)(6)  They assured me that his performance was being reviewed in a fair and unbiased manner; however the details of which could not be shared due to the nature of the investigation. Shortly after our meeting I was informed by LT Savage that we was to undergo a Field Naval Aviator Evaluation Board. LT Savage's attitude regarding his performance and experience at VFA-106 changed upon finding out that he was to undergo a FNAEB. He told me that he did not trust LDCR (b)(6)  or CDR (b)(6)  due to his belief that they intentionally ramped up the level of difficulty on what was to be his final event in the syllabus- the FSTK-117. He communicated that he had reason to believe that several instructors in the command had graded him unfairly and that he intended to meet with the Commanding Officer and claim that he was being unfairly targeted because of his race. I advised him that making such allegations without concrete proof would undoubtedly lead to his FNAEB resulting in the loss of his wings.

7. I immediately informed the Commanding Officer, CDR (b)(6)  that LT Savage strongly believed that he was being unfairly graded and targeted due to his race. CDR (b)(6)  directed that a Preliminary Investigation (PI) be conducted to determine whether LT Savage's concerns were valid.

8. It is my understanding that the conduct of the FSTK-117 was modified at the discretion of the VFA-106 Training Officer in order to effectively test LT Savage's ability to perform and ultimately progress with his training. It is critical that our replacement pilots demonstrate adaptability and flexibility in conjunction with the standards explicitly outlined in the VFA-106 CAT 1 syllabus. The FSTK-117 that proved to be LT Savage's final event was in my opinion facilitated in a manner that

exceeded normal CAT-1s level of proficiency and skill.  However, LT Savage had the opportunity to execute the Strike Syllabus in its entirety on two separate occasions.  I believe this was taken into account by his instructors as they believed that based on the extra training he had that he should have been able to complete the event albeit with a slightly increased level of difficulty.

9.  I do not believe that LT Savage took advantage of his extended time out of the cockpit while med down in order to set himself up for success upon his return.  The best advice I received from my mentors regarding how to handle racial bias was that "you must work hard and perform or else we cannot help you".  It is my opinion that LT Savage could have worked much harder during his time at VFA-106.

10.  I believe that the leadership of VFA-106 is appropriately focused on ensuring racial bias does not manifest itself in any way at VFA-106 and emphasizes professionalism in everything that the command does.  There is oversight on callsigns and class t-shirts, and "What's App" chats to ensure that we do not violate Navy standards. Additionally, on at least one occasion during the previous year, the CO and XO formally addressed all officers at VFA-106 to reinforce the importance of professionalism and fair grading.

11.  LT Savage's experiences may have been different from mine, but I have not found VFA-106 to be a hostile working environment for African Americans, and I have not experienced racial bias in this command.  I do not believe that LT Savage was specifically targeted and removed from his training because he was an African American.  My impression is that, like many RPs, he experienced difficulties in the training program, but was unable to find a way to overcome them.  I do not believe that VFA-106 is a hostile working environment towards minorities in anyway.  In my opinion the senior leadership promotes a positive command climate.  Although LT Savage and I shared a similar circumstance having both experienced a FNAEB, my experience was different in that my record, in the words of ADM(ret) (b)(6)         reflected that I was nothing short of an "average to above average aviator".  LT Savage feels strongly that he was targeted due to his race; however his performance record does not fully support that claim.  My final thoughts on racial bias; does it exist in this squadron or any other military organization?  Possibly, yes- racial bias along with religious, or sex is inescapable due to the lack of diversity in Strike Fighter Aviation.  When one is the only African American or Female aviator in the squadron

they will undoubtedly stand out as "different". How that
individual is viewed will vary depending on lens through which
they are observed. That lens is shaped by upbringing,
background of every individual. We as leaders in the Navy
cannot change that fact rather we can only acknowledge the
threat as uncomfortable as it may be. We must also do all we
can to ensure that we have diversity up and down the Chain of
Command. With that said, I consider LT Savage's claim that he
was graded differently than his counterparts. Is it possible
that he was graded differently because of his race? I believe
it is possible whether it was intentional or not; however I do
not think it is likely given his record of performance.
Additionally I don't want our instructors or anyone in a
leadership position to feel like they have to give a grade that
is has not been earned for fear that they will be accused of
racial bias. There will always be a small degree of
subjectivity in how we grade our students at VFA-106; that in my
opinion is acceptable. Our grading process and the manner in
which we facilitate every event is extremely standardized and
fair albeit with a small amount of subjectivity. At the end of
the day LT Savage did not perform to the standard and that is
why he did not progress through the program. We cannot afford
to let someone who struggles continue in Strike Fighter Aviation
as they could be a danger to themselves or someone else, or
simply ineffective in combat- either is unacceptable. However,
LT Savage's experience has highlighted an issue that must be
continually assessed and addressed by leadership.

(b) (6)
LCDR, USN

15 FEB 18

Subj: STATEMENT BY LCDR (b) (6)                  , VFA-106 TRAINING
      OFFICER

1. I have been the Training Officer (TO) at VFA-106 since 1 Nov
2016 and am very familiar with LTJG Savage's performance record
while he was a Replacement Pilot (RP) at the Command.

2. I first met LTJG Savage in early November 2016 when he was
sent home early from his first Strike Detachment to Mountain
Home, Idaho due to performance issues that prevented him from
successfully completing the syllabus. Working with others in
the Training Department, I developed a tailored, remediation
program of additional flights and simulators to address his
performance deficiencies. Although not often required, this
kind of specialized program is intended to provide the RP with
additional opportunities to improve areas in which he/she is
struggling before returning to the normal syllabus.

3. In support of the remediation program, I encouraged both of
his class leaders, fully-qualified instructors, to work closely
with LTJG Savage on his airborne issues. Additionally, given
the nature of the aviation skills with which LTJG Savage was
struggling (e.g., multitasking, low level flying, Close Air
Support (CAS)), I assigned LT (b) (6)                  an Instructor
Pilot (IP) and qualified Forward Air Controller (Airborne)
(FAC(A)), to serve as a mentor. Despite LTJG Savage's claims in
his complaint, I know that LT (b) (6)      was very proactive in
his attempts to help improve LTJG Savage's performance.

4. In his complaint, LTJG Savage makes repeated mention of the
fact that he was awarded, "SOD, press" grades in some of his
events. The Signal of Deficiency (SOD) is simply a mark used to
annotate a deficiency in some aspect of a training event.
Whether it is awarded to an RP because of something that happens
on the ground—in a simulator, brief or debrief—or during an
actual flight, a SOD is only a signal that something needs extra
attention. A SOD does not, by itself, trigger further actions
from the command.

5. As the TO, I review every SOD to ensure that it was
justifiably awarded. In the cases LTJG Savage presents, FSTK-
111, FSTK-112 and FSTK -117, a SOD was certainly warranted:
forgetting to arm one's seat; being unprepared in a brief, and
failure to execute basic flight skills are all reasonable
reasons for a SOD to be awarded. It is, however, notable that

these were only three of the eight SODs given to LTJG Savage during his time at VFA-106. Again, taken individually, each SOD simply indicates that a deficiency was noted and, "SOD, press" was an indication that the deficiency was noted, addressed and that the RP is assessed as being able to continue training. That said, LTJG Savage's inability to successfully complete the Strike syllabus in addition to the number of SODs he received remains a clear indication that he was struggling.

6. As for the FSTK-117 event he discusses in his complaint, I was acting as the Lead Pilot in a culminating event in which LTJG Savage flew as my Wing and another aircraft provided close control as the FAC(A) to direct the simulated employment of ordnance. LTJG Savage makes note of the fact that he was unfairly directed to perform strafing runs, which are not listed as an element in this syllabus flight. Although that is true, it is important to note that:

    (a) strafing is an element in 14 of the syllabus events leading up to this flight;

    (b) strafing was only directed by the FAC(A) instructors after it was recognized that LTJG Savage was unable to complete the assigned ordnance delivery skills for the event; strafing was viewed as a chance for him to perform a task that he had successfully completed multiple times previously;

    (c) I chose to fly this event with LTJG Savage because, as the TO, I felt it important to personally ensure that he was ready to advance to the next phase of training;

7. LTJG Savage also mentions an event he flew in which he went hypoxic as being evidence of a double standard that confirmed racial bias. In this event, LTJG Savage completely disregarded the procedures known to all aviators in the event of hypoxia, endangering three other aircraft at the time. Although he landed without incident, he did not report hypoxia until the post-flight debrief, and he had to undergo additional training to ensure he understood the dangers of hypoxia and the need to follow established safety procedures.

8. As for some of the other issues LTJG Savage raised:
    (a) Callsigns. Callsigns are generally given to RPs during a Callsign Review Board that happens on detachment during the Strike Phase. LTJG Savage returned home early from the Mountain Home detachment but after the Callsign Review Board was completed. His callsign from the board was "Mr. Bucket." The

callsign, "Radio," must have been from a previous command.
Throughout the time I knew him at VFA-106, he was generally
referred to as, "Mr. Bucket," which has no racial connotation
whatsoever.

(b) Unapproved syllabus.  The syllabus at VFA-106, as in
every training command, is under near-constant revision based on
input from the Fleet, changes in tactics and changes in
equipment.  As the primary stakeholder is CNATRA, the process to
make major changes (i.e., those that would require additional
resources) is cumbersome; however, minor adjustments (known as
"maintenance changes") are made frequently and only require the
concurrence of the Commanding Officers on each coast and the
respective Commodores.  LTJG Savage was trained under the same
syllabus, using the same metrics, as every other RP.

(c) FNAEB discussion with CDR (b) (6)     LTJG Savage seems to
believe that my discussion with CDR (b) (6)     somehow undermined
the FNAEB process.  This is not true.  The FNAEB independently
considered all of the data presented in LTJG Savage's case and
made its recommendation based on those facts alone.  My
discussion with CDR (b) (6)     was independent of that process.

9. As a former Training Officer at TOPGUN, I have had to
attrite a number of aviators for sub-standard performance.
These decisions are difficult and they have never been based on
anything other than inability for the aviator to meet a given
standard.  In LTJG Savage's case, the declining performance that
he exhibited prior to his arrival at VFA-106 (his cumulative
Navy Standard Score (NSS) of 131 was far below the average of
200) was a strong indicator that he would have difficulty
completing the syllabus. Despite the extra opportunities and
close mentorship he received, LTJG Savage never demonstrated the
requisite skills necessary to safely complete the syllabus. In
my estimation, allowing him to continue flying would have
represented a serious danger to both himself and to others
around him.

_____

(b) (6)
LCDR, USN

27 FEB 18

Subj:  STATEMENT BY CDR (b) (6)                EXECUTIVE OFFICER,
       VFA-103

1.  I served as both an Instructor Weapons System Operator
(IWSO) and as the Operations Officer (OPSO) during most of the
time that LTJG Savage was a student at VFA-106.  I would like to
start by noting that I, too, am a minority officer, having been
born in Senegal to parents originally from the Cape Verde
islands.  Given that, I find the allegations of racial bias
raised in LTJG Savage's complaint to be without merit.

2.  I tried to help LTJG Savage successfully complete his
training at VFA-106.  As a backseater, it was a bit more
difficult for me to specifically address his deficiencies as a
pilot; however, I encouraged CDR (b)(6)            . another African-
American pilot, to engage with LTJG Savage to improve his Close
Air Support (CAS) skills.  I believed this would be a good
approach because I knew that CDR (b)(6)   had experienced similar
difficulties when he went through training as a Replacement
Pilot (RP).  I spent many hours trying to help LTJG Savage
through extra simulators, briefs and in personal meetings.  I
know that many other instructors tried to assist LTJG Savage as
well, but I think that he rarely took advantage of these offers.

3.  In many of his syllabus events, LTJG Savage's substandard
performance resulted in him receiving Signals of Deficiency
(SODs).  A SOD, by itself, simply indicates that a student
struggled in the execution of some skill or skills.  The fact
that LTJG Savage received a greater number of SODs than most
students clearly indicated a concerning trend.

4.  I gave LTJG Savage a SOD during a CAS simulator event in
preparation for his third attempt at completing the Strike
Syllabus.  LTJG Savage does not mention my SOD because it
obviously undermines his claim of racial bias.  As the OPSO, I
was aware of struggles and so I gave him two attempts to
complete the CAS event before finally given him a SOD.
Specifically, I had scheduled simulator time for myself after a
scheduled event with LTJG Savage.  I briefed the event with LTJG
Savage and he struggled with questions in the brief and the
event started and finished poorly.  Afterwards, we debriefed on
the missteps he had during the first attempt.  I encouraged him
to shake it off and try again because I had scheduled personal
time in the simulator and decided it would be better to
reattempt the CAS event.  LTJG Savage showed no improvement

during his second attempt to complete the simulated event, so I stopped the event early and debriefed LTJG Savage accordingly.

5.   Additionally, I was the instructor Forward Air Controller (Airborne) (FAC(A)) during the FSTK 117 event in which LTJG Savage claims he was evaluated unfairly and further used as evidence that he was being targeted for attrition as an African-American.  His claims are false.  Simply put, despite his previous attempts at completing the Strike Syllabus, and his numerous attempts at remediation to prepare him for the event, LTJG Savage was unable to adequately execute the skills necessary to successfully complete the flight.  He claims that he was unfairly tasked to execute strafing runs, which are not a part of the syllabus flight.  Although strafing is not normally part of the FSTK 117, I was the instructor that directed him to execute those runs for two reasons:  he failed to execute the required syllabus actions; and I hoped that, since he had successfully strafed numerous times in previous events, he would at least be able to complete those tasks.

6.   At the completion of the flight, I went directly to LCDR (b)(6)   , the VFA-106 Training Officer (TO) who had flown the event with LTJG Savage, in order to present my assessment that LTJG Savage was not ready to progress further in the training.  LCDR (b)(6)   agreed with my assessment and, even though I was the instructor, ultimately gave the SOD to LTJG Savage as the squadron's TO.  Racial bias played no part in any aspect of this, or any other, assessment of LTJG Savage's performance.

7.   LTJG Savage makes an additional false allegation concerning his callsign.  His callsign at VFA-106 was, "Mr. Bucket," which has absolutely no racial connotation.  I am unaware if he was called "Radio" at a previous command, but I was present at the squadron event in which he received the callsign which everyone knew him by.  I know of no minority aviators that received any callsign at VFA-106 that had any racial component.

8.   I was not present for the discussion of the class t-shirt which LTJG Savage presents as further evidence of racial bias at the Command, but I do know that things like t-shirts are reviewed by leadership to ensure that no bias of any kind is present.  Given that, I find it difficult to believe that the other members of his class, including at least one other minority, were trying to make any kind of statement about race when they designed their t-shirt.

9.  Finally, I would like to point out that I have served in the Navy for nearly 30 years.  I have experienced many, different command climates and so I have the experience to recognize that the actions taken by the instructor cadre in regards to LTJG Savage were purely professional:  he was not attrited because of racial bias, but because he was a danger to himself and others when in the air.  The difficult decisions made by the leadership of VFA-106 were based solely on LTJG Savage's inability to safely operate an aircraft and were absolutely necessary.


(b) (6)
CDR, USN

10 May 18

Telephone interview with LCDR (b) (6)

CNAL FNAEB program manager during LT Savage's board process

1. Does CNAL track race data for FNAEBs?

No, not since 2001.  Gender data is tracked and displayed on the spreadsheet.

2. How far back does the spreadsheet go?

5 years.

3. Out of those 5 years, how many FNAEBs has VFA-106 had?

21 FNAEBs.

4. Being the FNAEB program manager and having first-hand knowledge of his board, can you give me your opinion on LT Savage's FNAEB?

LT Savage received significantly more training opportunities than other VFA-106 FNAEBs.

11 May 18

Personal interview of LT (b) (6)

Arrived at VFA-106 on 17 Oct 16
Currently an Instructor Pilot and Assistant Admin Officer
Previously the Legal Officer

1. Did you give the screen shots of the Pure Bloods chat to Capt
(b) (6)   and LT Savage?  Why?

Yes.  All three of us have been involved in this case.  I
believed that he (b) (6)  needed to know about the negative
comments made about him.

2. Are you a member of the Pure Bloods group chat?

Yes, I was a member, but I was removed in December 2017.

3. You were removed after group members found out you gave the
screen shots to (b) (6) and Savage?

That's correct.

4. Are there any minorities in Pure Bloods?

While I was in the group, none I remember.  There were females.
LT (b) (6)          a VFA-106 IP that's African-American and a
Naval Academy grad, is not in the group.

5. Is that by choice?

I don't know.

6. Please tell me your opinion about VFA-106's climate.

The climate is in flux due to the (b) (6)  Savage complaint and
the Military.com article.  It's a fraternity culture, the IPs
are the frat boys and the RPs are the rushes trying to get into
the "club" (i.e., Strike Fighter Aviation).  The community is
predominantly white male.  I believe there's a combination of
unconscious influence and deliberate exclusion.  As an RP, you
feel forced to participate even though you may not.

7. Do you know what the eggplant emoji represents?

Yes, some people use it as a symbol for a penis.  But I do know that the term "eggplant" is synonymous with the n word in the black community.  Eggplant was used in the TV show "The Sopranos" where Italian-Americans used it to negatively describe African-Americans.

8. Can you tell me about any other inappropriate texts?

There are multiple chat groups that we use in the squadron. There is a "JOPA" group mainly used for professional coordination such as schedule changes, and there are chat groups established for dedicated detachments, such as strike or fighter dets so word can be passed to everyone.  On the JOPA group, other IPs used negative stereotypes to describe single demographics, for instance they mentioned "Obama phones" and just had a general negative attitude towards minorities (non-whites).  It's the mindset of "we can say whatever we want and everyone agrees with us."  Well not everyone does.

04 Jun 18

Telephone interview of Mr. (b)(6)


- Retired Commander (O-5). 1992 BOOST program.  Nuke MM for 2 years. Graduated/commissioned NROTC University of Memphis in 1997.  Qualified as NFO, later transitioned to Naval Aviator.

- IP at VFA-106 from Sep 2017-2017 during LT Savage's tenure

- Was previously an RP at VFA-106.

1. Can you describe the culture at VFA-106?

No culture of attrition or blatant weeding out, "you're in the FRS now".  There's competitiveness between the -18C and -18E/F guys, as well as single seat versus dual seat.  There's always a rivalry between pilots and NFOs.

2.  Have you witnessed or experienced racial discrimination in the Navy or at VFA-106?

As an African-American that grew up in the south, I have never experienced any racial discrimination in the Navy or at VFA-106. Naval Aviation is a melting pot, no matter who you are, you're going to have to conform.

3. Were social events inclusive?

Yes, everyone was invited as far as I know.  The RPs organized the CQ parties.  The annual Strike Fighter Ball staff and students and Fleet officers.  The FRS didn't miss the mark when it came to the RP and IP relationship and toeing the line.

4. What is your opinion on callsigns?

I think there is hypersensitivity through callsigns and it's bullshit.  I got mine, "Snoop Dog" in 2003, and it was mocking the fact that I tried rapping.  Most people's callsigns are taken out of context.  There may have been racist callsigns at one time.

5. Tell me about LT Savage's flying capabilities.

He could take off and land, but didn't do tactics well.  He couldn't fight the airplane.

6. Do you think there were biases associated with his FNAEB?

There is a subjective element to instruction of any kind.  In general, biases do exist, but you must be professional.

7. Did you read the military.com article?

Yes, the Navy has a recruiting problem for minorities and I think their false claims hurt the Navy's recruiting efforts.

8. Did you ever fly with females?

Yes, one pilot and one WSO at VFA-106.  They met the standard. I had two female pilots in one of my Fleet squadrons.  One went to TOPGUN and the other flies for Delta.  I'd call that successful.

9. Were you aware of the "Pure Bloods" group chat?

No.  As an O-5 you aren't invited into those things.

07 Jun 18

Personal interview of LT (b) (6)

- Currently an IP at VFA-106. Been here one year.
- Went through VFA-122 for FRS training at NAS Lemoore. Then went to VFA-115 in Japan for first Fleet tour.

1. How has it been so far at VFA-106?

An awesome experience so far. I'm a fully qualified IP.

2. Describe for me the culture of the squadron.

The IP vs student relationship is good. Some are more buddy-buddy than others. I am the class leader of 17-7 and the students were too buddy-buddy with IPs, so I sat down with them and corrected the issue. Overall, it's conducive to a good learning environment. We hold Kangaroo Courts on Strike Det for callsigns.

3. Have you observed any fraternization?

Not a lot of fraternization. LT(b)(6) crosses the line often, hangs out with the students and none of the IPs. He gives them a lot of gouge. He cares.

4. Did you observe LT Savage during his time here?

No, I arrived after Savage had left.

5. Have you observed any racial discrimination?

No, I haven't observed any racial discrimination. I don't think the syllabus is biased in any direction.

In my Fleet squadron, we had issues with the music selection in the Ready Room. The SDO was the person who got the pick the music during their duty day. I'm an R&B/smooth jazz guy. My Skipper would always give me a hard time. Another LT, African-American too, would listen to some hardcore rap. He and the CO would go head to head. Some people are more sensitive than others. Personality differences can drive racial tension.

6. I was told by LT(b)(6) that you are not in the "Pure Bloods" group chat, yet you are a Naval Academy grad. Is that true?

No, I'm not a part of the group chat.

7. I was told that all USNA grads are automatically added to the chat when they check-in to VFA-106.  Your thoughts?

I guess I wasn't included because nobody thought I was an Academy grad.

8. Or was it because you're African-American?

I'm claiming ignorance.

9. Can you see the perception that you were excluded from the chat possibly because you are African-American, when all USNA grads are in the chat?

Yes, I can see that.

10. Have you asked to be added to the chat?

No.  There are already too many chats in the squadron. I don't need to be in another one.

11. What's your callsign?

It's **(b) (6)**     I look like Chris Tucker's character in the movie The Fifth Element. I was a SURGRAD in the VTs after I got winged.  Most people called me **(b) (6)**  because my initials are **(b) (6)** I got the **(b) (6)**     callsign in VFA-115.

12. What's your opinion of the culture at VFA-106?

I have no issues with the culture. It is definitely "work hard-play hard". There's a fair amount of drinking here, off-duty. The competition here is a good part of the culture. I feel included in the VFA community. I conform to the community rather than the community conforms to me.

13. Did you read the **(b) (6)**/Savage article on military.com?

Yes.

14. Your opinion?

I think it invalidates racial complaints overall, meaning that when you cry wolf, it makes the real complaints taken less serious. There was no ownership of their failures. Part of the minority culture is you have to do well.



**DEPARTMENT OF THE NAVY**
STRIKE FIGHTER SQUADRON ONE ZERO SIX
1760 FIRST STREET, SUITE 200
VIRGINIA BEACH, VA 23460-2210

IN REPLY REFER TO:
5800
N1L/030
26 Apr 17

From:  Commanding Officer, Strike Fighter Squadron ONE ZERO SIX
To:    LT (b) (6)                           USN

Subj:  PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND A.
       SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
       UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW.

Ref:   (a) JAGINST 5800.7F
       (b) 45 CFR Parts 160 and 164
       (c) DoD 6025.18-R

1. This appoints you, per Chapter II of reference (a), to
inquire into the facts and circumstances surrounding the
possible discrimination based on pilot performance of LTJG
Courtland A. Savage, USN.

2. Investigate the possible facts and fault, neglect, or
responsibility therefore, and recommend appropriate
administrative or disciplinary action. In addition, you are the
designated representative to receive Protected Health
Information (PHI) and/or Personally Identifiable Information
(PII) of the active duty member. Report your summary of
findings, and recommendations in letter form by 2 May 2017,
unless an extension of time is granted. If you have not
previously done so, read Chapter II of reference (a) and
familiarize yourself with references (b) and (c) in its entirety
before beginning your investigation.

(b) (6)

M. L. WEIZENBERG

28 Apr 17

MEMORANDUM

From:  LT (b)(6)          _ , USN, Preliminary Inquiry Officer
To:    Commanding Officer, Strike Fighter Squadron ONE ZERO SIX
Via:   Executive Officer, Strike Fighter Squadron ONE ZERO SIX

Subj:  PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND A.
       SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
       UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW

Ref:   (a) JAGMAN Section 0204
       (b) Manual for Courts-Martial (MCM), 2012 Edition
       (c) CNAF 5420.2
       (d) VFA-106INST 5420.1B
       (e) VFA-106 Strike Standardization Guide – FEB 2017

Encl:  (1) Cleansing Warning - LTJG C.A. Savage, USN
       (2) Suspect's Rights Acknowledgement – LTJG C.A. Savage, USN
       (3) FSTK117 Syllabus Guide
       (4) FSTK117 Gradesheet – LTJG C.A. Savage, USN
       (5) Comparative Performance Data – LTJG C.A. Savage, USN

1.  Purpose of memorandum.  This reports completion of the
preliminary inquiry conducted in accordance with reference (a)
into the alleged.

2.  (FOUO) Personnel contacted (in order)

    a.  LTJG C.A. Savage,     (704)813-5266
    b.  LCDR
    c.  LCDR   (b) (6)
    d.  LT
    e.  LT

3.  Materials reviewed

    a.  Enclosures (1) through (5)

4.  (FOUO) Summary of findings

     On or about 24 April 2017, LTJG Savage, a Replacement Pilot
(RP), reached out to LCDR (b)(6), an Instructor Pilot (IP), and
voiced a concern that he may have been treated unfairly in the
evaluation of his performance while at VFA-106. On 25 April 2017,

FOR OFFICIAL USE ONLY

Subj:  PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND
A. SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW

a preliminary inquiry was initiated by the Commanding Officer (CO)
of VFA-106 to determine whether or not there was sufficient
evidence to warrant further action.

After interviewing LTJG Savage – see Enclosures (1-2), the
genesis of his concern is in regards to the evaluation of his
performance on the FSTK117 on 20 March 2017 – a Section Precision
Guided Munitions (PGM) Close Air Support (CAS) flight – see
Enclosure (3).

LCDR (b)(6)      the Training Officer, was the IP and flight
lead for this flight. LTJG Savage was the wingman. LT (b)(6)   was
the pilot in the platform serving as the Forward Attack Controller
(Airborne) - FAC(A).

a.  Instructor Perspective

The skillsets displayed by the RP in the FSTK117, as assessed
by the IP, are detailed in Enclosure (4).

As graded by the IP, the flight was below average. The RP was
often confused and lacked the assertiveness to gain clarity. The
RP's assessment of his own performance was inaccurate and not in
line with the instructor cadre.

The FSTK117 was the RP's final flight in the Strike Phase,
and the IP ultimately questioned the RP's ability to keep himself,
his flight lead, and the people on the ground safe. In the IP's
judgment, too much risk was assumed and the student's skillsets
had not progressed IAW training requirements.

According to the pilot in the FAC(A) platform, the flight was
below average. The FAC(A) pilot noted that the RP's confusion and
performance in the first run, post an extensive brief, may have
warranted a Signal of Difficulty (SOD). The FSTK117 is the
culminating flight of the Strike Phase, by which point progression
is required. The FAC(A) pilot also noted that the IP gave the RP
significant assistance throughout the flight, not something that a
student at the end of a Phase should require.

In the debrief, the FAC(A) pilot complimented the RP on his
coordinate read back procedures, adding some positive feedback to
the debrief.

FOR OFFICIAL USE ONLY

2

Subj:  PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND
A. SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW

a.  Student Perspective

LTJG Savage commented on a number of topics throughout the
interview. When asked about his evaluation at VFA-106, he
emphasizes the FSTK117. LTJG Savage believes that the IP's
assessment in Enclosure (4) under the "On Deck" section is
contradictory. LTJG Savage understands the "On Deck" paragraph to
say: the RP both did not troubleshoot and did troubleshoot the MU
LOAD caution in the aircraft on deck prior to takeoff. The RP's
question is essentially, "How could I be troubleshooting and not
troubleshooting at the same time? The FAC(A) and I did
troubleshoot, and we eventually determined that I could indeed
take the jet flying. And then we all went flying".

LTJG Savage questions why the IP included a strafe attack in
the conduct of the flight when it is not delineated in the
Syllabus Guide for the FSTK117, see Enclosure (3).

LTJG Savage also discusses his failure to arm the aircraft in
Run 3. He says that other students have failed to do the same
thing, and they did not receive a SOD.

LTJG Savage's opinion is that the IP's evaluation of his
performance in the FSTK117 may have been contradictory or slightly
unfair. When questioned directly about the instructor cadre and
VFA-106 culture in general, LTJG Savage said, "No one here is
treating me differently."

LTJG Savage noted that that he is an African American in the
Strike Fighter community, a community with a statistically smaller
percentage of aircrew that are African American, but he believes
he is not treated differently due to his race and that no one
within the command is racist.

LT (b)(6) discussed statistics and demographics of the Strike
Fighter community with LTJG Savage on 21 April 2017 during normal
duty standing. LT (b)(6) noted that at no time did LTJG Savage
express to him that he believed some type of malicious screening
existed within the Strike Fighter community, nor did he associate
statistics with the evaluation of his own performance during
training at VFA-106. LTJG Savage noted to LT (b)(6)  and during the
interview, that he may have put some extra pressure on himself to
change this statistic.

FOR OFFICIAL USE ONLY
3

Subj:  PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND
A. SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW

c.  Additional Considerations

LTJG Savage originally reached out to LCDR (b)(6)   as a mentor
when he perceived potential unfair grading. LCDR (b)(6)   believes
it possible that post the RP's second attempt at the syllabus
(which includes the FSTK117), he may have started looking to
external factors, outside of his control, such as comparing his
performance to other RPs, and that this potentially contributed to
the difficulties he experienced during training.

LCDR (b)(6)   received a secondhand account of the conduct of
the FSTK117, but as an IP he noted that the RP was asked to
perform certain attacks, namely the strafe, that were not included
in the conduct delineated in the Syllabus Guide for the FSTK117 –
see Enclosure (3).

LCDR (b)(6)   also noted that it is ultimately up to the
judgment of the instructor to test the student's skillsets,
including adaptability and flexibility – important characteristics
of a prospective Strike Fighter aviator.

d.  Analysis

1. The "On Deck" critique – (Section 4.b.)

(a)  The RP failed to understand the constructive
criticism given during the evaluation, which was that he needed to
be more assertive. The RP should have attempted communication with
the IP or the FAC(A) to identify a solution. The FAC(A) should not
have had to initiate communication on the RP's behalf, especially
if the RP is finishing the Strike Phase.

2.  The strafe pattern – (Section 4.b.)

(a)  The FSTK117 is the final flight during Strike Phase at
VFA-106; as such it is a flight where the culmination of the
student's skillset is tested. (Section 4.a.)

(b)  The RP was asked to demonstrate a Strike skill outside
the conduct of the FSTK117 Syllabus Guide (3), but the strafe
pattern was briefed that day by the IP. The syllabus requires the
RP to execute the strafe pattern on 6 out of the 17 flights in the

FOR OFFICIAL USE ONLY

4

Subj:   PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND
A. SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW

Strike Phase, and the strafe attack is optional on an additional 2
flights. (Reference (e))

(c)   The IP briefed the strafe pattern. It is at IP
discretion to determine the RP's skillset, including the student's
adaptability and flexibility (Section 4.c.).

2.   Air-to-Surface checklist and performance comparison
(Section 4.b.)

(a)   With recommendations from the Training Department and
IPs, it is the Commanding Officer charged with determining RP
readiness for the fleet. The IP's assessments are not simple, and
ensuring Air-to-Surface checklist completion is only one portion
of an individual flight. "Any error, combination of errors, or
negative performance trends could potentially result in a SOD
depending on the circumstances and the [Replacement Air Crew]
RAC's previous performance." (Reference (d))

(b)   Past performance of LTJG Savage is well below average.
When ranked against his last 100 peers in the Strike Phase (when
he had his first look at the event), LTJG Savage ranked 100/100
(Enclosure (5))

(c)   The IP has a tremendous responsibility to more than
just the RP. Considering the FSTK117 is the culmination flight
during Strike Phase, and arguably the last look at a CAS scenario,
it is ultimately up to the instructor to make a well-informed and
thoughtful decision, especially given the unforgiving consequences
of future poor performance.

5.   Matters in aggravation, extenuation and mitigation, and work
performance

(a)   LTJG Savage mentioned one instance of an IP (outside
the cadre of IPs that participated in his FSTK117) discussing LTJG
Savage's below average performance with other students. LTJG
Savage said that this occurrence, while acknowledged as
unprofessional, did not bother him or have an effect on his future
performance in the aircraft.

FOR OFFICIAL USE ONLY

5

Subj:  PRELIMINARY INQUIRY INVESTIGATION ICO LTJG COURTLAND
A. SAVAGE, USN, REGARDING POSSIBLE EQUAL OPPORTUNITY AND/OR
UNFAIR GRADING ISSUES WITH VFA-106 INSTRUCTOR AIRCREW

6. Recommendation

    a.  After the completion of the preliminary inquiry, I find
no reason to believe that LTJG Savage was mistreated during the
evaluation and review of his performance as a RP at VFA-106, and
no further investigation is required.

    b.  I recommend that VFA-106 refer to established proceedings
to review the performance of a student, i.e. a Human Factors Board
(HFB) - see Reference (c), a Performance Review Board (PRB) - see
Reference (d), and a Field Naval Aviator Evaluation Board (FNAEB)
when necessary.

(b) (6)

**RETURN TO LEGAL**

FOR OFFICIAL USE ONLY

Date: 26 Apr 2017

## Cleansing Warning

"I advise you that any prior illegally obtained admissions or other improperly obtained evidence which incriminated you cannot be used against you in a trial by court-martial."

(b) (6)
_____
Member signature

Witness (b) (6)

LT (b) (6)                    ₹ , USN

Enclosure (1)

## SUSPECT'S RIGHTS ACKNOWLEDGEMENT/STATEMENT (See JAGMAN 0170)

| FULL NAME (ACCUSED/SUSPECT) | SSN | RATE/RANK | SERVICE (BRANCH) |
|---|---|---|---|
| Courtland A Savage | (b) (6) | LT JG  O-2 | USN |
| ACTIVITY/UNIT | | | DATE OF BIRTH |
| STRIKE FIGHTER SQUADRON ONE ZERO SIX | | | 06/26/1991 |
| NAME (INTERVIEWER) | SSN | RATE/RANK | SERVICE (BRANCH) |
| (b) (6) | (b) (6) | LT   O-3 | USN |
| ORGANIZATION | | BILLET | |
| STRIKE FIGHTER SQUADRON ONE ZERO SIX | | PRELIMINARY INQUIRY OFFICER | |
| LOCATION OF INTERVIEW | | TIME | DATE |
| CSFWL  CONF.  Room  — VFA-106 | | 1515 | 26 APR 17 |

### RIGHTS

I certify and acknowledge by my signature and initials set forth below that, before the interviewer requested a statement from me, he warned me that:

(1) I am suspected of having committed the following offense(s): N/A _____

_____    ⊠

(2) I have the right to remain silent; - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

(3) Any statement I do make may be used as evidence against me in trial by court-martial, - - - - -   CAS

(4) I have the right to consult with lawyer counsel prior to any questioning. This lawyer counsel may be a civilian lawyer retained by me at my own expense, a military lawyer appointed to act as my counsel without cost to me, or both; and - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

(5) I have the right to have such retained civilian lawyer and/or appointed military lawyer present during this interview. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

(6) If I decide to answer questions now without a lawyer present, I will have the right to stop this interview at any time. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

### WAIVER OF RIGHTS

I further certify and acknowledge that I have read the above statement of my rights and fully understand them, and that, - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

(1) I expressly desire to waive my right to remain silent; - - - - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

(2) I expressly desire to make a statement; - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   CAS

(3) I expressly do not desire to consult with either a civilian lawyer retained by me or a

Enclosure (2)

military lawyer appointed as my counsel without cost to me prior to any questioning; - - - - - - - - -    CAS

(4) I expressly do not desire to have such lawyer present with me during this interview; - - - - - - - -    CAS

(5) This acknowledgment and waiver of rights is made freely and voluntarily by, and without any promises or threats having been made to me or pressure or coercion of any kind having been used against me; and - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    CAS

(6) I further understand that, even though I initially waive my rights to counsel and to remain silent, I may, during the interview, assert my right to counsel or to remain silent. - - - - - - - - - - - - - -    CAS

NOTE: IF THE SUSPECT INDICATES HE IS WILLING TO MAKE A STATEMENT, HE SHOULD FIRST BE ASKED WHETHER HE HAS MADE A STATEMENT IN RESPONSE TO QUESTIONS ABOUT THE SUSPECTED OFFENSE TO ANYONE HE BELIEVED WAS ACTING IN A LAW ENFORCEMENT CAPACITY PRIOR TO THE PRESENT INTERVIEW. IF THE SUSPECT INDICATES HE HAS PREVIOUSLY MADE SUCH A STATEMENT, ADVISE THE SUSPECT AS FOLLOWS:

(1) Your previous statement may not be admissible at court-martial and may not be usable against you. *(It may be possible to determine whether a previous statement made by the suspect will be admissible at some future court-martial; this suggests it may be wise to treat it as inadmissible and provide the cleansing warning).*

(2) Regardless of the fact that you have talked about this offense before, you still have the right to remain silent now.

(3) *(Continue with the Rights Advisement and Waiver of Rights above).*

| SIGNATURE (ACCUSED/SUSPECT) | TIME | DATE |
|---|---|---|
| Courtland Q Savage | 1520 | 4-26-17 |
| SIGNATURE (INTERVIEWER) (b) (6) | TIME 1520 | DATE 4-26-17 |
| SIGNATURE (WITNESS) | TIME | DATE |

The statement which appears on this page (and the following ____ page(s), all of which are signed by me),  is made freely and voluntarily by me, and without any promises or threats having been made to me or pressure or coercion of any kind having been used against me.

_____
SIGNATURE (ACCUSED/SUSPECT)

2

**SAVAGE PE 6, Page 104 of 135**

## FSTK 117 (2217): SECTION PGM CAS
### Revision: 10/01/16

| Brief Time: 2.3 (15 min for FAC(A) to FTR | Mission Time: CD: 1.3 EF:1.7 | Debrief Time: 2.0 |
|---|---|---|

| | |
|---|---|
| **Prerequisites:** | FSTK 116 |
| | CAT 2.2: FSTK 2216 |
| **Crew:** | RP: Solo |
| | RWSO: IP |
| **Aircraft:** | 2 x FA-18A-F |
| **Equipment:** | VTR / SSR, 2 x pylons required,  RP/RWSO: FLIR required |
| | IP: FLIR desired |
| **Ordnance:** | 2 x LGTR |
| **Weather:** | Ceiling >10,000 ft/5 nm visibility |
| **Support:** | 1 x FAC(A) / JTAC |

## MISSION PLANNING FACTORS

1. Mission Objective
   a. Perform Type 2/3 close air support (CAS) in a low threat environment utilizing precision guided munitions and advanced FLIR systems. (see notes)
2. Training Objectives
   a. Introduce proper 9-line/JTAR Type 2 and talk-on CAS procedures and communications using precision guided munitions in a low threat environment as a section.
   b. Introduce sensor postures as a section in the CAS environment.
   c. Introduce level delivery of precision guided munitions using detached section buddy lase delivery procedures and communications IAW JP 3-09.3 standard LASER brevity terms in the CAS environment. Introduce both employing and lasing platform and switch between attacks.
   d. Introduce 30/60 second spacing on section PGM attacks.
   e. Introduce target acquisition and techniques for maintaining PID as a section (including TXDSG, if L-16 equipped).
   f. Practice cockpit task management during deliveries to include scan and situational awareness.
   g. Practice proper crew resource management standards for strike phase in the CAS environment.
   h. Practice standardized communication procedures with C2 and CAS agencies.
   i. Practice SCAR (VMFAT-101 only).
3. Friendly OOB
   a. Air
      1) Fighter
         a. 2 x FA-18A-F
            i. 2 x LGTR (actual)
            ii. 1 x GBU-54(v)2, FMU-139C/B, Mk-122
   b. Surface
      2) Ground assault force composition / positioning (scenario dependent)
4. Enemy OOB
   a. Surface / Air
      1) Anticipated enemy ground force composition / positioning / scheme of maneuver (scenario dependent)
      2) Refer to situational report (SITREP) updates
5. PID criteria / ROE
   a. Expect FAC / JTAC to solve PID / CDE unless otherwise stated
   b. Correlation is required for all attacks

1

Enclosure (3)

## FSTK 117 (2217): SECTION PGM CAS
### Revision: 10/01/16

**RAC BRIEFING ITEMS**
1. Laser Comm Brevity – Describe proper laser comm brevity for buddy lase attack.
2. Sensor Posture – Describe offensive, defensive, and neutral sensor postures.

**IAC BRIEFING ITEMS**
1. Section Attack Spacing – Describe techniques for setting 30/60 second spacing during section attacks.

**CONDUCT**
1. CAS Communication Procedures – Conduct appropriate check-in/check-out procedures with the DASC and JTAC using standard MNPOPCA format. Record the provided SITREP in the standard TEFACHR format. Comply with all DASC and JTAC instructions.
2. CAS Holding Procedures – Utilize keyhole technique for holding procedures.
3. Low Threat Type 2 CAS – Conduct low threat Type 2 PGM CAS in accordance with JP 3-09.3, executing the following attacks:
   a. LGTR self-lase utilizing spacing within the section.
   b. (2 runs) LGTR – Buddy lase lead's bomb, -2's LASER. Follow on attack swap roles.
   c. JDAM/LJDAM
4. SCAR – (VMFAT-101 only)

**COMPLETION REQUIREMENTS**
1. 1 x Self-lase LGTR or SIM LGB attack utilizing 60 second spacing.
2. 1 x LGTR or SIM LGB attack utilizing detached Buddy Lase tactics.

**EXPECTATIONS**
1. This is the RAC's first and only section CAS flight, however it is their third PGM/Urban CAS event. Employment of PGM, sensor integration, and CAS communication should be executed with little or no IAC input. However, section CAS and detached buddy lase tactics are introduction items to RAC for this event. While these are introductory items, RAC must be able to demonstrate solid PGM employment, be able to maintain deconfliction in the CAS stack, and adhere to A/S training rules.

2

# SYLLABUS EVENT GRADESHEET

4/28/2017 9:26:15 AM

## Savage, Courtland

## SYLLABUS/PHASE/EVENT: EF CAT I P/STK/FSTK 117          Grade: 3.55

| Event Type | Pre Reqs Met | Student Can Log | On Track Date | Status | Actual Date | Gradesheet Type | Instructor | Signature | Reviewed |
|---|---|---|---|---|---|---|---|---|---|
| FLIGHT | True | All Data | | Failed | 3/20/2017 | NORMAL | (b) (6) | True | False |

| SKILL | 0 | 1 | 2 | 3 | 4 | 5 | NA | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 1. Brief / Preflight Preparation | O | O | O | O | ● | O | O | |
| 2. Deck Procedures | O | O | O | ● | ● | O | O | MU LOAD AND MSN CARD ADV-ALMOST DIDNT GO FYING |
| 3. Basic Airwork | O | O | O | O | ● | O | O | |
| 4. Admin Comm | O | O | O | ● | ● | O | O | VERY HARD TO UNDERSTAND ON THE RADIO |
| 5. VFR Course Rules | O | O | O | O | ● | O | O | |
| 6. System and Display Management | O | O | O | O | ● | O | O | |
| 7. Tactical Comm | O | O | O | ● | ● | O | O | DID NOT ASK QUESTIONS WHEN HAD DOUBTS ABOUT GAMEPLAN OR SETUP |
| 8. Sensor Integration (if applicable) | O | O | O | ● | ● | O | O | DID NOT MAINTAIN PID USING SENSOR |
| 9. Training Rules Adherence | O | O | O | O | ● | O | O | |
| 10. Adv. Handling / Energy Management | O | O | O | O | ● | O | ● | |
| 11. A/G Checks and Timeline Awareness | O | O | O | ● | ● | O | O | NO DROP FOR SWITCHOLOGY |
| 12. A/G Tactics and Sensor Employment | O | O | ● | ■ | O | O | O | LATE ON TOT.  SLEWED OFF TGT. |
| 13. Visual Target Acquisition | O | O | O | O | ● | O | O | |
| 14. Delivery Parameters | O | O | O | O | ● | O | O | |
| 15. Error Analysis | O | O | O | ● | ● | O | O | AFTER TAPE REVIEW, STUDENT WAS NOT AWARE OF THE GRAVITY OF ERRORS. |
| 16. Smart Weapon Employment | O | O | O | O | ● | O | ● | |
| 17. TIMING | O | O | O | ● | ● | O | O | LATE ON TIMING TODAY |
| 18. Landing Pattern | O | O | O | O | ● | O | O | |
| 19. Landings | O | O | O | O | ● | O | O | |
| 20. Crew Coordination (if applicable) | O | O | O | O | ● | O | O | |

Page   1   of   3

Enclosure (4)

Savage, Courtland SYLLABUS/PHASE/EVENT: EF CAT I P/STK/FSTK 117 (4/28/2017 9:26:15 AM)

| SKILL | 0 | 1 | 2 | 3 | 4 | 5 | NA | COMMENTS |
|---|---|---|---|---|---|---|---|---|
| 21. Headwork / CRM (DAMCLAS) | O | O | O | O | ● | O | O | |
| 22. Debrief / Professionalism | O | O | O | O | ● | O | O | |
| **Total Grades** | 0 | 0 | 1 | 7 | 12 | 0 | 2 | |

**Overall Comments:**
Significant problems on this flight due to LTJG Savage not reaching outside his cockpit to his flight lead or the FAC(A) to remove the doubt inside his cockpit. Overall trend was to stick with the SA he had, and the doubts. If the slightest impediment to acquiring that SA presented itself, there was no effort to overcome the impediment.

**Weather:** clear
Alabis: Lead-ATFLIR and MIDS; RP-no significant alabis.

**Brief:** Covered Detached buddy lase and JLASE comm at length.
Discussed SAPDARRT for all manner of LGTR employment.

**On deck:** LTJG Savage almost did not go flying based on an MU LOAD Caution that was caused by a mission card advisory. While the flight lead was troubleshooting, the FAC(A) stepped in to help the RP troubleshoot. No effort by the RP was made to solicit information from the flight lead or FAC(A). LTJG Savage followed the PCL steps with the FAC(A) and was informed that based on that MUMI page issue causing the msn card advisory, the jet was fine to take flying.

**Admin:** Very hard to understand LTJG Savage throughout the flight. Ghost 56 was the call sign. When things are unclear to LTJG Savage, this is compounded by the fact he becomes more difficult to understand by the fellow members of his flight.

**Tac Admin:** NSTR

**Flight:** Checked on station in Navy Dare to work with Falcon 45, a FAC(A) and a simulated Helo assault Force with embedded JTACs. Multiple PGM attacks. Upon initial check-in, the flight was tasked with establishing in the block 13-14K and setting up 180 degrees out overhead the target. The flight lead, asked initial 180 degrees out while orbiting over the Navy Dare target area. After the initial setting of 180 degrees, the RP will no maintain 180 degrees out, nor a stable orbit around the target area. Ghost 55 was not in MIDS, and this contributed no doubt to the RPs inability maintain 180 degrees out from lead overhead the target area, but the fact that he never asked about the location of Ghost 55 a single time during the entire flight is significant as well.

**Run 1** was a buddy lase game plan. Ghost 55 simulated GBU-12, Ghost 56 laser. Game plan is given by FAC(A). Based on remarks restrictions comm of a "Captured" call being required, Ghost 55 informs the FAC(A) that he can't make a "captured" call because Ghost 55 has not ATFLIR. Gives the option for Ghost 56 to lase his own and the FAC(A) says no. Ghost 56 will lase Ghost 55's bomb.
Ghost 55 rogers up 9 line. On Aux, discusses with Ghost 56 that he needs to change his laser code to ghost 55's laser code and be ready to lase the bomb. Ghost 55 let's him know that he will need to continuously lase the bomb based on wind limits. Ghost 55 proceeds out to make the TOT. Gives multiple sugar calls to let Ghost 56 know that Ghost 55 is turning in at 10 nm, is at 6 nm. An In (dry) call is made, followed by proper JLASE comm for the continuous lasing of the laser. With approval, Ghost 55 employs a simulated GBU-12. No comm is made by Ghost 56 at any point. Ghost 56 has proceeded out to D-10 and is setting up for his own attack, which is a departure from the briefed gameplan. No interval was ever given by the FAC(A). No request for SA was ever made by Ghost 56 to clear up the confusion of the game plan. No comm was made by Ghost 56 to Ghost 55 to stop him from releasing simulated ordnance on a target.

**Run 2** was a repeat of run 1. Ghost 56 will make a captured call and the run will proceed per the game plan.

**Run 3.** This will be a BOT self-lase for Ghost 56. Ghost 56 will have to generate some coordinates for the JTAC IOT to

Page    2    of    3

**SAVAGE PE 6, Page 108 of 135**

Savage, Courtland SYLLABUS/PHASE/EVENT: EF CAT I P/STK/FSTK 117 (4/28/2017 9:26:15 AM)

confirm the target location.  Ghost 56 makes target points on the appropriate targets buildings and gives coordinates for the attack.  Ghost 55 will employ a simulated attack and Ghost 56 will set up 90 seconds in trail.  Ghost 56 will be off the run in heading restrictions at approximately 30 seconds time to release and will make an aggressive play to the North to set up on the proper run in heading.  After his correction back to the East, Ghost 56 will make the proper in call and will receive approval from the FAC(A) to employ.  No drop for switchology; failure to arm up.

Run 4: this will be a transition to the strafe pattern.  Ghost flight will be given approval to descend to 6K to set up overhead the target IOT to strafe.  As Ghost 56 has a targeting pod, Ghost 55 asks the FAC(A) for the altitude block of 6-8k to facilitate a bunt strafe if necessary.  Ghost 55 brings Ghost 56 down to the block.  Ghost 56 remains at 8k. Through the discussion with the FAC(A) and the need for bullets (simulated) on target now, Ghost flight elects to stay overhead the target and set up for gun attacks with 30 secons of spacing.  Visual strafe patterns will be executed and tally comm is made.  Ghost 56 remains at 8k while Ghost 55 goes down to 6k to set up for strafe roll ins.  Ghost 55 rolls in.  Ghost 56 does not make anv e

Last Modified By:(b) (6)                    on 3/21/2017 7:25:33 AM

SAVAGE PE 6, Page 109 of 135

COMPARATIVE PERFORMANCE DATA – LTJG C.A. SAVAGE, USN

TRANSITION (FAM/FORM/AWI)

| | | | | |
|---|---|---|---|---|
| 18 SIMS | AVERAGE SIM SCORE: | 2.907 | RANK 87/100 | LAST 100 AVG: 2.973 |
| 14 FLIGHTS | AVERAGE FLT SCORE: | 3.029 | RANK 81/100 | LAST 100 AVG: 3.069 |
| 32 EVENTS | AVERAGE SCORE: | 2.959 | RANK 89/100 | LAST 100 AVG: 3.024 |

STRIKE (1ST LOOK AT EVENT)

| | | | | |
|---|---|---|---|---|
| 21 SIMS | AVERAGE SIM SCORE: | 2.939 | RANK 100/100 | LAST 100 AVG: 3.030 |
| 20 FLIGHTS | AVERAGE FLT SCORE: | 3.399 | RANK 100/100 | LAST 100 AVG: 3.520 |
| 41 EVENTS | AVERAGE SCORE: | 3.163 | RANK 100/100 | LAST 100 AVG: 3.277 |

STRIKE (1ST LOOK POST PRB)

| | | | | |
|---|---|---|---|---|
| 21 SIMS | AVERAGE SIM SCORE: | 3.041 | RANK 29/100 | LAST 100 AVG: 3.030 |
| 20 FLIGHTS | AVERAGE FLT SCORE: | 3.469 | RANK 92/100 | LAST 100 AVG: 3.520 |
| 41 EVENTS | AVERAGE SCORE: | 3.250 | RANK 78/100 | LAST 100 AVG: 3.277 |

IN TOTAL, STUDENT SHOWED A SIGNAL OF DIFFICULTY (SOD) ON 6 FLIGHTS AND 2 SIMULATORS

**LTJG SAVAGE TOTAL: 8**

THE AVERAGE NUMBER OF EVENTS WITH A SOD FOR AN RP IS:

**AVERAGE STUDENT TOTAL: 1.81** (THROUGH END OF SYLLABUS)

**AVERAGE STUDENT TOTAL: 0.83** (THROUGH END OF STRIKE PHASE)

VFA-106 Training Department

Enclosure (5)

(b) (6)    **CAPT CNRMA, N3**

| | |
|---|---|
| **From:** | (b) (6)        CDR VFA-87, XO |
| **Sent:** | Wednesday, July 04, 2018 9:21 |
| **To:** | (b) (6)     CAPT CNRMA, N3 |
| **Subject:** | RE: LT Savage's FNAEB |
| **Signed By:** | (b) (6) |

CAPT (b) (6)

I don't have any recollection of anyone on the board telling LT Savage he was capable of successfully transitioning to another platform. The FNAEB instruction is pretty clear on what the board can recommend, and the board is not authorized to recommend transition to another platform. The board recommend B1 to CNAL for final adjudication.

Please feel free to reach out if I can be of any other assistance. I was on leave until todays so I apologize in the short delay getting back to you.

V/R,

CDR (b) (6)
VFA-87 (b) (6)
(757) 433-9438 Office
NIPR: (b) (6)
SIPR: (b) (6)

-----Original Message-----
From: (b) (6)      CAPT CNRMA, N3
Sent: Monday, July 02, 2018 1:43 PM
To: (b) (6)           VFA-87, XO
Cc (b) (6)         CAPT CNRMA, N3
Subject: LT Savage's FNAEB

CDR (b) (6)

I am investigating LT Savage's EO complaint against VFA-106 and know that you were a member of his FNAEB.

There are no charges against you, therefore I will not ask you to waive your Article 31b rights.

Please answer these questions:
1) LT Savage states that at the conclusion of his FNAEB "they [CDR (b) (6) and LCDR (b) (6)] believed I was more than capable of successfully transitioning to another platform". Is that true?
2) Do you remember LCDR (b) (6)   telling LT Savage the same thing?

Thanks for your time.

Very respectfully,

CAPT (b) (6)      USN
Commander, Navy Region Mid-Atlantic

1

(b) (6)      **CAPT CNRMA, N3**

| | |
|---|---|
| **From:** | (b) (6)                    LT VFA-106, Instructor |
| **Sent:** | Monday, July 09, 2018 11:17 |
| **To:** | (b) (6)        CAPT CNRMA, N3 |
| **Subject:** | RE: LT Savage investigation |
| **Signed By:** | (b) (6) |

CAPT (b) (6)

I was instructed - by the VFA-106 Legal Officer - to read LT Savage his Article 31b rights prior to the interview.

I received informal guidance by the VFA-106 Legal Officer as to how to perform the interview, and I was also referred to the PIO instruction.

When reading the Article 31b rights to LT Savage, I told him (by the direction of the Legal Office) that the command did not suspect him of any crime at that time.

V/r,
LT (b) (6)

-----Original Message-----
From: (b) (6)         CAPT CNRMA, N3
Sent: Sunday, July 08, 2018 8:04 PM
To: (b) (6)        _         LT VFA-106, Instructor
Cc: (b) (6)         CAPT CNRMA, N3
Subject: LT Savage investigation

LT (b) (6)

I am the designated Investigating Officer for LT Savage's EO complaint.

I have some questions:
- When you conducted the Preliminary Investigation into racial discrimination, were you instructed to read LT Savage his Article 31b rights prior to interviewing him?
- If yes, by whom?
- If no, why?
- Did you receive any legal guidance prior to conducting the PI?  VFA-106 Legal Officer?

I would appreciate a quick response.  Thank you.

Very respectfully,

CAPT (b) (6)      USN
Commander, Navy Region Mid-Atlantic
N3/Regional Dispatch Center (RDC) Project Lead
(757)322-2742

1

23 FEB 18

Subj:   STATEMENT BY LT (b) (6)                    CURRENT OPERATIONS
        OFFICER, VFA-106

1.   I am an Instructor Pilot at VFA-106 and was assigned as LTJG
Savage's mentor by LCDR (b) (6)       in November 2016.  I believe
he selected me for that role because LTJG Savage did not
successfully complete the Strike Phase of his training on his
first attempt and, as a qualified Joint Tactical Air Controller
(JTAC) and Forward Air Controller, Airborne (FAC(A)), I have
deep experience in the skills necessary to succeed in the strike
mission.

2.   In his complaint, LTJG Savage misrepresents our mentorship
interactions, claiming we met, "at most on six occasions, never
for more than 5 minutes."  In fact, I met with him on at least
10 separate occasions between November 2016 and February 2017
and kept notes on the meetings.

3.   Initially, I did not find LTJG Savage to be especially
motivated to improve the skills necessary to complete the Strike
Phase of Training, so we worked together to develop a plan to
improve his performance.  This remediation plan included both a
commitment to spend more time studying, as well as the execution
of a number of simulators to address certain shortfalls.  I also
offered my personal support to help in any aspect of his
training; however, he neither approached me for my assistance
nor shared with me any concerns about his ability to
successfully complete the Strike Phase on his second attempt.

4.   I saw steady improvement in his ability to execute the
skills necessary in Strike, but I continued to be concerned
about his basic airmanship due to numerous Safety of Flight
issues noted in his simulator work.  For example, as part of his
remediation, I worked with LTJG Savage on an SFAM simulator
event in January 2017. During this event, LTJG Savage performed
very well in the execution of strike elements, but his handling
of Emergency Procedures (EPs) was well below average.  As a
result, I recommended that he receive an additional EP simulator
before being allowed to progress to the aircraft.  This event,
in my view, was representative of the primary reason that LTJG
Savage was ultimately removed from training:  a concern about
his ability to safely address unexpected difficulties while in
the air.

5.  Overall, I believe that LTJG Savage tried to maintain a positive attitude while working through some difficulties in his performance.  I did my best to help prepare him for his second attempt to complete the Strike Phase, but ultimately, it was not enough to help him overcome his performance deficiencies in other elements of aviation.

(b) (6)
LT, USN

From: LtCol (b) (6)          , USMC
To:   Captain (b) (6)     , USN

Subj: CALL SIGNS AT STRIKE FIGHTER SQUADRON 106

1. The following is in response to an email request for information regarding student aircrew call signs at VFA-106. Several administrative notes are addressed prior to the questions and responses from the unit's Executive Officer.

   a. CDR (b) (6) cc'd) is now the CO of VFA-106 as of 25 Jun 2018.

   b. Aircrew call signs are generally not formal and as such it isn't an official process.

   c. Typically, across all of my squadrons, not just VFA-106, call signs are developed post an event in which one produces some type of memorable experience for one's own squadron mates, often times a prank, good joke, or mistake that we utilize to thicken one's skin. As a general rule of thumb, the intent is to sharpen the individuals professional or personal sharpness.

   d. Not every call sign is as it appears and should you not understand our culture, community or the events developing the call sign we (referring to all Naval Aviators) would not expect one to necessarily understand.

   e. IP call signs are from their fleet squadrons and during my tenure here I have yet to see an IP call sign change (although it is possible). Students come with a call sign from their prior squadron and typically keep those until their Strike Detachment occurs. Once in a while a student will do something meaningful enough, good or otherwise, that will earn them a call sign prior to Strike Detachment. Student call signs at times remain with aircrew after they depart VFA-106. (i.e. the same call sign they arrived with, they depart with, no one at VFA-106 was involved in the process).

   f. The CO can trump any assigned call sign anytime and always as with all other matters has the final say however, rarely does he review them and never in my tenure as XO have I seen or felt it needed to involve him in call signs.

2. Questions and Answer.

   a. Who is head of the board? CO or XO or DH? No formal board head, no formal board exists. Typically, the JOs address their own regarding the development of call signs. I know of no such board in any aviation unit.

   b. What is the board comprised of? Any JOs? Minorities? Females? No formal board exists however, call signs can come from any officer in the unit, even the ground officers will typically have a call sign or nickname although not utilized as often as aviators. When call signs are developed here at VFA-106 aircrew IPs that are on Strike Det with the students at the time, generally begin call sign development. All are American Fighter pilots, (often a Canadian, Australian, French or Swiss IP is in the mix). You either are a fighter pilot / weapons systems

Officer (WSO) or you are not, to have a valid opinion in regards to a call sign you must be in the mix of fighter aviation at VFA-106. We do not distinguish that opinion or our aircrew by minority or sex, nor do we know. That requested information is PII. The men and women at VFA-106 are all Americans and that is what we consider our nationality. Rank is discernable and all the JOs are in the mix.

c. How often is the board held? About every 6 weeks a Strike Det occurs.

d. Boards held at Oceana or on det? Typically call signs develop away from NAS Oceana. During the Strike detachment the JO IPs meet for a student review (normally at an IP dinner away from the squadron) post week 1 and typically a call sign review ensues. During the det student aircrew call signs begin to develop or are suggested by other IPs. Normally at the dinner there are some O-4s, sometimes some O-5s and more often than not myself (the XO), the Training O, the CO or the OPSO. If a call sign were to be suggested that is deemed inappropriate it would be immediately addressed. O-4s and O-5s have seen a lot of these and very rarely have to step in. The JOs also know that should a student aircrew arrive home with a call sign deemed inappropriate, then it will not last the test of time, and some formal/informal counseling will occur. That counseling takes many forms.

e. Any guidance from leadership (CO or XO, CDRE, CNAF) used for board? Guidance for the group is informal but legitimate, more unwritten rules than official orders.

1. Call signs need to be appropriate in nature but, are not confined to those that do not understand our culture and history.

2. They will not be derogatory in nature. Fun and humorous is good but they are not to be offensive to the aircrew or any other.

3. If you think the XO will have questions, you now have questions.

f. How many pilots/NFOs at a time? Numbers depend on class size, normally 6-10 pilots, 4 NFOs is an approximate estimate.

g. Are most call signs given due to person's name? Sometimes call signs are based on the aircrew's name ie "Mo" Vaughn, "Count" Boese or "MC" Hanner. Probably not the norm, no formal tracker.

h. Can you please give me last 10 c/s given as well as gender/race? Without the Service member's record book or medical record no certainty exists as to the definitions requested or sex based on current DOD policies. We can attempt to affiliate with the following.

1. Skunk Ape - male, American
2. Princess– male, American
3. Pinky Pie – male, American
4. Twilight Sparkle – male, American
5. Derby hooves – male, American

6. CHAM – male, American
7. Sassy Saddles – male, American
8. Scoot-a-loo – male, American
9. Hoity Toity – male, American
10. Old Deuteronomy – male, American

i. Are minorities (i.e., African-Americans, Hispanics) generally given call signs associated with their race or color? Not aware of that thought process or generality. Typically, call signs are assigned for doing something not highly intelligent in nature, perhaps your personality has a quirk, or you survived something luckily, just some beginning ideas in regards to how one may receive a call sign. These are just example but call signs are not limited to just the aircraft, they might have to do with your officership or a social behavior (If you are a highly talkative person you might get the call sign "Hot Mic" (pronounced Hot Mike), particularly if your first name was Mike) as hot mic references the voice box reception always being on in the aircraft.

j. Are Caucasians generally given call signs associated with their race or color? Not aware of that thought process or generality. Typically, call signs are assigned for doing something not highly intelligent in nature, perhaps your personality has a quirk, or you survived something luckily, just some beginning ideas in regards to how one may receive a call sign. These are just example but call signs are not limited to just the aircraft, they might have to do with your officership or a social behavior (If you are a highly talkative person you might get the call sign "Hot Mic" (pronounced Hot Mike), particularly if your first name was Mike) as hot mic references the voice box reception always being on in the aircraft.

k. Are females generally given call signs associated with their gender? Not aware of that thought process or generality. Typically, call signs are assigned for doing something not highly intelligent in nature, perhaps your personality has a quirk, or you survived something luckily, just some beginning ideas in regards to how one may receive a call sign. These are just example but call signs are not limited to just the aircraft, they might have to do with your officership or a social behavior (If you are a highly talkative person you might get the call sign "Hot Mic" (pronounced Hot Mike), particularly if your first name was Mike) as hot mic references the voice box reception always being on in the aircraft.

(b) (6)

2 May 18

From:   CAPT (b) (3) (A), (b) (6) USN
To:     CAPT (b) (3) (A), (b) (6) USN

Subj:   NAVPERS 5354/2 STATEMENT ICO (b) (3) (A), (b) (6)

1. I have reviewed Capt (b) (3) (A), (b) (6) NAVPERS 5354/2 Equal Opportunity Report and recommend it be rejected as untimely and as having been previously addressed. Alternately, I request it be determined unsubstantiated on its merits.

2. Capt (then 1stLt) (b) (3) (A), (b) (6) was a F/A-18C Fleet Replacement Squadron (FRS) student during my time as the VFA-106 Commanding Officer. His training was halted on 19 February 2016 due to substandard aeronautical performance. During his time at VFA-106, Capt (b) (3) (A), (b) (6) appeared before a Human Factors Board (HFB), Performance Review Board (PRB), and Field Flight Performance Board (FFPB), as well as a USMC Flight Status Selection Board (FSSB) as part of the FFPB process. Capt (b) (3) (A), (b) (6) checked out of VFA-106 on 1 June 2016. My last interaction with him was on 8 July 2016, when I provided a response to his mast request, confirming decisions on his FFPB case. LtGen Jon M. Davis, USMC Deputy Commandant for Aviation (DCA) adminstered final adjudication of the FFPB report on 19 August 2016, directing Capt (b) (3) (A), (b) (6) to transition to the USMC KC-130 training pipeline.

3. Over approximately 18 months, Capt (b) (3) (A), (b) (6) contested multiple aspects of his FFPB. His grievances are captured in the following:

        12 May 2016—Response to Board Opinion
        28 June 2016—NAVMC 11296 Request Mast Application
        15 November 2016—Inspector General Complaint
        1 March 2017—Complaint of Wrongs under Article 1150
        10 May 2017—Article 1150 Rebuttal
        10 May 2017—Article 1150 Supplementary Rebuttal
        6 December 2017—EO Complaint

4. In four documents submitted between 12 May 2016 and 1 March 2017, Capt (b) (3) (A), (b) (6) made no allegation of racial discrimination. The first accusation does not occur until his 10 May 2017 Article 1150 rebuttal. This was 306 days after my last interaction with him on 8 July 2016. Capt (b) (3) (A), (b) (6) then waited an additional 210 days to submit this NAVPERS 5354/2 Equal Opportunity Report. Per OPNAVINST 5354.1G, a formal report shall be made within 60 calendar days of the offending incident, or the most recent incident in the case of a series of incidents. As with his late submission of the 2017 Article 1150 complaint, the excessive 516 day tardiness of this current EO complaint cannot be justified by any unusual circumstance. Additionally, none of Capt Ashley's grievances are new. In this EO report, he repeats previous allegations that: (1) I treated him different than other students; (2) I included false and inaccurate ranking information in my FFPB endorsement; and (3) he was subject to FFPB board membership comprised of interested members. I responded to these concerns in my 8 July 2016 Request Mast response and 7 April 2017 statement on Article 1150 complaint. Having failed to gain wanted resolution during the FFPB and Article 1150 processes, Capt (b) (3) (A), (b) (6) has simply resubmitted old arguments using different means. I contend this complaint should be rejected because it is excessively late and has been previously reviewed.

5. An in-depth understanding of Capt [(b) (3) (A), (b) (6)] performance deficiencies leading to his removal from the F/A-18C training pipeline can be obtained by reviewing his HFB, PRB, and FFPB reports. My assessment of Capt Ashley's performance as the VFA-106 Commanding Officer is captured in my 7 June 2016 FFPB endorsement. I stand by the opinions and recommendations contained in that endorsement.

6. Capt [(b) (3) (A), (b) (6)] ongoing narrative is he was an average performing replacement pilot (RP) who was unfairly removed from training. To support this, Capt [(b) (3) (A), (b) (6)] cites a 55/100 ranking which he alleges I subsequently undercut with a "false" and "made up" ranking system in an attempt to wrongfully remove him from the F/A-18C flight syllabus. It is worth noting that Capt [(b) (3) (A), (b) (6)] tactical struggles were not unique to his time at VFA-106. After doing exceedingly well during primary flight training, his performance fell off considerably during advanced jet training at VT-7 where he placed in the bottom 4th percentile of his peer group.

7. The F/A-18C Category I pilot syllabus consists of 153 evaluated events (66 simulators and 87 flights) and is broken up into four major phases—Transition, Strike, Fighter, and Carrier Qualification. Similar to the Navy Standardized Score (NSS) model applied in CNATRA flight training, VFA-106 uses a moving ranking system to determine how graduating replacement aircrew (RAC) compare to the previous 100 syllabus completers. Attrites who fail to complete the syllabus are not factored into the previous 100 ranking pool. Substandard performance, safety-of-flight, or directive (SOP, NATOPS, etc.) violations can result in an event failure known as a Signal of Difficulty (SOD). The vast majority of RAC complete events on their first attempts in line with training curriculum intent. A VFA-106 snapshot from 1 January 2015 to 31 December 2016 revealed a total of 135 Category I RP syllabus completers (35 F/A-18C and 100 F/A-18 E/F). The average number of SODs was .82 per RP through the Transition and Strike phases (76 events) and 1.8 per RP throughout the entire 153 event syllabus. Cap [(b) (3) (A), (b) (6)] received three SODs during Strike phase alone, necessitating a pause in his training. During the 2015 and 2016 timeframe, only three RPs, including Capt [(b) (3) (A), (b) (6)] repeated Strike phase due to performance issues (≈2.2%). Training complexity increases as replacement aircrew progress through the syllabus and significant early struggles rarely translate to later success. As evidence, none of the three RPs required to repeat Strike phase successfully completed the F/A-18 FRS syllabus.

8. While Capt [(b) (3) (A), (b) (6)] is correct in stating he was ranked 28 / 100 in Strike phase and 55 / 100 overall, these numbers come with an important caveat. The system which compiles the ranking data assumes events are completed, as intended, on the first attempt. It does not have the agility to reconcile multiple grade sheets attributed to the same event particularly when an entire phase is repeated. The above rankings did not paint a fully accurate picture as Capt [(b) (3) (A), (b) (6)] repeated 15 separate Strike events, some up to three times, with only his most recent grades being factored into the relative ranking. This is analogous to comparing an academic student who took the same test three times achieving scores of 50%, 70%, and 90% against another student who achieved 85% on their first and only test attempt. Making an apple-to-apples comparison above is difficult since it is reasonable to infer the second student's scores would have also improved if given two more test taking opportunities. I clearly made this point in my endorsement of Capt [(b) (3) (A), (b) (6)] FFPB stating, "His initial attempt at the Strike syllabus yielded a ranking of 84 of the previous 100 RPs . . . ." This did not take away the 28 / 100 ranking he attained on a follow-on phase attempt but instead put it in proper context noting, "He demonstrated improvement in the Strike phase through heightened monitoring and additional training opportunities, but only after subsequent attempts at the phase." Capt [(b) (3) (A), (b) (6)] also completed 56% of the Fighter phase events before his training was

eventually terminated.  As system rankings are typically not generated until after a RAC completes all events in a particular training phase, I asked my training department to perform a comparative analysis of the events only Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾ ⁽ᵇ⁾⁽⁶⁾completed to get a quantitative measurement of his advanced tactics performance since he was over half way through Fighter phase.  Again, this data caveat is clearly communicated in his FFPB endorsement.

9.  As I explain above, the process assumes everyone can successfully complete the syllabus and the ranking reflects this by capturing only the most recent scores of passing students.  Additionally, rankings are extremely fluid and change frequently as event grade sheets are continually entered into the system.  For these reasons, Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾focus on the ranking is a red herring.  If a RAC demonstrates the requisite ability to safely execute the FRS syllabus and complete the required training objective in each phase, they will graduate and move on to an operational fleet squadron regardless of their relative position, even if ranked 100 / 100.  The opposite is also true, a top ranking RAC will not graduate if they cannot safely and successfully complete a particular training objective such as night carrier qualification.  A ranking is simply one of several data points which inform a broader assessment of a RAC's performance, potential, and motivation.  As I wrote in my Article 1150 statement: "In situations where replacement aviators struggle, their performance is evaluated carefully on a case-by-case basis to determine the best course of action."

10.  Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾ ⁽ᵇ⁾⁽⁶⁾claims "different treatment" disadvantaged him.  In reality, Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾was given more opportunities to succeed than others, to include repeating 14 flight and 21 simulator events.  He went through the full range of administrative boards (HFB, PRB, and FFPB) during his time at VFA-106.  The 17 June 2015 HFB occurred after ⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾training was halted due to three SODs in Strike phase.  A 22 July 2015 PRB took place a short time later after Ashley completed remedial strike refresher training.  I concurred with the VFA-106 Training Officer's 27 July 2015 PRB recommendations which established: "These are the final measures intended to allow 1stLt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾the opportunity to successfully complete the FRS syllabus.  If there are follow on failures, even with 1stLt ⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾exceptional attitude and motivation, those will not make up for his shortcomings as an F/A-18 pilot and will not warrant additional training resources."  Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾later received a fourth SOD on 25 January 2016 during a Basic Fighter Maneuvering (BFM) event.  Nonetheless, I permitted Capt ⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾to continue training until a subsequent fifth safety-related SOD on 19 February 2016 convinced me a FFPB was necessary.  I did this, because I assessed his professionalism and exceptional work ethic coupled with the extended length of time since his last SOD warranted him another attempt.  However, allowing Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾to continue training after he failed the conditions of his PRB was not an opportunity I extended other RAC under similar probationary circumstances.

11.  Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾complains some of his FFPB board members were biased because they were associated with a group chat named "Pure Bloods".  I was unfamiliar with this name until I reviewed the EO complaint but have recently learned this was a group comprised of junior officer instructors.  The group name is a tongue-in-cheek reference to their Naval Academy lineage and I have no reason to believe it possesses racial undertones.  Capt ⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾board members were in fact selected based solely on criteria established in Marine Corps Order 1000.6.  Additionally, Capt⁽ᵇ⁾⁽³⁾⁽ᴬ⁾, ⁽ᵇ⁾⁽⁶⁾was notified of his FFPB right to challenge board membership on 29 February 2016, but he did not object.

12. Each FRS is continually measured on its ability to produce replacement aircrew and every fully trained pilot and WSO is critical to meeting operational squadron manpower needs. It is irrational to remove a RAC from training unless it is absolutely necessary to do so. In an unlimited resource environment, it might have been possible for Capt[(b) (3) (A), (b) (6)] to have completed the FRS syllabus by repeating many additional syllabus events. However, in addition to the $11,773 FY16 cost per F/A-18C flight hour, every time Capt[(b) (3) (A), (b) (6)] re-flew an event it also tied up valuable aircraft, range space, maintainer, and instructor resources to the detriment of other FRS production needs. While efficiency concerns played a small role in the decision to halt Capt[(b) (3) (A), (b) (6)] F/A-18C training, the overarching factor was that he was heading down a path towards an aircrew-induced mishap. As I wrote in my Article 1150 response: "Referring a struggling aviator to a Field Naval Aviator Evaluation Board (FNAEB) or FFPB is a solemn decision and one not taken lightly." In my professional judgment, initiation of a FFPB was necessary in Capt[(b) (3) (A), (b) (6)] case, because he posed an excessive safety risk to himself, the Command, and the USMC tactical aviation community. Race played absolutely no role in the decision.

13. Capt[(b) (3) (A), (b) (6)] has been afforded more than a fair opportunity to raise his concerns over the last two years. He appears intent on recycling old complaints using different grievance procedures continuing a trend of draining valuable time and resources away from others. It is time this matter be finally settled. I respectfully recommend you determine this complaint to be unsubstantiated.

(b) (3) (A), (b) (6)

(b) (3) (A), (b) (6)

23 Apr 2018

From: Major (b) (3) (A), (b) (6) USMC, Assistant Operations Officer, Strike-Fighter Squadron ONE ZERO SIX
To:      CAPTAIN (b) (3) (A), (b) (6) USN, N3, CNRMA

Subj:   STATEMENT REGARDING EQUAL OPPORTUNITY COMPLAINT

Encl:   (1) Flight Status Selection Board (FSSB) Memorandum of Senior Member, dtd 15 Aug 16
        (2) Screenshot of What's App Chat Conversation with Date of Conversation as 11 Sep 17
        (3) Screenshots of Meaning of the Eggplant Emoticon from Multiple Internet Sources

On 24 Feb 16, the CO of VFA-106 appointed me via a Convening Order as the senior member of a Field Flight Performance Board (FFPB) for First Lieutenant (1stLt or Lt) (b) (3) (A), (b) (6)  At the time, I was the XO of Marine Aviation Training Support Group-33 (MATSG-33), the "PSD" for Marines aboard NAS Oceana. I was also an Instructor Pilot at VFA-106. An FFPB is the process for which Marine Aviators undergo for flight performance issues that persist when unit level means of correcting flight deficiencies have been exhausted (Human Factors Board (HFB), Performance Review Board (PRB), counseling, remedial syllabi, etc). The governing document for a Marine FFPBs is MCO 1000.6, the USMC ACTS Manual.

At the time of the Convening Order, I was aware 1stLt (b) (3) (A), (b) (6) was having issues with performance, although I, and other board members, did not yet know the full extent. As the XO of MATSG-33, it was my job to have situational awareness to where each Marine student was in the syllabus, and how they were generally performing. 1stLt (b) (3) (A), (b) (6) reputation at this time was that he was a hard worker, determined to succeed, and a polite and professional officer. When I was appointed, to started looking into his HFB, PRB, grade sheets, and his performance in Flight School. I officially gave notification of the FFPB to Lt (b) (3) (A), (b) (6) on 24 Feb 16, FFPB Encl (2) which he signed. (The FFPB is not enclosed in this document due to PII and its size, but can be provided upon request.) This Notification states what his rights are and that he understands them. I cannot recall if he had any questions at the time of notification.

At 1400 on 29 Feb 16, the FFPB was convened by me and three other board members: LCDR (b) (3) (A), (b) (6) (b) (3) (A), (b) (6), Flight Surgeon; LT (b) (3) (A), (b) (6) VFA-106 Instructor Pilot; and LT (b) (3) (A), (b) (6) VFA-106 Instructor Pilot. **It is noted in the FFPB's Preliminary Statement that Lt (b) (3) (A), (b) (6) did not object to the composition of the board.** The board met with Lt (b) (3) (A), (b) (6) and several other witnesses who were available. The board conducted an in-depth analysis of Lt (b) (3) (A), (b) (6) record that covered his performance at VFA-106 and in flight school, and are included in the FFPB report and its enclosures. Lt (b) (3) (A), (b) (6) requested statements from several instructors from VFA-106 and flight school on his behalf, and they were also included in the FFPB package. IAW the FFPB checklist, Lt (b) (3) (A), (b) (6) was allowed to access and review all materials considered by the FFPB prior to the report's initial submission to the Convening Officer, CAPT (b) (3) (A), (b) (6) VFA-106 CO. He submitted a written statement that is included as Enclosure (17) to the FFPB.

One of the concerns that Lt (b) (3) (A), (b) (6) expressed to me at the time just before submittal, and in his written statement (Pg 10 of 45, FFPB Encl (17)), was what MCO 1000.6 says about no witness or "interested party" being a member of the board. I explained to him that no member of the board was your instructor for one of your failed events (called "SODs" or Signal of Difficulty or "pink sheet"), and I, as the senior member, has never flown with him. LT (b) (3) (A), (b) (6) flew two flights with Lt (b) (3) (A), (b) (6) (2x FAM flights); in both flights there were no issues or concerns noted by the IP. LT (b) (3) (A), (b) (6) flew a Fighter-Weapons flight that was a "nice" flight; he also flew a Fighter-Weapons sim that was considered "average." In fact, one of

(b) (3) (A), (b) (6)

23 Apr 2018

the gradesheets Lt<sup>(b)(3)(A),(b)(6)</sup> submitted in his written statement to highlight comments that show "I am improving and I correct my mistakes" (Pg 8 of 45, FFPB Encl (17)) is a grade sheet from LT<sup>(b)(3)(A),(b)(6)</sup> a supposed "interested party" board member (Pg 15 of 45). He seems to be playing both sides of the coin. The point is that over the course of a student's syllabus, a student will end up flying with almost all of the instructors in the squadron. This is especially true in Lt<sup>(b)(3)(A),(b)(6)</sup> case as he has flown many additional flights and sims beyond what the syllabus allots. To put experienced instructors on the board who have had no contact with the respondent is not practical. VFA-106 instructors are not, by default, interested parties, but are used since they have a breadth of experience instructing many FRS students and intimately understand the characteristics and trends of struggling FRS students. Ultimately for this FFPB, the decisions of the board were made based on the evidence included in the FFPB, and nothing outside of the evidence included in the FFPB.

Another complaint that Lt<sup>(b)(3)(A),(b)(6)</sup> had about the FFPB that was documented in his initial statement (FFPB Encl (17)) was that he didn't have the opportunity to sit in on the board when the panel interviewed other witnesses (Pg 10 of 45, FFPB Encl (17)), nor did he have the ability to cross-examine the witness. The FFPB process does not dictate either of these as a right, nor did he even request to do so at the time the board was in session. **MCO 1000.6 states, "An FFPB is an informal administrative board…" and "legal rules of evidence and testimony do not apply," and FFPBs "may consider and include in the record any matter of reasonable authenticity relevant to the case." He was advised of, and acknowledged, all of his rights pertaining to the FFPB in his Notification, FFPB Encl (2). Furthermore, the board ensured his rights were not infringed and allowed him to exercise those rights.**

After Lt<sup>(b)(3)(A),(b)(6)</sup> submitted his written statement, it took another couple of weeks to type up the FFPB Report. The determination of the FFPB was for him to transition to another manned Marine aviation platform other than TACAIR. The FFPB was submitted to the Convening Officer, CO VFA-106, after which the respondent is now given his official copy of the entire FFPB Report, including enclosures. On 5 May 16, he signed an acknowledgment (FFPB Encl (26)) that he was provided the completed FFPB and he noted his desire to make a statement. On 12 May 16, Lt<sup>(b)(3)(A),(b)(6)</sup> provided his Response to the Completed FFPB (FFPB Encl (27)).

One of the complaints that Lt<sup>(b)(3)(A),(b)(6)</sup> had in is Response was about the routing of the FFPB. According to COMNAVAIRFORINST 5420.1F on page 2, Marine Aviators assigned to Navy Commands shall be processed using the procedures outlined in reference (a), which is MCO 1000.6 ACTS Manual. In the 5420.1F, it also says that the FFPB report shall be routed via FRS CO, MATSG CO, Type Wing Commander, TYCOM, then CMC. This is a disagreement in the routing chain between 5420.1F and MCO 1000.6. However, even the 5420.1F, on page 18 states, "Where conflicts exist between this instruction and reference (a) [MCO 1000.6], the procedures outlined in reference (a) **shall** be used." Bottom line, a Marine FFPB will use a Marine Corps Order. I called the Marine Corps' FFPB SME, LtCol<sup>(b)(3)(A),(b)(6)</sup> ASM-52 about this conflict, and he directed the FFPB be routed VFA-106 CO, MATSG CO, MCIS CO, USMC Trng Cmd CG, CMC. As a result of this conflict, I believe ASM-52 and the Navy's FNAEB SME collectively updated the 5420.1F to correct this conflict. I tried to explain this to Lt<sup>(b)(3)(A),(b)(6)</sup> several times, but he didn't want to accept the fact that MCO 1000.6 abides and that the way the FFPB was routed was correct.

Now that the FFPB was submitted, my job was to be apprised of what level of command the FFPB was at and to get copies of each endorsement along the way. On 28 Jun 16, Lt<sup>(b)(3)(A),(b)(6)</sup> submitted a NAVMC 11296, Request Mast (RM) to see CAPT<sup>(b)(3)(A),(b)(6)</sup> VFA-106 CO. The RM went through me since at this point I am the Detachment Commander of MATSD Oceana (formally MATSG-33). The RM was heard by

2

(b) (3) (A), (b) (6)

23 Apr 2018

CAPT (b) (3) (A), (b) (6) on 8 Jul 16. Lt (b) (3) (A), (b) (6) submitted a written statement where he again complained of the FFPB being improperly routed. Other complaints were: He was not allowed to make a rebuttal and that additional information was added to the FFPB report. He requested that my FFPB report be recalled and another report be conducted on the basis of the board members being interested parties. CAPT (b) (3) (A), (b) (6) thoroughly responded in writing to Lt (b) (3) (A), (b) (6) RM statement in which he alluded to the board's actions being IAW MCO 1000.6 and refuted the claims of Lt (b) (3) (A), (b) (6) (CAPT (b) (3) (A), (b) (6) response can be provided upon request.)

The RM submitted by Lt (b) (3) (A), (b) (6) corresponds to the time when Officers in the squadron started to have a negative impression of him. He was dissatisfied and refused to accept the results of the FFPB. As a result, he tried to discredit the credibility of the board process. The accusations of procedural errors, that he didn't have chances to respond, that he couldn't question witnesses or sit in during witness interviews, that the board has "interested parties," that the board used methods or evidence that was not authorized, to name a few, became a ceaseless attack. He requested Mast again, but this time with the Marine Corps Intelligence Schools (MCIS) CO, Col (b) (3) (A), (b) (6) I cannot recall the date). His attempts at redress were tedious and time consuming.

The four endorsements the FFPB required before getting to the FSSB, addressed to the level of detail and effort that went into the FFPB. "The FFPB did an admirable job thoroughly reviewing 1stLt (b) (3) (A), (b) (6) overall performance and providing well thought out opinions and recommendations." "The FFPB report thoroughly details the strengths and weaknesses of 1stLt (b) (3) (A), (b) (6)" On 15 Aug 16, the FSSB published the memorandum of their decision to transition Lt (b) (3) (A), (b) (6) to KC-130Js, agreeing with the FFPB's recommendation. In the FSSB's Findings and Opinions, **"the Board found that the procedures of the Field Flight Performance Board were in accordance with all relevant orders and directives"** (Encl (1)). The FFPB package was accepted by each level of command in the routing chain, and was not rejected or sent back for any bias or a lack of impartiality.

While waiting for his orders to train in KC-130Js, Lt (b) (3) (A), (b) (6) worked at MATSD Oceana and reported to me. Not much was expected of him during the day; I had him working on a PI and I believe a LOD Determination. He had a lot of latitude to PT, come in mid-morning and leave early afternoon. Around the end of Aug 16, he received his PCS orders to report to MATSG-22 on NAS Corpus Christi. He set up his check out to be the first week in Sep 16, although I can't recall the exact date. On the day he left, he came into MATSD Oceana, picked up his orders with the Marines up front, then took off. He never checked out with me, told me he's leaving, or submitted to me his MROW for his fitrep. I was surprised at his lack of decorum to see me, or even call to let me know he was leaving. I called him on his phone a few minutes later and he said he was already two hours on the road. I counseled him for lack of professionalism, yet still wished him luck in his new career path.

A few days later, I called the MATSG-22 XO, LtCol (b) (3) (A), (b) (6) to let him know that Lt (b) (3) (A), (b) (6) was on his way to Corpus Christi, and he seemed to already be expecting him. I gave him a summary of his time at VFA-106, to include his dissatisfaction with the results of the process starting with the FFPB. I also asked him if he would be willing to brief Lt (b) (3) (A), (b) (6) on proper check out procedures and courtesy.

From about Sep 16 until I turned over MATSD Commander in Aug 17, I worked daily with LtCol (b) (3) (A), (b) (6) VFA-106 XO, on Marine issues. Newly promoted Capt (b) (3) (A), (b) (6) had initiated an IG complaint against VFA-106, still seeking redress of his attrition from the F/A-18 pipeline. I was not given the details. During this time, LtCol Nesbitt would occasionally ask me for information about the FFPB and FSSB so that he could answer RFIs related to the IG. I do not know for sure if the IG went up the USMC or USN chain,

3

(b) (3) (A), (b) (6)

23 Apr 2018

but either way it involved VFA-106.  From what I understand, other instructors at VFA-106 were interviewed concerning the IG and the instructor cadre knew something "not good" was brewing.

By this point, negative sentiment had started to develop amongst the instructors about Capt (b) (3) (A) (b) (6). Instructors were upset that Capt(b) (3) (A), (b) (6) was manipulating the system after he was attrited, and was casting undeserved aspersions upon the command which naturally offended the instructor base.  Though rumor at the time, it was believed that the IG/CONGRINT was based on racial discrimination, which further frustrated the instructor corps.

Shortly after joining VFA-106 in 2015, I was invited into a private chat room called "Pure Bloods" on What's App.  This is an unofficial app we use on cell phones to better enhance our communication amongst the instructors.  There are different chat rooms we use for different purposes:  some for use at work amongst different departments, and some that are recreational.  **Pure Bloods is a chat room for instructors that are USNA graduates**.  We pass info about Navy Football games and tickets, talk about homecoming, coordinate wearing our class rings on Fridays, quote old Academy sayings, make jokes, and give each other a hard time.

On Monday, 11 Sep 17, **eighteen months after I submitted the FFPB** (Encl (2)), a conversation began about Capt (b) (3) (A) (b) (6) that started with a joke about when the canopy was blown off an F/A-18.  Capt (b) (3) (A) (b) (6) at this time, was assigned to his fleet KC-130 squadron at MCAS Miramar, CA.  After months of hearing these unfounded claims brewing against VFA-106, the collective frustration of the situation manifested itself in the conversation.

It appears Capt (b) (3) (A), (b) (6) has issue with my comment on the chat, in reference to a class t-shirt that made light of the canopy incident.  He thinks it showed I had bias a year-and-a-half prior at the time of the board.  **My comment made on a private chat well after the FFPB was completed, was after Capt (b) (3) (A), (b) (6) repeated attempts to manipulate the system and criticize a fair process.  However, prior to, and during the FFPB, the sentiment behind my comment did not exist since it was his actions post-adjudication that inspired that sentiment.**

Capt (b) (3) (A), (b) (6) accused me of "not stopping or reporting a racist conversation" on the chat.  I did not see a racist conversation take place, therefore, there was nothing to stop or report.  As to the use of the eggplant emoticon by another member on the chat, I have included Encl (3) to reflect my understanding of it.

In my opinion, Capt (b) (3) (A), (b) (6) didn't like the end result of the FFPB/FSSB process—even though he got a better outcome than others historically have—and he is trying every method he can to overturn the results, culminating in making these unfounded accusations.

# (b) (3) (A), (b) (6)

4

(b) (6)

Statement in regards to Capt. (b) (6) USMC

On a chat, someone posted a photo of a canopy lying on the ground. This reminded me of Capt. (b) (6) and caused me to ask if anyone had heard he was suing VFA-106 on the grounds of racial discrimination. At the same time another member of the chat posted the same fact, however my comment was posted first. That member then posted that I had beat him to the punch. At which point I posted an eggplant emoji and a champagne bottle exploding to indicate that I was winning, in so much that I was the first to post that detail. At the same time that I responded to the first commenter, a third person asked who we were talking about, and that comment posted just before my emoji response. Due to all of these texts posting nearly at the same time (all have the same time stamp), the question as to who we were talking about posted in between the back and forth between myself and the first commenter. At no point did I use an eggplant to describe Capt. (b) (6)  In fact, I did not even know, nor have I ever heard of the eggplant having a derogatory racial connotation. I was simply responding to another person saying that I was quicker to the draw.

The chat's name is "Pure Bloods." This chat refers to Naval Academy Graduates. It has zero racial connotations and only exists to bolster of our academy pride. It is a tongue in cheek reference to the fact that we feel that our college is better than everyone else's institution of higher learning.

19 APR 18

Subj:  STATEMENT BY LT **(b) (6)**        INSTRUCTOR, VFA-106

1.  Following my initial Fleet tour on the west coast, I
reported to VFA-106 in June 2015 and have been an Instructor
Pilot (IP) there since.  I have served as a Schedules Officer,
the Carrier Qualification (CQ)Courseware Officer, Assistant CQ
Phase Head and finally as the CQ Phase Head.

2.  I was not present in the command when Capt **(b) (6)** began the
F/A-18 FRS syllabus.  When I joined the command, he had already
completed the transition phase and had already gone through his
first attempt at the strike syllabus.  I was not a qualified
instructor at that time and have never personally flown with
Capt **(b) (6)**  in his entire time with VFA-106.  My only personal
interactions with him were on a professional basis through
greeting him in passing in the squadron spaces or in conducting
official business while he was the Squadron Duty Officer (SDO).

3.   In my duties as a schedules officer, I was responsible for
the writing of the simulator and flight schedules along with
approximately 10 other instructors.  It was during the execution
of these duties that I learned of his struggles throughout the
syllabus from other instructors.  He was identified as a student
struggling and was issued a refresher syllabus by CDR **(b) (6)**
VFA-106 Training Officer, after his first unsuccessful attempt
at the strike syllabus. I can't remember if there was specific
guidance given but in general practice at the time, he would
have been scheduled to fly with senior instructors who were
designated Standardization Instructor Pilots for the strike
phase in order to ensure performance standards were met and
training was conducted in accordance with the FRS syllabus. Capt
**(b) (6)**  again failed the strike syllabus on his second attempt
and was recommended to a FFPB which resulted in his removal from
the F/A-18 FRS syllabus.  I was not a member of his FFPB and
because I had never flown with him nor was a qualified
instructor in that phase at the time I have no knowledge of
those proceedings.

4.  Capt **(b) (6)**   specific EO allegation against me comes in
referencing a WhatsApp Group Chat called "Pure Bloods" in
November 2017.  "Pure Bloods" is a reference to commissioning
source and specifically was a group of current and former
instructors who were all US Naval Academy (USNA) graduates where
we generally discuss football games and USNA activities.  This
specific conversation regarding Capt **(b) (6)**  and LTJG Savage

**SAVAGE PE 6, Page 127 of 135**

began with someone sending out a picture of an F/A-18 canopy
laying on the ground in a storage area and someone asking if the
mishap instructor pilot lost something, in reference to Capt
(b)(6)      accidental jettisoning of a canopy.  The conversation
continued with 13 current and former instructors about his
continued press for investigation into his removal from the F/A-
18 FRS syllabus based on a perceived racist bias against him.
The conversation was a private conversation among peers about
his and LTJG Savage's EO complaint and their performance in the
syllabus.  The conversation was a frank discussion that was not
intended for dissemination but shows that there was no racial
bias in their removal from the syllabus and was done so because
of concern for their safety and the safety of others.

5.  Capt (b)(6)    alleges that I and others used an eggplant emoji
as code for a racial slur in reference to him and that it was
evidence of systemic racial bias against him at VFA-106.  The
eggplant emoji is commonly known as the penis emoji based on its
phallic shape.  In fact, the eggplant emoji is specifically
referenced in the major motion picture movie trailer BLOCKERS,
released this month, where the eggplant emoji is referred to as
the "dick emoji" and not any other racist meaning.  A recent
military.com article even states that the eggplant emoji is
typically known as a phallic reference but Capt (b)(6)     alleges
that it was used as a racist term for him.  In the whatsapp
conversation, I and one other person used the eggplant emoji in
conjunction with an opening champagne bottle toward one another
and not in reference to Capt (b)(6)   in anyway.  Specifically, I
made a statement on the chat that the other person "beat me" to
a similar comment about the investigation.  The other person
posted the eggplant and champagne bottle popping as a crude hand
job joke that he had ejaculated because I "beat him".  Several
comments later the other former instructor similarly says that I
"beat him" to a comment and I subsequently posted the eggplant
and champagne bottle emojis making a similar hand job /
ejaculation joke to him.  The eggplant emoji was never used as
code for a racial slur against Capt (b)(6)    and I had never heard
of the eggplant being a racial slur against African Americans
previously.

6.  Capt (b)(6)    also makes an allegation against me that I used
a black finger emoji in reference to LTJG Savage and that this
act is inherently racist and further evidence of the bias
against both of them.  The black finger emoji when read in the
context of the conversation shows that I made a statement that
Capt (b)(6)   was trying to bring LTJG Savage in on the EO
complaint against VFA-106.  Another person asks "white dude?"

and I laugh and state "That's the irony" in reference to the poor optics of the situation that another African American had been removed from training for performance.  A third instructor asks "Savage?", and I used the black finger emoji to both confirm the name of the student and the fact that he is indeed African American.  I then make a statement one comment later that their removal from training was coincidental and that they were both going to kill themselves implying that there was no racist motivation to their removal from training but it was out of concern for their safety and the safety of others.  This entire conversation continues on further to be a frank discussion on performance issues in the aircraft for both students and not based on race.

7.  I have been at VFA-106 for almost 3 years and believe that all of the IPs work hard to maintain fair standards for all of the students.  Although I am not a minority pilot, I have not witnessed bias against any RP, regardless of race, religion or gender.  I actually think that it would be nearly impossible for the systemic racial bias that Capt (b) (6) and LTJG Savage allege, or any racial bias, to exist at VFA-106 because it would be found out too quickly and not allowed to continue.

(b) (6)  _____      DATE
LT, USN

NAVY EQUAL OPPORTUNITY (EO) AND SEXUAL HARASSMENT REPORT
**NAVPERS 5354/2 (Rev. 08-2017)**      Supporting Directives OPNAVINST 5354.1G and OPNAVINST 5300.13

PART III. FORMAL REPORT PROCESSING/COMMAND ACTIONS

**INTERIM FEEDBACK/ASSISTANCE TO COMPLAINANT.** Take particular care to avoid re-victimizing complainants (and witnesses). Keep the complainant and alleged offender apprised of the status of the investigation (including any deadline extensions). Provide supplemental counseling/ support assistance/referral as warranted. Ensure that all involved are aware of the retaliation plan of action and know that retaliation against the complainant will not be tolerated. (*Recommend keeping a record of such feedback/assistance.* Attach record to the report form.)
**RESOLUTION TIME STANDARDS/REPORTING.** Resolution of case should be completed no later than 20 days from investigation commencement. Resolution includes: Completion of investigation, determination of validity of report, adjudication at non-judicial punishment or courts-martial, initiation of other appropriate action, notification to accused, and notification of complainant and submission of a close-out. If time standards cannot be met, continuation messages every 14 days through case resolution is mandatory for reports of sexual harassment. Explain the reason(s) for delay. Send all messages UNCLASSIFIED.
**DOCUMENT COMMAND ACTION.** The complainant's command is responsible for ensuring Parts I and II are complete and providing this to the alleged offender's Commander, Commanding Officer or Officer-in-charge (hereafter referred to as Commander) (as applicable). Upon completion of Part III, with the exception of continuation(s) and close-out Date Time Groups, Parts I through III are required to be forwarded within 72 hours (3 days) and Parts IV and V upon final disposition of report, via appropriate Echelon II CCS, CMEO program manager, or EO program manager, to Mill_NavyEOAdvice@Navy.mil via an e-mail that is not encrypted. Command records should permit reviewers to clearly ascertain/assess decisions reached. Make appropriate entries in individual personnel records, if applicable. Make any statistical reports required by the chain of command. Retain this completed form and investigation onboard at least two years, at which time the entire command investigation shall be sent to the Office of the Judge Advocate General (Code 15) Investigations Branch. Provide a copy of completed form to complainant as authorized under Freedom of Information Act (FOIA) and governing directives.

1. Command Climate Specialist (CCS) Consultation: OPNAVINST 5300.XX and OPNAVINST 5354.1G requires consultation of a CCS in all informal, formal, and anonymous sexual harassment, unlawful discrimination and harassment reports.

| (a) Command Climate Specialist Name: | (b) Rank/Rate: | (c) Command Name/UIC: |
|---|---|---|
| ETC(b) (6) | ETC/E-7 | COMNAVAIRLANT |

| (d) Command Climate Specialist Phone Number: | (e) Command Climate Specialist E-mail Address: |
|---|---|
| 757-836-4501 | (b) (6) |

I understand that I must provide all appropriate voice reports and required message reports (*e.g., OPREP*) per OPNAVINST F3100.6 series within established time lines. I further understand I must initiate an appropriate investigation or ensure that one is being conducted (e.g., by NCIS) within three calendar days (72 hours) and notify complainant the same day of investigation commencement. I must ensure a retaliation plan is in place and acknowledged by all involved parties. I also understand that I am required to consult a CCS prior to making a determination of this report, as well as, consult with a judge advocate for all allegations of sexual harassment and for legal sufficiency review.

Transfer of Report: When the complainant and alleged offender are assigned to different commands or services (*when all parties are not assigned to a joint military environment*), the report shall be processed by the command or service of the alleged offender.

2. Commander Directing Investigation:

| (a) Name: | (b) Rank/Rate: | (c) Command Name/UIC: |
|---|---|---|
| (b) (6) | O5/CDR | VFA106/09679 |

| (d) Contact Information: | (e) Signature: | (f) Date: |
|---|---|---|
| 757.433.9080 | (b) (6) | 4/9/18 |

3. Date Time Group (DTG) of OPREP Messages (*Attach a copy of all messages to this form.*)–

| (a) Initial DTG: | (b) Close-Out DTG: |
|---|---|
| 062004Z APR 18 | |

4. Investigating Officer.

| (a) Name and Contact Information: | (b) Date Convened: |
|---|---|
| | |

5. Complainant Acknowledgment/Signature. (*By signing, Complainant affirms the above has been read and is understood.*)

| (a) Name: | (b) Signature: | (c) Date: |
|---|---|---|
| (b) (6) | | |

6. Alleged Offender Acknowledgment/Signature. (*By signing, Alleged Offender affirms the above has been read and is understood.*)

(a) DoD ID Number: (b) (6)

| (b) Name: | (c) Signature: | (d) Date: |
|---|---|---|
| (b) (6) | (b) (6) | 4/18/18 |

FOR OFFICIAL USE ONLY
PRIVACY SENSITIVE            [ Print Form ]            Page 3 of 5

**NAVY EQUAL OPPORTUNITY (EO) AND SEXUAL HARASSMENT REPORT**
**NAVPERS 5354/2 (Rev. 08-2017)**     Supporting Directives OPNAVINST 5354.1G and OPNAVINST 5300.13

---

**PART III. FORMAL REPORT PROCESSING/COMMAND ACTIONS**

INTERIM FEEDBACK/ASSISTANCE TO COMPLAINANT. Take particular care to avoid re-victimizing complainants (and witnesses). Keep the complainant and alleged offender apprised of the status of the investigation (including any deadline extensions). Provide supplemental counseling/ support assistance/referral as warranted. Ensure that all involved are aware of the retaliation plan of action and know that retaliation against the complainant will not be tolerated. *(Recommend keeping a record of such feedback/assistance. Attach record to the report form.)*
RESOLUTION TIME STANDARDS/REPORTING. Resolution of case should be completed no later than 20 days from investigation commencement. Resolution includes: Completion of investigation, determination of validity of report, adjudication at non-judicial punishment or courts-martial, initiation of other appropriate action, notification to accused, and notification of complainant and submission of a close-out. If time standards cannot be met, continuation messages every 14 days through case resolution is mandatory for reports of sexual harassment. Explain the reason(s) for delay. Send all messages UNCLASSIFIED.
DOCUMENT COMMAND ACTION. The complainant's command is responsible for ensuring Parts I and II are complete and providing this to the alleged offender's Commander, Commanding Officer or Officer-in-charge (hereafter referred to as Commander) (as applicable). Upon completion of Part III, with the exception of continuation(s) and close-out Date Time Groups, Parts I through III are required to be forwarded within 72 hours (3 days) and Parts IV and V upon final disposition of report, via appropriate Echelon II CCS, CMEO program manager, or EO program manager, to Mill_NavyEOAdvice@Navy.mil via an e-mail that is not encrypted. Command records should permit reviewers to clearly ascertain/assess decisions reached. Make appropriate entries in individual personnel records, if applicable. Make any statistical reports required by the chain of command. Retain this completed form and investigation onboard at least two years, at which time the entire command investigation shall be sent to the Office of the Judge Advocate General (Code 15) Investigations Branch. Provide a copy of completed form to complainant as authorized under Freedom of Information Act (FOIA) and governing directives.

1. Command Climate Specialist (CCS) Consultation: OPNAVINST 5300.XX and OPNAVINST 5354.1G requires consultation of a CCS in all informal, formal, and anonymous sexual harassment, unlawful discrimination and harassment reports.

| (a) Command Climate Specialist Name: | (b) Rank/Rate: | (c) Command Name/UIC: |
|---|---|---|
| ETC (b) (6) | ETC/E7 | COMNAVAIRLANT |

| (d) Command Climate Specialist Phone Number: | (e) Command Climate Specialist E-mail Address: |
|---|---|
| (757)836-4501 | (b) (6) |

I understand that I must provide all appropriate voice reports and required message reports *(e.g., OPREP)* per OPNAVINST F3100.6 series within established time lines. I further understand I must initiate an appropriate investigation or ensure that one is being conducted (e.g., by NCIS) within three calendar days (72 hours) and notify complainant the same day of investigation commencement. I must ensure a retaliation plan is in place and acknowledged by all involved parties. I also understand that I am required to consult a CCS prior to making a determination of this report, as well as, consult with a judge advocate for all allegations of sexual harassment and for legal sufficiency review.

Transfer of Report: When the complainant and alleged offender are assigned to different commands or services *(when all parties are not assigned to a joint military environment)*, the report shall be processed by the command or service of the alleged offender.

2. Commander Directing Investigation:

| (a) Name: | (b) Rank/Rate: | (c) Command Name/UIC: |
|---|---|---|
| (b) (6) | CAPT | CSFWL/ 09103 |

| (d) Contact Information: | (e) Signature: | (f) Date: |
|---|---|---|
| 757 433-9273 | (b) (6) | 6 APR 18 |

3. Date Time Group (DTG) of OPREP Messages *(Attach a copy of all messages to this form.)*

| (a) Initial DTG: | (b) Close-Out DTG: |
|---|---|
| 051920Z APR 18 | |

4. Investigating Officer.

| (a) Name and Contact Information: | (b) Date Convened: |
|---|---|
| CAPT (b) (6) | |

5. Complainant Acknowledgment/Signature. *(By signing, Complainant affirms the above has been read and is understood.)*

| (a) Name: | (b) Signature: | (c) Date: |
|---|---|---|
| COURTLAND A. SAVAGE | | |

6. Alleged Offender Acknowledgment/Signature. *(By signing, Alleged Offender affirms the above has been read and is understood.)*

| (a) DoD ID Number: (b) (6) | | |
|---|---|---|
| (b) Name: (b) (6) | (c) Signature (b) (6) | (d) Date 4/9/18 |

**BRIEF SHEET FOR:** VADM MILLER, CNAP COMMANDER

**SUBJ:  RECOMMENDATION FOR ADMINISTRATIVE SEPARATION ICO AA ALLIE R. JUDE USN**

**PURPOSE:**  Informational.

**REFERENCES:**  MILPERSMAN 1900-120; DODINST 1332.38; MILPERSMAN 1910-704

**BLUF:**  AA Jude requested administrative separation (ADSEP) due to a medical condition not amounting to a disability.  Commanding Officer (CO), Strike Fighter Squadron ONE TWO FIVE (VFA-125) recommended separation with an Honorable characterization of service.  Commander, Strike Fighter Wing, Pacific (COMSTRKFIGHTWINGPAC) concurred with the recommendation to separate the member.  Legal recommends that you separate AA Jude with an Honorable discharge.

**BACKGROUND:**

•Jan 19:  AA Jude was evaluated by Dr. Lori Passion-Gonzalez where she complained of "super bad anxiety" and indicated she was not herself anymore; that the Navy changed her.  AA Jude also indicated that she was sleeping poorly, had panic attacks, had nightmares of dying, and felt depressed since joining the Navy.

•3 Apr 19:  AA Jude was recommended for administrative separation for a diagnosed medical condition, Adjustment disorder with mixed anxiety and depressed mood by Dr. Passion-Gonzales.  AA Jude has a behavioral condition that is not compatible with military service but does not amount to a physical disability.  Further mental health treatment, although recommended, is unlikely to result in symptom resolution.

•16 Apr 19:  AA Jude requested separation under MILPERSMAN 1900-120 - Separation by reason of convenience of the government as evidenced by medical conditions not amounting to a disability.

**DISCUSSION:**

•Commanding Officer, Strike Fighter Squadron ONE TWO FIVE recommended that AA Jude be separated per MILPERSMAN 1900-120 with an Honorable characterization of service.

•Commander, Strike Fighter Wing, Pacific concurred with the CO.

**RECOMMENDATION:**
Respectfully request that you sign the 10-day letter authorizing separation of AA Jude with an Honorable characterization of service.

**PREPARED BY:**  CDR Brandon Keith, JAGC, USN, N01J1, 619-545-5045

**NOTE:  RETURN SIGNED LETTER TO N004 FOR SERIALIZATION**

15 FEB 18

Subj:   STATEMENT BY LCDR (b) (6)          VFA-106 TRAINING
        OFFICER

1.  I have been the Training Officer (TO) at VFA-106 since 1 Nov
2016 and am very familiar with LT Savage's performance record
while he was a Replacement Pilot (RP) at the Command.

2.  I first met LTJG Savage in early November 2016 when he was
sent home early from his first Strike Detachment to Mountain
Home, Idaho due to performance issues that prevented him from
successfully completing the syllabus.  Working with others in
the Training Department, I developed a tailored, remediation
program of additional flights and simulators to address his
performance deficiencies.  Although not often required, this
kind of specialized program is intended to provide the RP with
additional opportunities to improve areas in which he/she is
struggling before returning to the normal syllabus.

3.  In support of the remediation program, I encouraged both of
his class leaders, fully-qualified instructors, to work closely
with LT Savage on his airborne issues.  Additionally, given the
nature of the aviation skills with which LT Savage was
struggling (e.g., multitasking, low level flying, Close Air
Support (CAS)), I assigned LT (b) (6)          , an Instructor
Pilot (IP) and qualified Forward Air Controller (Airborne)
(FAC(A)), to serve as a mentor.  Despite LT Savage's claims in
his complaint, I know that LT (b) (6)       was very proactive in
his attempts to help improve LT Savage's performance.

4.  In his complaint, LT Savage makes repeated mention of the
fact that he was awarded, "SOD, press" grades in some of his
events.  The Signal of Deficiency (SOD) is simply a mark used to
annotate a deficiency in some aspect of a training event.
Whether it is awarded to an RP because of something that happens
on the ground—in a simulator, brief or debrief—or during an
actual flight, a SOD is only a signal that something needs extra
attention.  A SOD does not, by itself, trigger further actions
from the command.

5.  As the TO, I review every SOD to ensure that it was
justifiably awarded.  In the cases, LT Savage presents, FSTK-
111, FSTK-112 and FSTK -117), a SOD was certainly warranted:
forgetting to arm one's seat; being unprepared in a brief, and
failure to execute basic flight skills are all reasonable
reasons for a SOD to be awarded.  It is, however, notable that

these were only three of the eight SODs given to LT Savage
during his time at VFA-106.  Again, taken individually, each SOD
simply indicates that a deficiency was noted and, "SOD, press"
was an indication that the deficiency was noted, addressed and
that the RP is assessed as being able to continue training.
That said, LT Savage's inability to successfully complete the
Strike syllabus in addition to the number of SODs he received
remains a clear indication that he was struggling.

6.  As for the FSTK-117 event he discusses in his complaint, I
was acting as the Lead Pilot in a culminating event in which LT
Savage flew as my Wing and another aircraft provided close
control as the FAC(A) to direct the simulated employment of
ordnance.  LT Savage makes note of the fact that he was unfairly
directed to perform strafing ones, which are not listed as an
element in this syllabus flight.  Although that is true, it is
important to note that:

     (a) strafing is an element in 14 of the syllabus events
leading up this flight;

     (b) strafing was only directed by the FAC(A) instructors
after it was recognized that LT Savage was unable to complete
the assigned ordnance delivery skills for the event; strafing
was viewed as a chance for him to perform a task that he had
successfully completed multiple times previously;

     (c) I chose to fly this event with LT Savage because, as
the TO, I felt it important to personally ensure that he was
ready to advance to the next phase of training;

7. LT Savage also mentions an event he flew in which he went
hypoxic as being evidence of a double standard that confirmed
racial bias.  In this event, LT Savage completely disregarded the
procedures known to all aviators in the event of hypoxia,
endangering three other aircraft at the time.  Although he
landed without incident, he did not report hypoxia until the
post-flight debrief, and he had to undergo additional training
to ensure he understood the dangers of hypoxia and the need to
follow established safety procedures.

8.  As for some of the other issues LT Savage raised:
     (a) Callsigns.  Callsigns are generally given to RPs during
a Callsign Review Board that happens at the end of the Strike
Phase.  LT Savage never completed that phase and so his claim of
having the callsign, "Radio," must have been from a previous
command.  Throughout his time at VFA-106, he was generally

referred to as, "Mr. Buckets," which has no racial connotation whatsoever.

(b) Unapproved syllabus.  The syllabus at VFA-106, as in every training command, is under near-constant revision based on input from the Fleet, changes in tactics and changes in equipment.  As the primary stakeholder is CNATRA, the process to make major changes (i.e., those that would require additional resources) is cumbersome; however, minor adjustments (known as "maintenance changes") are made frequently and only require the concurrence of the Commanding Officers on each coast.  LT Savage was trained under the same syllabus, using the same metrics, as every other RP.

(c) FNAEB discussion with CDR (b) (6)   LT Savage seems to believe that my discussion with CDR (b) (6)   somehow undermined the FNAEB process.  This is not true.  The FNAEB independently considered all of the data presented in LT Savage's case and made its recommendation based on those facts alone.  My discussion with CDR (b) (6)   was independent of that process.

9.  As a former Training Officer at TOPGUN, I have had to attrite a number of aviators for sub-standard performance. These decisions are difficult and they have never been based on anything other than inability for the aviator to meet a given standard.  In LT Savage's case, the declining performance that he exhibited prior to his arrival at VFA-106 (his cumulative Navy Standard Score (NSS) of 133 was far below the average of 200) was a strong indicator that he would have difficulty completing the syllabus. Despite the extra opportunities and close mentorship he received, LT Savage never demonstrated the requisite skills necessary to safely complete the syllabus. In my estimation, allowing him to continue flying would have represented a serious danger to both himself and to others around him.

(b) (6)
LCDR, USN