UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COURTLAND SAVAGE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 19-2983 (ABJ) |
| DEPARTMENT OF THE NAVY, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Both parties have moved for summary judgment in this Freedom of Information Act ("FOIA") case. *See* Mem. in Supp. of Def.'s Mot. for Summary Judgment [Dkt. # 13-2] ("Def.'s Mot."); Def.'s Statement of Material Facts as to Which There is no Genuine Dispute [Dkt. # 13-1] ("Def.'s SOF"); *see also* Mem. of P. & A. in Supp. of Pl.'s Opp. to Def.'s Mot. and Cross-Mot. for Summary Judgment [Dkt. # 15-1] ("Pl.'s Mot."); Pl.'s Statement of Facts [Dkt. # 15-2] ("Pl.'s SOF"). Defendant supported its motion with a declaration from Lieutenant Clayton Swearingen McCarl, III [Dkt. # 13-3] ("McCarl Decl."), who is the agency counsel assigned to this case. The Court has completed an *in camera* review of the documents in question, *see* Min. Order (Nov. 23, 2020), and the matter is now fully briefed. *See* Reply in Further Supp. of Def.'s Mot. and Opp. to Pl.'s Mot. [Dkt. # 17] ("Def.'s Reply"); *see also* Reply in Supp. of Pl.'s Mot. [Dkt. # 19] ("Pl.'s Reply"). For the following reasons, defendant's motion will be **GRANTED** in part and **DENIED** in part, and plaintiff's motion will be **GRANTED** in part and **DENIED** in part.

1

## BACKGROUND

Plaintiff Courtland Savage "is an African-American and former naval officer assigned as a student pilot with the Navy's Strike Fighter Squadron 106 (VFA-106)." First Suppl. Compl. [Dkt # 10] ("Compl.") ¶ 3. Plaintiff "was removed from the training pipeline after undergoing a subjective review board known as a Field Naval Aviator Evaluation Board ("FNAEB")." Compl. ¶ 6. Plaintiff challenged this outcome, first through a congressional inquiry in July 2017, and then with a formal Equal Opportunity ("EO") complaint in December 2017; plaintiff alleged that he and another student pilot had been the subjects of racial discrimination by VFA-106 command. Compl. ¶ 6; Def.'s SOF ¶ 1.

In April 2018, the Commander of the Naval Air Force, U.S. Pacific Fleet, Vice Admiral Dewolfe Miller, III, convened an investigation, and he appointed a Navy Captain to "[i]nvestigate the basis of the complaint, determine the validity of the allegations made in the complaint, and recommend any appropriate administrative or disciplinary action." *See* Command Investigation into Formal Equal Opportunity Complaint at VFA-106, Ex. 7 to Pl.'s Mot. at 23, 27.[1] The investigating officer was directed to report his "findings of facts, opinions, and recommendations in letter form." *Id.*

The report of the consolidated investigation was transmitted to Vice Admiral Miller – who had the power to make the final decision – on August 16, 2018. *See* Command Investigation into Formal Equal Opportunity Complaint at VFA-106, Ex. 7 to Pl.'s Mot. ("Report of Investigation") at 6. On May 13, 2019, Vice Admiral Miller issued his final endorsement, which "approved only

---

1  There are actually two appointment letters; each uses identical appointment language, but one was prompted by the inquiry of a United States Senator, while the other responds to the EO complaint plaintiff filed with the Navy itself.

select findings and recommendations of the investigating officer." Compl. ¶ 8; McCarl Decl. ¶ 4; *see generally* Final Endorsement, Ex. 7 to Pl.'s Mot. ("Final Endorsement") at 1–5 (listing amendments and deletions of findings of fact and opinion as well as approving and disapproving recommendations).[2]

In the meantime, on April 2, 2019, prior to the publication of Vice Admiral Miller's Final Endorsement, plaintiff filed a FOIA request "for a copy of the investigating officer's final report and accompanying endorsements." Compl. ¶ 7; Def.'s SOF ¶ 1; McCarl Decl. ¶ 4. On May 17, 2019, the Navy denied plaintiff's FOIA request in part. Def.'s SOF ¶ 3, citing McCarl Decl. ¶ 4. The Navy made two productions, but withheld certain portions of the requested documents. Def.'s SOF ¶¶ 3–7. There were further discussions among the parties,[3] and the *Vaughn* index, Ex. A to McCarl Decl. [Dkt. # 13-3], identifies the grounds for the withholdings at issue here.[4]

First, when it produced the Captain's Report of Investigation, the Navy redacted all of the statements that Vice Admiral Miller ordered deleted or modified in his Final Endorsement, citing FOIA exemption (b)(5) and Privacy Act exemption (d)(5). *See Vaughn* index. Second, the Navy

---

2   For ease of access, the Final Endorsement is attached to this opinion as Attachment A.

3   The agency issued a second letter on November 5, 2019 amending its prior decision, Def.'s SOF ¶ 6, and made a second production on December 6, 2019. *Id.* ¶ 7. After plaintiff appealed the second production, the Navy issued a third letter, Def.'s SOF ¶ 7, and eventually a fourth. *Id.* ¶ 11. It is not necessary to this decision to recount the changes in the agency's position over time.

4   The *Vaughn* index also explains and corrects two mistakes. First, it notes a mistake in which an entire page was wrongly redacted during the second production of documents; however, given that "[t]he first production included a correctly redacted page 64 which withheld only personal and identifying information about DoD personnel," the mistake appears to be harmless. Second, it clarifies that redactions for names of personnel were originally justified under FOIA exemptions (b)(3)(a) and (b)(6), but the Navy now relies on (b)(6) and (b)(7)(C) to justify those withholdings.

redacted "personal and identifying information about DoD personnel" from both the Report of Investigation and Final Endorsement under exemption (b)(6) and (b)(7)(C). *Vaughn* index.

Plaintiff exhausted his administrative remedies and then filed the complaint that initiated this case. Since that time, plaintiff's counsel was given an opportunity to view the full, unredacted Report of Investigation, but he was not permitted to copy or reproduce it. Def.'s SOF ¶ 9, citing McCarl Decl. ¶ 6. Given plaintiff's desire that the facts "see the light of day," Pl.'s Mot. at 10, he seeks to compel the unrestricted production of the requested documents under the Freedom of Information Act.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48. A dispute is "genuine" only if a reasonable fact-finder

could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate. *Weisberg v. DOJ*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980), quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).

"[S]ummary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006). See also *Chambers v. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) ("[i]n a suit seeking agency documents—whether under the Privacy Act or FOIA—'[a]t the summary judgment stage . . . the court may rely on a reasonably detailed affidavit'"). A plaintiff cannot rebut the good faith presumption afforded to an agency's supporting affidavits through "purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

In a FOIA case, the burden rests with "the agency to sustain its action," *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), and "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). See also *Wheeler v. CIA*, 271 F. Supp. 2d 132, 136 (D.D.C. 2003) (the agency

5

"bears the burden of sustaining its decision to claim an exemption from disclosure"), citing 5 U.S.C. § 552a(g)(3)(A).  The district court reviews agency decisions *de novo*. 5 U.S.C. § 552(a)(4)(B).

## ANALYSIS

### I.  The withholding of statements from the Report of Investigation under Exemption 5 was not justified under the statute.

Plaintiff first disputes whether statements in the Report of Investigation that were modified or deleted as part of Vice Admiral Miller's Final Endorsement were properly redacted from the version of the Report disclosed by the agency.  Defendant maintains that the material was appropriately withheld under FOIA exemption (b)(5) and Privacy Act exemption (d)(5).

#### A. The record is covered by the deliberative process privilege

Under the Freedom of Information Act, agencies must make requested records available to members of the public unless the documents fall under one of the specific exemptions set out in the statute.  *See generally* 5 U.S.C. § 552.  Exemption 5 authorizes an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  This exemption shields documents that would be privileged in the context of civil discovery, including materials protected by the attorney-client privilege, the attorney work-product doctrine, and the deliberative process privilege. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–54 (1975).

Similarly, under the Privacy Act, "upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, [the agency shall] permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him." 5 U.S.C. § 552a(d)(1).  But exemption (d)(5) of the Act provides,

6

"nothing in this section shall allow an individual access to any information compiled in reasonable anticipation of a civil action or proceeding." 5 U.S.C. § 552a(d)(5).

The Navy contends that FOIA Exemption 5 was properly invoked because any aspects of the Report of Investigation that were not adopted in the Final Endorsement are covered by the deliberative process privilege. *See* Def.'s Mot. at 7; *Vaughn* index. The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001), quoting *Sears*, 421 U.S. at 150. The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and its purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9, quoting *Sears*, 421 U.S. at 151. To accomplish that goal, "[t]he deliberative process privilege protects agency documents that are both predecisional and deliberative." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006), citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866. "[R]ecommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency[ ]" typically qualify as deliberative. *Id.*

The Supreme Court has recently clarified that "determining whether an agency's position is final for the purposes of the deliberative process privilege is a functional rather than formal inquiry," *United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 788 (2021), and

the privilege "shields documents that reflect an agency's preliminary thinking about a problem, as opposed to its final decision about it." *Id*. at 785. The Supreme Court emphasized that courts need to analyze whether a draft "communicates a policy on which the agency has settled[,]" rather than merely "whether a document is last in line." *Id.* at 786, 788.

      Here, the record supports a finding that the investigating officer's Report was both deliberative and predecisional. The Report was generated in advance of the Vice Admiral's Final Endorsement, and it included the author's findings and recommendations. The fact that some of the investigating officer's proposed findings were accepted, while others were modified or rejected, reveals that the Report did not "communicate[] a policy on which the agency ha[d] settled." *Sierra Club*, 141 S. Ct. at 786. Instead, it was part of the process through which the agency debated, internally, how to respond to plaintiff's allegations of discrimination, and it was therefore deliberative, an example of the "give-and-take of the consultative process." *Coastal States*, 617 F.2d at 866; *see also Sears*, 421 U.S. at 150 (the deliberative process privilege shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and polices are formulated") (internal quotation marks omitted).

      And, the content of the Report is clearly predecisional, since the Report conveyed findings and recommendations to the official who had the authority to make the final decision before he issued that decision. *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 365 (D.C. Cir. 2021) ("*Reporters Committee*") ("factual corrections" made to a draft report were "predecisional because they were provided to the [decisionmaker] before the final publication of the [] report.").

So the Court finds that the deliberative process privilege applies in this case, but the inquiry does not end there.[5]

### B. The agency has failed to make the necessary showing of harm.

In 2016, Congress added language to the Freedom of Information Act to mandate that "an agency shall withhold information under this section only if the agency reasonably foresees that disclosure would harm an interest protected by the exemption or disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i).  As the D.C. Circuit has explained, "Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can 'articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld.'" *Reporters Committee*, 3 F.4th at 369, quoting H.R. Rep. No. 391, at 9.  "In that way, the foreseeable harm requirement imposes an independent and meaningful burden on agencies." *Id.* (brackets and internal quotation marks omitted).

And in *Reporters Committee,* the Court of Appeals issued a clear instruction that this requirement must be enforced with rigor: the government cannot rely on a "perfunctory statement that disclosure . . . would jeopardize the free exchange of information." 3 F.4th at 370 (brackets and internal quotation marks omitted).  It must provide the Court with "a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific

---

5  Plaintiff argues that the withholdings fall outside the scope of the exemption because "[t]he deliberative process does not protect documents that are 'purely factual, unless the material is so inextricably intertwined in the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.'" Pl.'s Mot. at 7, quoting *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997).  However, the main portion of the Report that has been redacted under Exemption 5 is an "Executive Summary" that is a blend of facts and analysis, and it presents the writer's assessment and conclusions in addition to proposed factual findings.  And the redacted portions of the "opinions" section are, obviously, not purely factual.

context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.*; *see also Judicial Watch, Inc. v. DOJ*, 2019 WL 4644029, at *5 (D.D.C. Sept. 24, 2019) (The "reasonable foreseeability of harm" standard requires the withholding agency to "connect[] the harms . . . to the information withheld, such as by providing context or insight into the specific decision-making processes or deliberations at issue, and how in particular they would be harmed by disclosure" of the contested records.).

Moreover, in the *Reporters Committee* case, the court was addressing the application of section 8(A) to the very exemption that is at issue in this case. "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reporters Committee*, 3 F.4th at 369–70.

Here, defendant has asserted that:

> release of withheld information would harm the Navy's deliberative process by chilling the free and open communications necessary for the military to freely communicate regarding investigative matters and would "'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195 (citation omitted). Indeed, the subjective evaluations of the Investigating Officer presented to the final endorser for review are at the very heart of the deliberative-process privilege, as disclosing them would stifle candid discussions about matters at the core of Navy's duty-bound obligation to investigate and address discrimination within its ranks.

Def.'s Mot. at 7–8. In its reply brief, defendant repeats the same assertion, word for word. Def.'s Reply at 6–7. This explanation simply recites the general principles underlying the privilege, and it is subject to the criticism voiced in *Reporters Committee* that "the assertion of harm . . . is wholly

generalized and conclusory, just mouthing the generic rationale for the deliberative process privilege itself." 3 F.4th at 370.[6]

Defendant also emphasizes that it is irrelevant whether the particular investigating officer would be chilled; "rather, the issue is whether the release of this information would chill others within the Navy from being candid in their findings and recommendations if they knew that information would ultimately be publicly released." Def.'s Reply at 7.[7] While that may be so, it does not explain why release of the particular information in this case would chill others within the Navy from being candid in the future. Since it is already publicly known that the Vice Admiral rejected recommendations from the investigating officer he appointed,[8] the excision of his observations might have more of a chilling effect on future investigations than the release of the information would. And the fact that much of the Executive Summary that was withheld appears unredacted later in the report tends to contradict the agency's dire predictions of harm.

---

[6]   See also Def.'s Reply at 7 ("the Navy must rely on the candid recommendations of its employees, which would be chilled if those recommendations were to be routinely made public.").

[7]   This argument was made in response to plaintiff's assertion that the investigating officer would not only understand if his proposed findings were publicized, but would prefer it. See Pl.'s Mot. at 9 ("it is as though the Investigating Officer *wanted* others to know of his findings"). But neither plaintiff's musings on that point nor the agency's response bear on the resolution of the legal issue.

[8]   Not only does the Final Endorsement modify and reject certain proposed findings of the investigating officer, it explicitly rejects a recommended outcome related to convening a new board to evaluate plaintiff again. See Final Endorsement at 3–4 ("Recommendation 2 is disapproved. LT Savage is no longer on active duty with the U.S. Navy. Additionally, due to LT Savage's sustained substandard performance during the strike fighter syllabus, convening a new board is inadvisable and highly unlikely to result in a different recommendation.").

Finally, the Court notes that, with respect to the Exemption 5 issue, this case varies from the ordinary situation in which an agency's FOIA officer determines, after a record has been requested, that the record, or portions of the record, are subject to an exemption.

Here, the investigating Navy officer submitted his Report of the Command Investigation to Vice Admiral Miller in accordance with the order appointing him, and the subsequent decision document did not simply set forth Miller's opinions and conclusions or indicate how or why they varied from the recommendation; it specifically called for the modification or deletion of language contained in the investigating officer's Report. *See, e.g.*, Final Endorsement at 2 ("Delete FF 66. FF 66 states a personal opinion that is unnecessary to substantiate the conclusions of the investigation"), 3 ("Opinion 2(b):  Amend to read:  'Regardless of actual intent, a reasonable person could conclude the eggplant emoji used in the 'Pure Bloods' group chat was racially offensive and discriminatory."). Indeed, the Final Endorsement contains little narrative of its own, and it cannot be understood without referring to the Report of Investigation. *See generally* Final Endorsement.  Thus, in this case, the deletions of material from the investigating officer's report are part and parcel of the Final Endorsement, a decision document which is not covered by the deliberative process privilege at all.

The Freedom of Information Act requires the release of government records upon request, and its purpose "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  If the purpose of the Act is to enable the public "to be informed about what their government is up to," *Roth v. DOJ*, 642 F.3d 1161, 1177 (D.C. Cir. 2011) (citation and internal quotation marks omitted), and to make its own judgment concerning the validity of governmental decision making, that purpose will be frustrated

in this case if the public is only given access to the decision to delete statements or conclusions and not to the matters the Vice Admiral decided to delete. Under those unique circumstances, the Navy's recitation of boilerplate warnings of the harm that could flow from disclosing deliberative material is particularly unpersuasive as a basis for withholding it in this case.

In sum, the onus is on the agency to explain, with particularity, why disclosure would "actually impede" future deliberations. *Reporters Committee*, 3 F.4th at 370. Because the agency has not done so, it must produce the portions of the report identified in the *Vaughn* index as "Findings of fact and opinions from the Investigating Officer which were not adopted by the Final Endorser" which were redacted on the grounds that they were subject to the deliberative process privilege.[9]

## II. Personally Identifiable Information was properly withheld

Plaintiff's second claim is that defendant improperly redacted personally identifiable information from the Report of Investigation and Final Endorsement under FOIA Exemptions 6 and 7(C). Defendant states that "[t]hroughout the released documents, personal and identifying information about DoD personnel have been redacted . . . . With the exception of flag-level officers and other designated positions, DoD personnel have a privacy interest in their personal information that is not outweighed by the asserted public interest in this case." *Vaughn* index. These redactions were appropriate.

---

9      Given the Court's conclusion that the material withheld pursuant to FOIA Exemption 5 must be released to plaintiff, the Court need not reach the question of whether plaintiff is also entitled to these records under the Privacy Act. *See Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1184 (D.C. Cir. 1987) ("The two acts explicitly state that access to records under each is available without regard to exemptions under the other. . . . if a Privacy Act exemption but not a FOIA exemption applies, the documents must be released under FOIA.") (citations omitted).

FOIA Exemption 6 permits the withholding of "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

The applicable portion of Exemption 7 protects "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

Under Exemption 7(C), the threshold question is whether records were compiled for "law enforcement purposes." "[T]he term 'law enforcement purpose' is not limited to criminal investigations but can also include civil investigations and proceedings in its scope." *Mittleman v. Office of Personnel Mgmt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996). As the Court of Appeals has explained, "[i]n assessing whether records are compiled for law enforcement purposes, this circuit has long emphasized that the focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding . . . . [T]he purpose of the investigatory files is the critical factor." *Jefferson v. DOJ, Off. of Pro. Resp.*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (citations and internal quotation marks omitted). *See also Rural Housing All. v. Dep't of Agric.,* 498 F.2d 73, 82 (D.C. Cir. 1974) ("[I]f if the investigation is for a possible violation of law, then the inquiry is for law enforcement purposes, as distinct from customary surveillance of the performance of duties by government employees.").

The Navy asserts that "unlawful discrimination under the Navy Equal Opportunity Program Manual is a punitive order for Naval service members" and that the consequences of unlawful discrimination can include "formal counseling, comments in fitness reports and evaluations, non-judicial punishment, courts-martial, and administrative separation." Def.'s Mot.

at 11, citing McCarl Decl. ¶ 5. The Navy points to a 10th Circuit opinion which held that military investigations into potential racial discrimination qualify under exemption 7(C), *see Ford v. West*, 149 F.3d 1190 (10th Cir. 1998) ("the file was one compiled for law enforcement purposes, as the investigation centered on determining if illegal racial harassment occurred."), as well as a decision from this district applying Exemption 7(C) to an investigation of sexual misconduct "that would constitute a civil rights violation." *See Sinsheimer v. U.S. Dep't of Homeland Sec.*, 437 F. Supp. 2d 50, 55 (D.D.C. 2006) ("The Court finds that the investigations were carried out to enforce federal civil rights laws, and thus had a law enforcement purpose. The fact that they were not criminal investigations does not defeat the application of Exemption 7.").[10]

This Court agrees. Investigations into racial discrimination – especially when conducted in response to specific complaints by a particular individual and identifying particular perpetrators – have a law enforcement purpose. This comports with the rationale behind the exemption; the agency was not performing general "surveillance or oversight of the performance of duties of its employees," but rather conducting a tailored "investigation[] which focus[ed] directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions." *Rural Housing All.,* 498 F.2d at 81.

Having found that records were compiled for law enforcement purposes, the Court must next "balance the privacy interests that would be compromised by disclosure against the public

---

10   Plaintiff submits in a footnote that, "given the concerted manner in which the Navy has tried to conceal any wrongdoing, the Navy cannot plausibly argue this investigation was conducted for any potential quasi-judicial hearing." Pl.'s Mot. at 13 n.4. He then asserts that "[t]he same argument applies for why the FOIA exemption (b)(7) is also inapplicable." *Id.* But the D.C. Circuit has explained that it is the "purpose of the investigation," not the outcome, that determines whether the exemption applies. *Rural Housing All.*, 498 F.2d at 82. Here, regardless of whether the Navy undertook the task poorly or came to the wrong conclusion, the purpose was to conduct an investigation into plaintiff's allegations.

interest in release of the requested information." *Davis v. DOJ,* 968 F.2d 1276, 1281 (D.C. Cir. 1992). Where a legitimate privacy interest exists, the requester must "(1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest." *Boyd v. Criminal Div. of the DOJ,* 475 F.3d 381, 387 (D.C. Cir. 2007), quoting *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 172, (2004) (internal quotation marks omitted). Moreover,

> where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Id.* at 174.

The privacy interest in this case is clear: individuals were named in the report in connection with allegations of racial bias and harassment. Given plaintiff's efforts to use his own case to draw public attention to the important issue of discrimination in the military,[11] the investigation has received coverage in the military press and elsewhere. *See, e.g.,* Navy to Change Pilot Call Sign Protocol After Minority Aviators Report Bias, https://www.military.com/daily-news/2019/05/21/navy-change-pilot-call-sign-protocol-after-minority-aviators-report-bias.html (May 21, 2019). The specter of third parties losing some degree of privacy is hardly theoretical;

---

11   *See, e.g.*, Advocacy, http://www.courtlandsavage.com/advocacy/ (last accessed August 9, 2021) ("This exclusive community was engaging in discriminatory practices in order to expel minorities from their training squadrons. After witnessing these disgraceful acts, Courtland decided to push for fair and equal treatment in Naval Aviation. This meant . . . taking legal action against the Navy.")

one of the goals of this lawsuit is to publish unredacted materials which plaintiff's lawyer has already seen. *See also* Pl.'s Mot. at 12 ("The allegations of racial discrimination in this case were true . . . Thus, this Court should not find a viable privacy interest in those investigated.").[12]

Plaintiff argues that the individual privacy interests are outweighed by the public interest in disseminating information regarding "racial discrimination and the abuse of authority by public officials." Pl.'s Mot. at 12. He asserts that "the public 'may have an interest in knowing that a government investigation itself is comprehensive, that the report of an investigation released publicly is accurate, that any disciplinary measures imposed are adequate, and that those who are accountable are dealt with an appropriate manner.'" *Id.*, quoting *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984).

But those significant interests can be fulfilled without revealing the names of every individual involved in this case. *See Boyd,* 475 F.3d at 387 (explaining that plaintiff must show that producing the information is likely to advance the asserted public interest in its disclosure). One can serve the interest in enabling the public to assess whether a government investigation is comprehensive and reported accurately, or whether there was adequate discipline and accountability, by revealing what the *agency* did; one need not know the name of an alleged perpetrator or witness to examine the evidence presented and the agency's analysis.

Therefore, while the Court finds that there is a legitimate public interest in exploring whether the Navy mishandled allegations of bias, it does not outweigh the privacy interests

---

12  Plaintiff cites *Forston v. Harvey*, 407 F. Supp. 2d 13, 17 (D.D.C. 2005) in arguing that there is little privacy interest involved in this case. But *Forston* did not involve the names or identities of witnesses; the government had already released the names of the individuals who gave statements, and the question before the court was whether it could withhold the contents of those statements. 407 F. Supp. 2d at 17.

supporting the limited redactions of personally identifying information in this case. Revealing the personally identifying information at issue is not necessary to advance the public interest.

Because the Court finds that exemption 7(C) applies, it need not reach the question of whether exemption 6 applies.[13]

### CONCLUSION

For all of the reasons stated above, defendant is **ORDERED** to produce the material redacted as deliberative under FOIA Exemption 5, but need not produce the personally identifying information withheld under Exemptions 6 and 7(C).

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 8, 2021

---

[13] Plaintiff also argues that defendant's *Vaughn* index is insufficiently detailed to justify an award of summary judgment. Pl.'s Mot. at 6. But, while it is relatively brief, the *Vaughn* index is not a standalone document; it is accompanied by a declaration, *see* McCarl Decl., and the Court has also reviewed the underlying documents themselves. And the *Vaughn* index "may take any form so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege." *American Civil Liberties Union v. CIA*, 710 F.3d 422, 433 (D.C. Cir. 2013), quoting *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994). The materials submitted were sufficient for plaintiff to understand the reasoning behind each withholding, especially since counsel has seen the requested documents and now merely seeks to be able to copy and distribute them. *See* Pl.'s Mot. at 4 ("Mr. Savage was permitted the opportunity to review, through counsel, a copy of the initial investigation."). This Court has sufficient information to make a decision and the Court will not decide the motions on this ground.